No. 24-2897

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

SHOSH YONAY, an individual, and YUVAL YONAY, an individual,

*Plaintiffs-Appellants*,

v.

PARAMOUNT PICTURES CORPORATION, a Delaware corporation,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Central District of California
No. 22-CV-03846-PA-GJS
Hon. Percy Anderson

_____

## APPELLANTS' OPENING BRIEF

_____

Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Alex Kozinski (S.B. #66473)
*alex@kozinski.com*
33 Marguerite Drive
Rancho Palos Verdes, CA 90275
Telephone: (310) 541-5885
Facsimile: (310) 265-4653

*Attorneys for Appellants*
Shosh and Yuval Yonay

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................iv

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED.............................................................................1

STATEMENT OF THE CASE ..................................................................3

STATUTORY BACKGROUND..................................................................6

SUMMARY OF THE ARGUMENT ..........................................................7

STANDARD OF REVIEW .......................................................................9

ARGUMENT ...........................................................................................10

I.     THE LOWER COURT ERRED IN ITS OVERBROAD FILTRATION OF YONAY'S PROTECTED EXPRESSION.............................................10

II.    THE DISTRICT COURT ERRED BY SUBJECTIVELY APPLYING THE "EXTRINSIC TEST" AND DISREGARDING THE WORKS' SUBSTANTIAL SIMILARITIES.................................................................13

    A.    The Court Was Required to Consider Literary Expert Evidence .......13

    B.    The Court Erred By Abstracting and Then Broadly Disregarding Elements as *Scènes À Faire* .........................................15

    C.    The Court Erred by Subjectively Evaluating and Disregarding Substantial Similarities between the Works........................................17

        1.    Selection and Arrangement......................................................19

            i.    The Court Misconstrued the Selection and Arrangement Inquiry..............................................19

            ii.    The Court Erred in Its Selection and Arrangement Analysis ...................................................23

        2.    Theme.........................................................................................34

ii

|  | 3. | Mood | 38 |
|  | 4. | Plot | 40 |
|  | 5. | Sequencing | 44 |
|  | 6. | Pacing | 45 |
|  | 7. | Setting | 46 |
|  | 8. | Characters and Dialogue | 48 |

III.   THE LOWER COURT ABUSED ITS DISCRETION BY EXCLUDING PLAINTIFFS' LITERARY EXPERT HENRY BEAN ........ 51

    A.   Bean Properly Analyzed Yonay's Protectable Expression ........ 51

    B.   The Court Erroneously Excluded Bean for Not Rendering Legal Conclusions ........ 54

    C.   Bean Objectively Compared the Works ........ 55

IV.   THE LOWER COURT ERRED BY ADMITTING PARAMOUNT'S "FACT EXPERT" ANDREW CRAIG ........ 57

    A.   The Sole Function of Craig's Report was to Support Paramount's Misleading Fact/Fiction Strawman ........ 57

    B.   Craig's Testimony is a Mere Conduit for Hearsay ........ 58

V.   THE LOWER COURT COMMITTED SERIOUS ERRORS IN DISMISSING THE YONAYS' BREACH OF CONTRACT CLAIM ........ 59

VI.   THE LOWER COURT DISREGARDED THE CONTEXT IN WHICH THIS CASE AROSE AND THE REMEDIAL PURPOSE OF THE ACT'S TERMINATION PROVISIONS ........ 64

CONCLUSION ........ 66

## TABLE OF AUTHORITIES

**Cases**                                             **Pages**

*Alfred v. Walt Disney Co.*,
   821 Fed. App'x 727 (9th Cir. 2020) .............................................. 16, 63

*Apple Comput., Inc. v. Microsoft Corp.*,
   35 F.3d 1435 (9th Cir. 1994) ............................................................ 56

*Baxter v. MCA, Inc.*,
   812 F.2d 421 (9th Cir. 1987) .............................................. 19, 20, 34

*Bell v. Wilmott Storage Servs., LLC*,
   12 F.4th 1065 (9th Cir. 2021) ............................................................ 9

*Bennett v. N.Y.C. Dep't of Corr.*,
   705 F. Supp. 979 (S.D.N.Y. 1989) .................................................. 61

*Caldwell v. Cty. of San Francisco*,
   No. CV 12-1892, 2021 WL 1391464 (N.D. Cal. Apr. 13, 2021) ........ 59

*CDN Inc. v. Kapes*,
   197 F.3d 1256 (9th Cir. 1999) .................................................... 10, 13

*Classic Media, Inc. v. Mewborn*,
   532 F.3d 978 (9th Cir. 2008) .................................................. 6, 64, 65

*Cooling Sys. & Flexibles v. Stuart Radiator, Inc.*,
   777 F.2d 485 (9th Cir. 1985) ............................................................ 11

*Corbello v. Valli*,
   974 F.3d 965 (9th Cir. 2020) ............................................................ 48

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ........................................................................ 57

*De Acosta v. Brown*,
   146 F.2d 408 (2d Cir. 1944) ...................................................... 12, 48

*EcoServices, LLC v. Certified Aviation Servs., LLC*,
   312 F. Supp. 3d 830 (C.D. Cal. 2018) ............................................ 59

iv

*Eggleston v. Twentieth Century Fox Film Corp.,*
  No. CV 21-11171, 2022 WL 3371601 (E.D. Mich. Aug. 16, 2022) ................48

*Esplanade Prods. v. Walt Disney Co.,*
  768 Fed. App'x 732 (9th Cir. 2019) ....................................................22

*Ets-Hokin v. Skyy Spirits Inc.,*
  323 F.3d 763 (9th Cir. 2003) .............................................................12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991) ..............................................................*passim*

*Fujifilm Corp. v. Motorola Mobility LLC,*
  No. CV 12-3587, 2015 WL 757575 (N.D. Cal. Feb. 20, 2015) ..........................59

*Gable v. Nat'l Broad. Co.,*
  727 F. Supp. 2d 815 (C.D. Cal. 2010) ..................................................54

*Gilbert-Daniels v. Lions Gate Ent. Corp.,*
  No. CV 23-2147, 2023 WL 8938403 (C.D. Cal. Dec. 7, 2023) .........................53

*Gregorini v. Apple, Inc.,*
  No. CV 22-0406, 2022 WL 4597419 (C.D. Cal. Aug. 26, 2022) ......................14

*Hanagami v. Epic Games, Inc.,*
  85 F.4th 931 (9th Cir. 2023) ....................................................*passim*

*Harper & Row, Publishers, Inc. v. Nation Enters.,*
  471 U.S. 539 (1985) ............................................................*passim*

*Hilt v. Foster Wheeler, LLC,*
  690 Fed. App'x 482 (9th Cir. 2017) ...................................................59

*Honeywell Int'l, Inc. v. W. Support Grp., Inc.,*
  947 F. Supp. 2d 1077 (D. Ariz. 2013) .................................................11

*In re Citric Acid Litig.,*
  191 F.3d 1090 (9th Cir. 1999) ........................................................58

*Jacobsen v. Deseret Book Co.,*
  287 F.3d 936 (10th Cir. 2002) ........................................................41

v

*Johannsongs-Publ'g Ltd. v. Lovland,*
  No. CV 18-10009, 2020 WL 2315805 (C.D. Cal. Apr. 3, 2020),
  *aff'd,* 2021 WL 5564626 (9th Cir. 2021) ............................................................53

*Kumho Tire Co. v. Carmichael,*
  526 U.S. 137 (1999) ........................................................................................51

*L.A. News Serv. v. Tullo,*
  973 F.2d 791 (9th Cir. 1992) ....................................................................10, 11

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.,*
  676 F.3d 841 (9th Cir. 2012) ....................................................................18, 29

*Litchfield v. Spielberg,*
  736 F.2d 1352 (9th Cir. 1984) ........................................................................18

*Marvel Characters, Inc. v. Kirby,*
  726 F.3d 119 (2d Cir. 2013) ............................................................................58

*Mattel, Inc. v. MGA Entm't, Inc.,*
  616 F.3d 904 (9th Cir. 2010) ....................................................................passim

*McCulloch v. Albert E. Price, Inc.,*
  823 F.2d 316 (9th Cir. 1987) ..........................................................................21

*Messick v. Horizon Indus. Inc.,*
  62 F.3d 1227 (9th Cir. 1995) ..........................................................................53

*Metcalf v. Bochco,*
  294 F.3d 1069 (9th Cir. 2002) ..................................................................passim

*Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.,*
  900 F. Supp. 1287 (C.D. Cal. 1995) ..............................................................17

*Mills Music, Inc. v. Snyder,*
  469 U.S. 153 (1985) ....................................................................................6, 65

*Moore v. Wells Fargo Bank, N.A.,*
  39 Cal. App. 5th 280 (2019) ............................................................................63

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.,*
  523 F.3d 1051 (9th Cir. 2008) ........................................................................54

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,*
  166 F.3d 65 (2d Cir. 1999) ..................................................................41

*Pac. Dawn LLC v. Pritzker,*
  831 F.3d 1166 (9th Cir. 2016) ............................................................62

*Paddack v. Dave Christensen, Inc.,*
  745 F.2d 1254 (9th Cir. 1984) .......................................................58, 59

*People v. Schulz,*
  66 Cal. App. 5th 887 (2021) ...............................................................61

*Ray Charles Found. v. Robinson,*
  795 F.3d 1109 (9th Cir. 2015) ............................................................64

*Rentmeester v. Nike, Inc.,*
  883 F.3d 1111 (9th Cir. 2018) ......................................................*passim*

*Russell v. Walmart Inc.,*
  No. CV 19-5495, 2020 WL 9073046 (C.D. Cal. Oct. 16, 2020) .........54

*Shaw v. Lindheim,*
  919 F.2d 1353 (9th Cir. 1990) ......................................................*passim*

*Sheldon v. Metro-Goldwyn Pictures Corp.,*
  81 F.2d 49 (2d Cir. 1936) ...................................................................22

*Twentieth-Century Fox Film Corp. v. Stonesifer,*
  140 F.2d 579 (9th Cir. 1944) ..............................................................15

*Twentieth Century-Fox Film Corp. v. MCA, Inc.,*
  715 F.2d 1327 (9th Cir. 1983) ............................................................18

*Unicolors, Inc. v. Urban Outfitters, Inc.,*
  853 F.3d 980 (9th Cir. 2017) ..............................................................18

*United States v. Wells,*
  879 F.3d 900 (9th Cir. 2018) ..............................................................51

*Univ. Sales Corp. v. Cal. Press Mfg. Co.,*
  20 Cal. 2d 751 (1942) ........................................................................61

*Van Asdale v. Int'l Game Tech.*,
   577 F.3d 989 (9th Cir. 2009) .................................................................. 53

*Wainwright Sec. v. Wall St. Transcript Corp.*,
   558 F.2d 91 (2d Cir. 1977) ..................................................................... 41

*Walt Disney Prods. v. Air Pirates*,
   581 F.2d 751 (9th Cir. 1978) .................................................................. 23

*Williams v. Gaye*,
   895 F.3d 1106 (9th Cir. 2018) .........................................................*passim*

*Zindel v. Fox Searchlight Pictures, Inc.*,
   815 Fed. App'x 158 (9th Cir. 2020) ............................................... 15, 18

**Statutes**

17 U.S.C.

   § 101 ........................................................................................................ 1

   § 203 ..................................................................................................*passim*

   § 304 ...................................................................................................... 62

28 U.S.C.

   § 1291 ...................................................................................................... 1

   § 1331 ...................................................................................................... 1

   § 1332 ...................................................................................................... 1

   § 1338 ...................................................................................................... 1

   § 1367 ...................................................................................................... 1

   § 2201 ...................................................................................................... 1

California Civil Code § 1654 ................................................................... 63

California Code of Civil Procedure § 1859 ............................................ 63

## Rules

Federal Rule of Civil Procedure

4 ..................................................................................................... 1

12 ..............................................................................................6, 15

50 ................................................................................................17

56 ................................................................................................. 1

Federal Rule of Evidence

403 ...............................................................................................57

702 ..........................................................................................51, 57

703 ...............................................................................................51

802 ...............................................................................................58

## Other Authorities

1, 3, 4 David Nimmer, *Nimmer on Copyright* (2024 rev. ed.)

§ 2.01 ...........................................................................................16

§ 2.11 ...........................................................................................48

§ 11.02 ..........................................................................................62

§ 13.03 ....................................................................................*passim*

H.R. Rep. No. 94-1476 (1976)...........................................................7, 65

2 William F. Patry, *Patry on Copyright* § 4:7 (2024 rev. ed.).................... 10, 48, 50

ix

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under the U.S. Copyright Act, 17 U.S.C. §§101 *et seq.*, 28 U.S.C. §2201, as well as 28 U.S.C. §§1331, 1332, 1338(a), and 1367. This timely appeal arises from a Fed. R. Civ. P. 56(c) order dated April 5, 2024 disposing of all of Plaintiffs' claims. 1-ER-3–16; Fed. R. Civ. P. 4(a)(1)(A). The Notice of Appeal was timely filed May 6, 2024. This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED

Ehud Yonay's ("Yonay") compelling 1983 story "Top Guns" ("Story"), purchased by Defendant Paramount Pictures Corporation ("Paramount"), was the documented literary genesis of its highly successful film *Top Gun* (1986) ("1986 Film") and thus its blockbuster sequel *Top Gun: Maverick* (2022) ("Sequel" or "*Maverick*").[1] On January 24, 2020, Yonay's widow and son, Shosh and Yuval Yonay ("Yonays" or "Plaintiffs") successfully recovered the U.S. copyright to the Story pursuant to the termination provisions of the Copyright Act ("Act"), 17 U.S.C. §203(a), consistent with its legislative purpose. 2-ER-218. Paramount ignored the statutory termination and released its derivative Sequel which naturally

---

[1] Corrected Mot. for Leave to Transmit Physical Exhibits, Ex. B (*Top Gun: Maverick* ("TGM")), Ex. C (*Top Gun* ("TG")).

1

exploits the Story, willfully infringing the Yonays' copyright. Notwithstanding numerous similarities between the Story and Sequel (collectively, "Works"), the lower court granted Paramount summary judgment, remarkably holding that no jury could find substantial similarity between the Works. 1-ER-14. The lower court's decision gives rise to the following issues:

(i)     Whether the court erred by adopting Paramount's invented fact/fiction dichotomy to sweepingly "filter out" nearly all the Story's protectable expression simply because it is a nonfiction work.

(ii)    Whether the court, in conducting the "extrinsic test," erred by disregarding all literary expert evidence and inserting its own subjective view of the Works' elements.

(iii)   Whether the court erred by excluding Plaintiffs' literary expert for not filtering out unprotected elements, even though he had done so and, in any event, proper analysis of an author's "selection and arrangement" requires no filtration.

(iv)    Whether the court erred by failing to exclude (and relying upon) Paramount's alleged expert whose report consisted entirely of hearsay and targeted the strawman issue of the Story's "factual accuracy."

(v)     Whether the court erred by interpreting, on Paramount's motion, its Agreement with Yonay in the light most favorable to Paramount (which had also drafted the contract) to deny Yonay credit on the Sequel.

2

In broadly dismissing Yonay's expressive Story simply because it is nonfiction; in disregarding all literary expert evidence; and in substituting its own subjective view of the Works, the lower court committed serious errors which must be reversed.

## STATEMENT OF THE CASE

Yonay's original Story was published in *California* magazine on April 21, 1983. 3-ER-372–85. *California* magazine was a bastion of "New Journalism," where writers use extensive imagery and subjective expression to present facts with the colorful voice of fiction. 2-ER-161. In this expressive literary style, Yonay created an engaging cinematic depiction of a naval aviation school by curating vivid portrayals from the perspective of the pilots, highlighting their childhood dreams, personalities, and experiences. 3-ER-374–85. The Story springs from the page and immediately evokes *Top Gun* and *Maverick* long before these derivative films existed. 3-ER-374–85; 2-ER-161.

According to Jerry Bruckheimer (producer of *Top Gun* and *Maverick*) and Don Simpson (producer of *Top Gun*), when they first read Yonay's cinematic Story, **Simpson** exclaimed: "'We got to get this. We got to buy this,'" … "'Get on the phone with *California* Magazine. We want this right away.'" … "What grabbed me was the colorful incidents, anecdotes and characters. These guys had names, like Hollywood." 2-ER-281–82.

3

**Bruckheimer**: "Yogi and Possum."

**Simpson**: "Yogi and Possum. I mean they were animals" … "One of the head [Paramount] admins said: 'Well tell us about the movie you're going to make.' I said 'Well, we're going to make a movie about the Top Gun school.' He says 'No, tell me the story'… And I told him about the spirit of the movie, which means gentlemen, we are going to make a movie about the process of becoming a Top Gun and we are going to dramatically expose you to what it's like to go through the process, and succeed at it, and the price you have to pay to be frankly the most important warrior we have." 2-ER-282–84.

Mere weeks after its publication, Paramount raced to lock up *exclusive* rights under copyright to Yonay's Story in an agreement dated May 18, 1983 ("Agreement"). 3-ER-391. The Agreement required Paramount to give Yonay credit on any film "substantially incorporating" the Story's literary elements. *Id.* ¶ 7(b). And, no surprise, Paramount's 1986 *Top Gun* credited Yonay because it did. 2-ER-200.

On January 23, 2018, the Yonays exercised their rights under 17 U.S.C. §203(a) to recapture the Story's U.S. copyright by terminating Paramount's 1983 grant, effective January 24, 2020. 2-ER-219–21. According to Paramount's copyright registration, the Sequel was not completed until 2022. 2-ER-197. But in response to Plaintiffs' cease-and-desist letter (2-ER-223–24), Paramount blankly

4

denied the Sequel's obvious derivation from Yonay's Story, made no effort to relicense it, and steamrolled ahead with the release of its Sequel on May 27, 2022. 2-ER-197.

The Sequel, referred to as a "legacy" sequel, closely follows and incorporates *Top Gun* and was hugely successful.[2] But unlike *Top Gun*, the Sequel conspicuously failed to credit Yonay, breaching Paramount's Agreement. 3-ER-396 ¶7(b). Considering that Paramount raced to secure film rights to Yonay's inspiring Story; that *Top Gun* credited Yonay; that its Sequel closely tracks it; and that unsurprisingly, the Story, *Top Gun*, and Sequel share unmistakable similarities, the Yonays were entitled to a jury trial, if not summary judgment, on their claims for copyright infringement and breach of contract.

The lower court, however, bought Paramount's revisionist narrative hook, line, and sinker, granting it summary judgment. Just because the Story is nonfiction, the court disregarded Yonay's original expression, reducing his exhilarating work to a phonebook of unprotectable facts. 1-ER-11–13. The court

---

[2] 2-ER-164–65. The Sequel contains stills and flashbacks from/to *Top Gun*, incorporates its central characters, setting, themes, and depicts similar aerial combat training including exact stunts from the Story. The Sequel even credits the writers and *both* producers of *Top Gun*. TGM 00:00:30, 00:03:39, 00:03:45, 00:03:49, 00:17:00–00:17:25, 00:31:15–00:32:30, 00:35:04–00:35:34, 00:36:30, 02:01:25; TG 00:32:57, 01:07:35, 01:13:58–01:14:40; 3-ER-378, 381–82; 2-ER-164–66, 181,186–87, 190.

eschewed both sides' literary experts despite having earlier denied Paramount's

Rule 12(b)(6) motion citing this Court's precedent calling for such expert

evidence. 1-ER-6–7; 3-ER-407. Without expert guidance, the court waved away

clear similarities in the Works to find no infringement. 1-ER-14. The court further

denied Yonay credit on the Sequel as mandated by Paramount's Agreement,

brushing off the essential role Yonay's Story played in spawning Paramount's

billion-dollar franchise. 1-ER-14–16.

## STATUTORY BACKGROUND

The Copyright Act provides authors or their families with the inalienable

right to recapture the copyright to the author's creative material after a lengthy

waiting period by statutorily terminating a prior transfer of such copyright. 17

U.S.C. § 203(a). "The principal purpose…was to provide added benefit to

authors." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985). Congress

recognized that publishers held far greater bargaining power and that consequently,

authors commonly agreed to one-sided grants precluding them from sharing in

their works' success. *See Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983-84

(9th Cir. 2008). The results were often supremely unfair, as when a work proved to

have enduring commercial value, but solely enriched the grantee. *Id*. Congress

created termination rights to "safeguard[] authors against unremunerative

transfers" and to give authors or their families a chance to obtain a more equitable

share of their works' value once it was proven. H.R. Rep. No. 94-1476, at 124

(1976); *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 495 n.3 (2001).

Consistent with this purpose, the Yonays exercised their termination right,

effective January 24, 2020. Their statutory termination did not prevent Paramount

from continuing to release pre-termination derivative works (e.g., *Top Gun*), 17

U.S.C. §203(b)(1). It solely affected new derivative works like the Sequel,

published after January 24, 2020, which just required a new license from the

Yonays. Accordingly, the termination would not deprive Paramount of its

franchise; it would simply allow the Yonays to finally participate in some financial

benefits of Yonay's creation—precisely as Congress intended. H.R. Rep. No. 94-

1476, at 124.

## SUMMARY OF THE ARGUMENT

This case seeks to safeguard the creative expression of authors and the

remedial purpose of the Act's termination provisions. A court's extrinsic

"substantial similarity" analysis must not throw the baby out with the bathwater.

Circumscribed filtration of truly unprotected material is key to maintaining the

critical balance between the public domain and copyright law's Constitutional

mandate to protect creative works for the benefit of authors and our culture. Courts

that broadly filter out an author's unique expression on pliable overbroad grounds

destroy this delicate balance, harming authors and the public alike.

7

The lower court committed six categories of errors requiring reversal:

(i)    The court erred when it adopted Paramount's legally unsupported fact/*fiction* dichotomy—as opposed to the proper fact/*expression* dichotomy—sweepingly filtering out Yonay's protected expression simply because his Story is nonfiction. Such rote, overbroad filtration of an author's protected expression is unsupported and requires reversal.

(ii)    In conducting the "extrinsic test" for copyright infringement, the court erred by expressly disregarding and replacing literary expert evidence with its own view of a complex comparison of works from different media. As a result, the court overlooked substantial similarities between the Works which, when viewed in the light most favorable to the Yonays (the non-moving parties), at minimum gave rise to genuine issues of material fact.

(iii)    The court erred by excluding Plaintiffs' literary expert who properly compared the Works' expression, distinguishing unprotectable facts and *scènes à faire.*

(iv)    The court further erred by excluding Plaintiffs' literary expert for purportedly not engaging in filtration when, in fact he did, and regardless, "selection and arrangement" analysis requires *none*.

8

(v)    The court erred by admitting and adopting the hearsay-laden reports of Paramount's expert on the Story's "factual accuracy"—an obvious nonissue—which merely served to bolster Paramount's misleading "fact/fiction" strawman.

(vi)    Finally, pursuant to its Agreement, Paramount was to credit Yonay on any film (e.g., *Maverick*) based on an adaptation of the Story (e.g., *Top Gun*). The court triply erred by misconstruing the Agreement in the light most favorable to Paramount—both its drafter and the moving party—to deny Yonay credit.

The lower court's numerous errors resulted in the wrongful dismissal of Plaintiffs' claims. This case presents an ideal opportunity to (i) safeguard the vital purpose of the Act's termination rights; (ii) reaffirm the importance of an author's creative expression; and (iii) mandate the need for caution and literary expertise in applying the extrinsic test.

## STANDARD OF REVIEW

This Court "review[s] the district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1068 (9th Cir. 2021) (citation omitted).

9

## <u>ARGUMENT</u>

I.    **THE LOWER COURT ERRED IN ITS OVERBROAD FILTRATION OF YONAY'S PROTECTED EXPRESSION.**

The lower court's extrinsic analysis was flawed from the start. It erroneously adopted Paramount's legally unsupported fact/fiction dichotomy (1-ER-11) when the *correct* analysis must parse the fact/*expression* dichotomy[3]—i.e., whether the Story expressed facts in an original way, not whether Yonay wrote fiction or nonfiction. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350-51 (1991) ("principle, known as the…fact/expression dichotomy, applies to all works"); *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547, 556-57 (1985) ("creation of a nonfiction work, even a compilation of pure fact, entails originality") (collecting cases); 2 William Patry, *Patry on Copyright* ("*Patry*") §4:7 (2024) (courts must not employ a binary fact/fiction framework and respect "expressive material in nonfiction works").

Courts have long protected expression in even *highly technical* factual works. *See, e.g., CDN Inc. v. Kapes*, 197 F.3d 1256, 1259-61 (9th Cir. 1999) (protecting compilation of coin prices); *Los Angeles News Serv. v. Tullo*, 973 F.2d

_____

[3] Plaintiffs assembled a chart comparing underlying *facts* to their substantially similar *expression* in both Works to clarify for the district court how Yonay's expressive Story colorfully portrayed bare facts. 2-ER-226–52.

791 (9th Cir. 1992) (raw news videotape is copyrightable); *Honeywell Int'l, Inc. v. W. Support Grp., Inc.*, 947 F. Supp. 2d 1077, 1081-82 (D. Ariz. 2013) (aircraft manuals protected).

By deploying Paramount's unsupported fact/fiction construct, the district court excluded any expression in Yonay's Story containing a kernel of fact—tossing the wine out with the cork. 1-ER-10–13 (Order: broadly filtering "factual elements" as opposed to "facts"). For example, the court ignored obvious similarities between Yonay's creative choice to center his Story on Yogi and Possum and the Sequel's similar focus on Maverick and Goose/Rooster solely because the former were "real people." 1-ER-13. The court overlooked Yonay's expressive characterizations of the pilots, including their "shit-hot" machismo (3-ER-384), Yogi/Possum's intimate "security blanket" bond (3-ER-381), and their place in "Camelot" at "King Arthur's Round Table [with] the gathering of the greatest of the greats in fighter aviation" (3-ER-378). Yonay's colorful portraitures are hardly "facts," yet they were all erroneously culled by the lower court's overbroad filter just because the Story's pilots were "real." 1-ER-13. *See Feist*, 499 U.S. at 348 (an author may "claim a copyright in []his written expression" if he "clothes facts with an original collocation of words"); *Cooling Sys. & Flexibles v. Stuart Radiator, Inc.*, 777 F.2d 485, 492 (9th Cir. 1985) ("to whatever extent the expression and arrangement of facts is original, an author is protected against its

11

copying"); *De Acosta v. Brown*, 146 F.2d 408, 410 (2d Cir. 1944) ("original treatment of…historic character…entitled to protection").

One need only contrast Yonay's expressive story with the naval air station's boring Wikipedia page[4], or the dull senate report proffered by Paramount (3-ER-447–516) to appreciate that "there are gazillions of ways" to approach the subject and a wide range of creative choices available, thus entitling the Story to broad copyright protection. *Mattel, Inc. v. MGA Entm't, Inc*., 616 F.3d 904, 913-14 (9th Cir. 2010); *compare Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003) (photo of vodka bottle got "thin" protection as it posed few creative choices) *with Rentmeester v. Nike, Inc*., 883 F.3d 1111, 1120 (9th Cir. 2018) (photo of Michael Jordan dunking a basketball received "broad" protection as there were a "much wider range of creative choices available in producing it").

The Story, while nonfiction, is predominantly the protectable original expression of Yonay and was valuable to Paramount for that exact reason. Just compare Yonay's electrifying Story to the report of Paramount's "fact expert" Andrew Craig ("Craig Rep."):

- **Craig Rep.**: "Sometimes, on cloudless days, the color of the sky and the color of the sea are exactly the same." 3-ER-316.

---

[4] https://en.wikipedia.org/wiki/Marine_Corps_Air_Station_Miramar.

12

- **Story**: "From where they sit, however, it's not their silver rocket that's rocking but the entire vast blue dome of sea and sky. There are no ups or downs up here, no rights or lefts, just a barely perceptible line separating one blue from another, and that line is spinning and racing like mad in the distance." 3-ER-376.

- **Craig Rep.**: "TOPGUN pilots could drink and socialize with women in a lively atmosphere." 3-ER-301.

- **Story**: "It is Wednesday night happy hour, and the small, noisy room is packed with pumped-up fighter jocks…With raw sex waving right in front of their eyes, these supremely healthy young males are standing around in twos or threes talking about the hop [flight]." 3-ER-379.

It goes without saying Paramount would not have rushed to lock up exclusive film rights to the Story if it were just a dry factual compilation. *See CDN Inc.,* 197 F.3d at 1261 (protecting factual guides: "If [plaintiff] merely listed historical facts…the guides would be…of little use to anyone."). Indeed, Paramount long treated Yonay's expressive work as a copyrightable "story" (3-ER-391), but upon losing its rights, flipped, and renounced the legal position from which it *exclusively* benefitted for decades. The lower court's embrace of Paramount's revisionism and legally unsupported "fact/fiction" filter tainted its entire analysis and must be reversed.

## II. THE DISTRICT COURT ERRED BY SUBJECTIVELY APPLYING THE "EXTRINSIC TEST" AND DISREGARDING THE WORKS' SUBSTANTIAL SIMILARITIES.

### A. The Court Was Required to Consider Literary Expert Evidence.

The lower court erred by refusing literary expert guidance from both sides in

13

conducting its extrinsic analysis of the Works. 1-ER-6–7. The Ninth Circuit has long recognized that the "extrinsic test [for substantial similarity] requires analytical dissection of a work and expert testimony." *Swirsky v. Carey*, 376 F.3d 841, 845-846 (9th Cir. 2004) (citing *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000)); *see Gregorini v. Apple, Inc.*, 2022 WL 4597419, at *5 (C.D. Cal. Aug. 26, 2022) (courts deny summary judgment when faced with "competing expert testimony on the question of extrinsic similarity") (collecting cases).

This Court's consistent precedent recognizes that judges and lawyers are often unqualified and/or ill-equipped to conduct the multifaceted literary analysis copyright infringement cases frequently require. *See Hanagami v. Epic Games, Inc.*, 85 F.4th 931, 945 (9th Cir. 2023) ("In many cases, application of the extrinsic test requires analytical dissection of a work and expert testimony because most judges are not sufficiently trained in the specifics of the art form at issue to make reliable conclusions about similarity.") (cleaned up) (quoting *Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018)).

This is particularly true here where the Works are in different media. *See* 4 David Nimmer, *Nimmer on Copyright* ("*Nimmer*") §13.03[E][2]. Naturally, derivative two-hour feature films like *Top Gun* and its Sequel will be far more expansive than the underlying magazine Story, but differences in scope and

14

content do not support dismissal. *Id.*; *see Twentieth-Century Fox Film Corp. v. Stonesifer*, 140 F.2d 579, 583 (9th Cir. 1944) (affirming infringement: Although "film and [play] differ in numerous respects[, s]uch dissimilarities result [] principally from the film's enlarged means.").

Here, the court previously denied Paramount's Rule 12(b)(6) motion because "development of the factual record would shed light on" the extrinsic analysis. 3-ER-407 (citing *Zindel v. Fox Searchlight Pictures, Inc.*, 815 F.App'x 158, 159-60 (9th Cir. 2020) (reversing *this district court* for unilaterally conducting its own similarity analysis because "expert testimony[] would aid in the objective literary analysis needed to determine the extent and qualitative importance of the similarities")). Yet, on summary judgment, the court disregarded *both sides'* literary experts resulting in its erroneous analysis and judgment. 1-ER-6–7.

## B. The Court Erred by Abstracting and Then Broadly Disregarding Elements as *Scènes À Faire.*

The court erred by glossing over intricate similarities in the Works with overbroad abstractions, which it then ruled were too "general" to be protectable. *See, e.g.*, 1-ER-12 ("And while both Works involve fighter pilots training…those general plot ideas are also not protected."). But the Story is far richer than "general ideas." When one actually engages in the *details* of the Works—which is where expression lives and is what the law requires—the substantial similarities in protectable expression become clear. *See Metcalf v. Bochco*, 294 F.3d 1069, 1074

15

(9th Cir. 2002) ("protectable expression includes the specific details of an author's rendering of ideas").

The court repeatedly ruled that the Story's elements were unprotected *scènes à faire*. 1-ER-10, 12–13. However, similarities cannot be disregarded as such unless they meet the narrow exclusion for stock literary elements which "are indispensable" (*Williams*, 895 F.3d at 1119 n.6), a ruling which requires expert evidence. "Even [as to] an old or stock situation, copyright protection may still be available for original material interpolated therein." *Nimmer* §2.01[A][2]. Thus, "[i]t is inappropriate to grant summary judgment on the basis of *scenes a faire* without independent evidence[.]" *Swirsky*, 376 F.3d at 850.

Without expert assistance, the court evidently evaluated the Works based on its subjective understanding of today's stock tropes. 1-ER-10–13. Proper analysis, however, required the court to gauge, with expert guidance, the stock elements of naval literature in 1983 when Yonay wrote his Story. *See Alfred v. Walt Disney Co.*, 821 F.App'x 727, 729 (9th Cir. 2020) ("[E]xpert testimony would aid in determining whether the similarities Plaintiffs identify are qualitatively significant. This would be particularly useful in this circumstance, where the works in question are almost twenty years old and the blockbuster *Pirates of the Caribbean* film franchise may itself have shaped what are now considered pirate-movie tropes.") (citations omitted).

16

In 1983, before *Top Gun* popularized the Story's elements, its high-tech, high-testosterone aerial action scenes were by no means common. 2-ER-194. The riveting aerial action visualized in Yonay's Story gave rise to *Top Gun* whose widespread success commercialized the Story's elements, shaping the action genre of today—analysis necessitating expert input. *Id.*; *see Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287, 1294 (C.D. Cal. 1995) (heeding expert testimony that "James Bond films are the source of a genre rather than imitators [of it]"). Here, the court ignored experts and dismissed protected expression as *scènes à faire* without analysis. 1-ER-10–13.

## C. The Court Erred by Subjectively Evaluating and Disregarding Substantial Similarities between the Works.

In applying the extrinsic test, a court must objectively analyze the works' similarities in characters, plot, mood, pace, sequencing, setting, dialogue, themes and other elements, including the "selection and arrangement of [even] unprotected elements." *Metcalf*, 294 F.3d at 1073-74 (citation omitted). Importantly, a district court may enter summary judgment against a copyright plaintiff *only* if, when viewing the works in the light most favorable to the plaintiff, "no reasonable juror" could find substantial similarities between the works.[5] *Swirsky*, 376 F.3d at 844;

_____

[5] This is the same stringent standard restricting courts' authority to render judgment notwithstanding a verdict under Fed. R. Civ. P. 50.

*see Williams*, 895 F.3d at 1127 ("[i]t is not the courts' place to substitute our [subjective] evaluations for those of the jurors").

In literature and film, story elements are often interwoven. *See, e.g*., 2-ER-189 ("Mood is a matter of pacing,…storytelling and, sometimes even character."). A comparison of works, especially across different media as here (short story to feature-length film), entails nuanced close questions of fact. *Nimmer* §13.03[E][2] (across different media, "a person untrained in the special requirements and techniques of…the short story [and] motion picture…may fail to note similarities that, if [expertly] analyzed and dissected, would be only too apparent").

For these reasons, "'[s]ummary judgment is 'not highly favored' on questions of substantial similarity'" and courts must be "cautious" before dismissing such cases. *Zindel*, 815 F.App'x at 159 (quoting *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 848 (9th Cir. 2012)); *see Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 985 (9th Cir. 2017) (As "'substantial similarity is usually an extremely close issue of fact…summary judgment has been disfavored.'") (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1355 (9th Cir. 1984)); *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1329-30 (9th Cir. 1983) (same, reversing summary judgment).

It was not the district court's role to decide whether "the works are, in fact, substantially similar," but only to decide whether "reasonable minds could differ as

18

to the issue." *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987) (reversing summary judgment for defendant). But instead of viewing the Works in the light most favorable to the Yonays on Paramount's motion, the court did the opposite, adopting Paramount's mischaracterizations almost verbatim.

### 1. *Selection and Arrangement*

It is well established that an author's choices, selection and arrangement of elements, even unprotectable elements, is protected. *Rentmeester*, 883 F.3d at 1119; *see Hanagami*, 85 F.4th at 946 (reversing for failure to properly assess "selection and arrangement"); *Swirsky*, 376 F.3d at 848-49 (same). A court must therefore assess whether an author's original choices and combination of protected and unprotected elements, without filtration, supports substantial similarity. *See Nimmer* §13.03 n.25.

### i. The Court Misconstrued the Selection and Arrangement Inquiry.

The court erred by misconstruing the selection and arrangement analysis. *First*, it required the Works to completely share the "same" (as opposed to a "substantially similar") selection and arrangement. 1-ER-14 (holding the Works "do not share the <u>same</u> combination of unprotected elements") (emphasis original). But slavish copying is not the standard. Under the court's rigid analysis, *Maverick* would not even infringe *Top Gun*. As this Court recently held, substantial similarity in selection and arrangement is evaluated both "qualitatively and

19

quantitatively": "the proper inquiry does not turn on the mere length of the copied material…If the copied portion is deemed significant, then the defendant cannot avoid liability simply because it is short." *Hanagami*, 85 F.4th at 946 (citing *Nimmer* §13.03); *see, e.g.*, *Baxter*, 812 F.2d at 425 (rejecting argument that a mere six-note musical sequence is unprotectable).

The court cited *Skidmore* and *Feist* to support its "sameness" holding, but each were decided on distinguishable facts. 1-ER-14 (citing *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1075 (9th Cir. 2020), quoting *Feist*, 499 U.S. at 361). *Feist* concerned the copyrightability of *a phonebook* containing alphabetized names and numbers. 499 U.S. at 342, 349. The Supreme Court held copyright in such a sterile "factual compilation is thin" and eschewed "substantial similarity" for a heightened "sameness" standard. *Id*. at 349. Similarly, in *Skidmore*, this Court noted in *dicta* that there "are relatively few ways to express a combination of five basic elements in just four measures" and therefore copyright "protects against only virtually identical copying" of such a short musical refrain. 952 F.3d at 1080.

By contrast, when Yonay drove out to that military base, he could have told his Story in *innumerable* ways. *Shaw v. Lindheim*, 919 F.2d 1353, 1360 (9th Cir. 1990) ("there is an infinite variety of novel or creative expression available to the author of a book, script, play, or motion picture based on a preexisting idea"). But Yonay selectively chose to tell it through the lens of two jocular flyers, Yogi and

20

Possum who, with others, train and play with intensity, intimacy, and frat-house antics, just like Maverick and Goose in *Top Gun*, and Maverick and the squadron in its Sequel.[6] In fact, the unique allure of Yonay's Story, adopted by both derivative *Top Gun* films, is that it moves well beyond the trappings of a regimented naval base to what drives and makes these pilots our elite warriors. The Story is obviously far more expressive than a phonebook or an isolated "four-bar" musical refrain.

As summarized in *Mattel*, 616 F.3d at 913-14:

> If there's a wide range of expression (for example, there are gazillions of ways to make an aliens-attack movie), then copyright protection is "broad" and a work will infringe if it's "substantially similar" to the copyrighted work. If there's only a narrow range of expression (for example, there are only so many ways to paint a red bouncy ball on blank canvas), then copyright protection is "thin" and a work must be "virtually identical" to infringe (citations omitted).

The court further erred by purporting to compare the Works' selection and arrangement of *only* "unprotected elements." 1-ER-14 ("[Works] do not share the <u>same</u> combination of unprotected elements."). But selection and arrangement analysis must consider *all* elements, protected and unprotected. *McCulloch v. Albert E. Price, Inc.,* 823 F.2d 316, 320 (9th Cir. 1987) ("[A] proper analysis of [selection and arrangement] requires that all of the elements of the work, including

---

[6] 3-ER-379; TGM 00:24:50–00:30:30; TG; 2-ER-191–92.

21

the uncopyrightable text, be considered as a whole in determining copyright infringement."). Neither *Skidmore* nor *Feist*, cited by the court (1-ER-14), had before them an expressive literary work, and therefore no cause to consider both protected and unprotected elements. *See Skidmore* 952 F.3d at 1079 (four musical bars); *Feist,* 499 U.S. at 342 (phonebook).

Further still, the court erred by focusing on two purported *differences* between the Works. 1-ER-14 ("[The Story] includes facts about the technical aspects of F-14 jet aircraft and the history of Top Gun, which do not appear in the Sequel."). Even as to this deviation, the court was wrong: e.g., the Story emphasizes the F-14's "wings can sweep back" or "open to the sides like an eagle's" and in the Sequel, though all the pilots fly F-18 jets, the movement of the wings of an old *F-14* is used as a plot device allowing Maverick to make an impossibly short takeoff. 3-ER-380; TGM 01:47:45–01:48:45; 2-ER-174–75.

Regardless, a court must focus on the Works' *shared* elements, not differences. *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936) ("no plagiarist can excuse the wrong by showing how much of his work he did not pirate"); *Harper & Row*, 471 U.S. at 565 (quoting *Sheldon*, 81 F.2d at 56); *Esplanade Prods. v. Walt Disney Co.*, 768 F.App'x 732, 733 (9th Cir. 2019) (same). "It is entirely immaterial that, in many respects…works are dissimilar…If substantial similarity is found, the defendant will not be immunized from liability

22

by reason of the addition in his work of different characters or additional and varied incidents[.]" *Nimmer* §13.03[B][1][a] (citing *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 756 (9th Cir. 1978) (finding infringement though stories differed *entirely*)); *see Shaw*, 919 F.2d at 1364 (reversing summary judgment "[d]espite these dissimilarities").

### ii.    The Court Erred in Its Selection and Arrangement Analysis.

The court failed to evaluate the original *choices* Yonay made in his Story, which Paramount carried through to *Top Gun* and its Sequel. 1-ER-13–14. Just like "there are gazillions of ways to make an aliens-attack movie" (*Mattel*, 616 F.3d at 913), there are gazillions of ways to tell a story about a naval base. Yet, despite all those available options, the selection and arrangement of Yonay's Story, *Top Gun*, and *Maverick* are exceptionally similar—unsurprising, since Paramount expressly purchased the Story to make such films. 3-ER-391. Similarities in *Top Gun* (in addition to those in *Maverick*) are sometimes noted herein because *Maverick heavily* relies upon *Top Gun,* both in flashbacks and stills, and incorporates, expressly and inherently, its story, characters, and other elements, which were derived from the Story.

Yonay's choices and combination and arrangement of them, shape the center of *Top Gun* and its legacy Sequel. 2-ER-191–93. Rather than offer an encyclopedic narration of the naval base's operations, Yonay focused on the personal

backgrounds and idiosyncrasies of ambitious fighter pilots to engage his audience and humanize his Story. 3-ER-375–85. *Top Gun* and *Maverick* do the same.[7] Most of the pilots in the Story, *Top Gun*, and *Maverick* are portrayed as "men's men."[8] All works depict its lead and other characters as adrenaline-junkies, undeterred, if not invigorated by danger.[9] In both Story and Sequel, the sheer love of flying is portrayed as all-consuming and as coming at the expense of personal relationships.[10] In the Story, "Possum will spend more of [his] married years with Yogi than with his [own wife]" and in the Sequel, Maverick has an on-again-off-again relationship and has never been married. 3-ER-382; TGM. Both Works use flashbacks and cutaways as shortcuts to fill in characters' pasts and tell their stories.[11]

The Story highlights that only the best of the best get invited back to Top

---

[7] TGM 00:17:00–00:17:25, 00:24:50–00:30:30; 00:31:15–00:32:30, 02:01:25; TG; 2-ER-167, 191–93.

[8] 3-ER-379; TGM 01:07:15, 01:14:40; 2-ER-185–86.

[9] 3-ER-379; TGM 01:10:45–01:11:45; 2-ER-169, 173, 178.

[10] 3-ER-379; TGM 01:07:15, 01:14:40; 2-ER-185–86.

[11] 3-ER-376–85; TGM 00:03:45, 00:17:00–00:17:25, 00:31:15–00:32:30, 02:01:25; 2-ER-164–65, 187–88.

Gun as instructors and in the Sequel, Maverick is invited back as an instructor.[12] In both Works, pilots live in a communal world (belonging to a "squadron," a "Wolfpack [that] will be their home and family, security blanket and confessional circle") (3-ER-381–82; 2-ER-169), but Maverick (just like Yogi in the Story) is essentially a loner. 3-ER-379, 382 ("[Yogi] was almost too serious for the Wolfpack").[13] The Story portrays fighter jets as the only place for people like Yogi and similarly, in the Sequel, as the only place Maverick is at home.[14] The Story features a character lauded for his combat experience who downs "three MiGs" in one day, taking him over the "five-kill line" making him an "ace." 3-ER-383. In *Top Gun*, Maverick is lauded for downing "three MiGs" in one day, re-emphasized in the Sequel (Maverick: "I shot down three MiGs in one of those [F-14s]" (TGM 1:45:00)), where he shoots down two more "mak[ing] him an ace."[15] Both Works include a similarly cheeky exchange with enemy fighters (Story: In midair, Yogi waves to an enemy fighter who does not wave back; Sequel: In midair, Maverick

---

[12] 3-ER-377; TGM 00:19:45; 2-ER-167.

[13] TGM 00:11:35–00:13:20; 2-ER-172, 177, 182.

[14] 3-ER-376; TGM 00:21:10–00:22:10, 01:17:15–01:18:45; 2-ER-185.

[15] TG 01:35:30–01:39:40; TGM 01:50:57–01:53:36, 01:58:15; 2-ER-168.

waves to an enemy pilot who does not wave back).[16] Both portray the tension between naval brass and fighter jocks, including a "by the book" Admiral who seeks to restore discipline and order, threatening irreverent hotshots like Maverick.[17]

Both Works contrast the ethereal beauty of the "vast blue dome of sea and sky" against jarring, unpredictable competitive action.[18] The Story describes landing on an aircraft carrier as a "controlled crash…if you're lucky," and in a major Sequel scene, Maverick makes a death-defying crash-landing on an aircraft carrier.[19] The Story emphasizes the fighter pilot's zealous denial mechanism in the face of death, and the Sequel portrays the same defense mechanism after a pilot's near-fatal accident.[20] Both Works feature "dogfights" between the pilots, portrayed as fierce but collegial.[21] The Story emphasizes grueling training: "There was more

---

[16] 3-ER-382; TGM 01:49:38–1:50:45; 2-ER-187.

[17] 3-ER-384; TGM 00:13:50–00:16:20, 00:17:20–00:20:39, 00:20:45–00:21:20; 2-ER-166–67, 176.

[18] 3-ER-376; TGM 00:34:30–00:41:30; 2-ER-187.

[19] 3-ER-381; TGM 01:57:00–01:59:00; 2-ER-175.

[20] 3-ER-380–81; TGM 01:10:45–1:15:40, 01:17:45–01:21:15; 2-ER-186.

[21] 3-ER-382; TGM 00:34:30–00:41:30; 2-ER-182, 188.

26

flying than they had ever had…one-versus-one hops (student crew vs. one instructor)…then the tough two-versus-unknown hop, in which two crews take off not knowing…where the bogey [instructor "enemy"] will come from…when the bogey rolls in and sends them home with a simulated shot." 3-ER-384. In exactly that way, Maverick trains his squadron in the Sequel, taking on single crews one-on-one, then two crews when Maverick rolls in behind them from nowhere, sending them home with a simulated shot.[22] In the Story, Yogi and Possum train by "shooting up mountains and down canyons and flying so low it was hard to keep from staring at the ground," and in the Sequel, the squadron trains by flying fast and extremely low to the ground down a canyon and quickly shooting up a mountain.[23] In both Works, tension is built as pilots botch exercises while training against a three-week ticking clock.[24] In the Story, when hotshot crews like Yogi and Possum are "shot down" by instructors, they're deflated and downcast and, in the Sequel, ace fighter crews are crestfallen when "shot down" by Maverick.[25] In

------

[22] TGM 00:34:30–00:41:30, 01:10:36; 2-ER-170.

[23] 3-ER-385; TGM 00:48:25, 01:09:20; 2-ER-171.

[24] 3-ER-377; TGM 00:42:40; 2-ER-172.

[25] 3-ER-377; TGM 00:37:56, 00:38:00, 00:38:55; 2-ER-170, 189.

the sky, the mood is freedom from everything but the laws of physics and the constant threat of death.[26] On the ground, the mood is often portrayed as restless, waiting to go back up.[27] All works feature the high-tech weaponry of the day, but emphasize that success in aerial combat comes down to the pilot.[28] 3-ER-378 (Story: "[I]n this age of remote-control, pushbutton warfare, the survival and effectiveness of the entire U.S. Pacific Fleet rests on a few dozen young men[.]"); TGM 00:52:35 (Rooster: "It's not the plane, it's the pilot"); 1:50:28 (same); 1:10:20 (Maverick: "[Success] will come down to the pilot in the box.").

Both Works counterpose intense aerial sequences with the human side of fighter pilots in scenes on the ground, in the briefing-room, convivial R&R featuring unexpected interludes on "glorious" sailing yachts, and carousing at the bar, which has a big brass bell and where those who break "house rules" must buy a round for everyone.[29] All works further punctuate the narrative tension by

---

[26] 3-ER-375, 377–78; TGM 00:32:40, 00:34:30–00:41:30, 00:42:45, 01:08:30; 2-ER-175–77.

[27] 3-ER-379; TGM 27:40–28:30, 33:30–35:00, 01:07:15, 01:08:00–01:10:32; 2-ER-185–86.

[28] 3-ER-377–78; TGM 00:13:52–00:16:21, 01:30:30–1:56:00; 2-ER-176.

[29] 3-ER-377–79, 382, 384; TGM 00:21:30, 00:24:24, 00:29:00, 00:24:50–00:30:30, 00:33:00, 00:33:40, 00:34:30–00:41:30, 00:46:00–00:47:25; 2-ER-162, 167, 182.

28

emphasizing characters' playful nicknames (e.g., Story: "Yogi," "Possum," "Heater"; Sequel: "Maverick," "Rooster," "Hangman") for comic relief and intimacy.[30]

"[W]hat a selection and arrangement copyright protects is the particular way in which the artistic elements form a coherent pattern, synthesis, or design." *See Skidmore*, 952 F.3d at 1074 (citing *L.A. Printex*, 676 F.3d at 850-51); *see Metcalf*, 294 F.3d at 1074 ("common patterns" of even generic literary elements constitute protectable selection and arrangement). Here, Yonay patterned contradictory character elements to engage his audience and enhance his Story: e.g., pilots are fierce, but playful; regimented, but irreverent; macho, but sensitive. And while the naval base has state-of-the-art technology, Yonay's portrayal reveals that success in combat comes down to a pilot's strength of character and instincts. 3-ER-377–78, 381–82; 2-ER-192–93 ("*That* is selection [and arrangement], not just of subject, but of how to approach and present the subject"). The Sequel makes similar choices and arranges them the same way and for the same storytelling

---

[30] 3-ER-377, 379–80, 384; TGM 00:25:07–26:00, 00:38:13–00:38:35; 2-ER-162, 183.

29

purpose: to energize, engage, and amuse the audience.[31]

As another example, Yonay's selection and arrangement of disparate imagery and structural elements suggests the visual and emotional core of *both* films. 2-ER-192–93. In all works, passages of idyllic flying over the beach in Southern California are juxtaposed suddenly and violently with gut-wrenching climbs, dives, and dogfights; beauty and terror spring from each other.[32] Yonay's curated alternation between the aerial ballet, at once lyrical and violent, juxtaposed against quiet, reflective scenes on the ground is an arrangement and rhythm exploited in both *Top Gun* and its Sequel.[33]

The Sequel even mimics Yonay's cinematic descriptions of fighter jets. Both Works emphasize the sight of afterburners kicking in with pairs of white-hot flames shooting out.[34] The Story describes Yogi discovering a heat-seeking missile heading toward him, so he "brake[s] hard—pull[s] away fast…to foul up the

---

[31] TGM 00:13:52–00:16:21, 00:20:00, 00:24:00–00:28:00, 00:33:20, 00:36:30; 00:38:40, 00:50:48, 00:51:00, 01:10:24; 01:30:30–01:56:00; 2-ER-192–93.

[32] 3-ER-376; TGM 00:34:30–00:41:30; 2-ER-187.

[33] 3-ER-376–77, 379; TGM 00:50:05–00:53:35, 00:24:50–00:30:30; 2-ER-162, 167, 182, 188.

[34] 3-ER-380; TGM 00:37:02, 00:37:28, 00:39:02, 00:51:02, 01:11:15, 1:11:54, 1:30:30, 01:47:30; 2-ER-172–74, 190.

missile's tracking system…and head[s] up in a 7.5G climb." 3-ER-385; 2-ER-174. The Sequel shows Maverick discovering a heat-seeking missile on his tail and conducting an identical maneuver. TGM 01:51:15; 2-ER-174. The Story emphasizes that at high angles of flight, not enough air flows into engines causing them to die, and in the Sequel, a plane's engine dies in the middle of this vertical stunt. 3-ER-380; TGM 01:13:00–01:14:00; 2-ER-172. The Story prominently features a back-to-back stunt where a pilot flies upside down close and parallel to another jet, and *in both films*, Maverick performs this same daring maneuver.[35]

Both Works depict the school's culture as one of storied valor but also as irreverent with good-natured belligerence, incorporating specific imagery including walls "covered from floor to ceiling with heavily carved wooden plaques—more like coats of arms" and playful signage like "Welcome to Fightertown, U.S.A."[36] Notwithstanding their contemporary settings, all works evoke a post-WWII nostalgia, harkening back to a simpler time of old-fashioned patriotism and the quaint treatment of male/female relations.[37] This nostalgia is an

---

[35] 3-ER-381; TG 00:08:56; TGM 00:40:05; 2-ER-174.

[36] 3-ER-377, 380; TG 00:15:46; TGM 00:16:30–00:17:25; 2-ER-180-81.

[37] 3-ER-378; TGM 00:16:25–00:17:20, 00:30:10, 00:46:00–00:47:25, 1:00:07–01:01:20, 02:00:10; TG 00:18:00, 00:19:05, 00:22:00–00:23:00; 2-ER-181, 190–91.

31

essential part of both films and the franchise's success, as its capacity to delight audiences comes from the suspension of modernity for a time of less polarization. 2-ER-190–91.

"To qualify for copyright protection, a work must be original to the author. …[T]he requisite level of creativity is extremely low…The vast majority of works make the grade quite easily." *Feist*, 499 U.S. at 345 (citing *Harper & Row*, 471 U.S. at 547-49). Yonay's choice to include and pattern specific settings, action sequences, pacing, moods, and character elements in contrasting fashion combined to form the Story's creative selection, arrangement, and protectable composition— highly original in 1983 before *Top Gun* and its Sequel exploited and popularized it. 2-ER-194.

Though referenced, Yonay's Story is not about war, the base, technology, or military history. 2-ER-181, 191–92. It is about the personal lives of remarkable people whose ambitions, competitive nature, and moxie led them to become the best of the best pilots at great risk to themselves and cost to their families, just like *Top Gun and* its Sequel.[38] As Simpson put it in choosing Yonay's Story: "we are going to make a movie about the process of becoming a Top Gun and…dramatically expose you to what it's like to go through the process, and

---

[38] 3-ER-375–85; TGM; TG; 2-ER-164, 166, 181–82, 184.

succeed at it, and the price you have to pay to be frankly the most important warrior we have." 2-ER-283–84. But it was *Yonay* who first chose to center his Story on the humanity, struggle, and bonding of these fighters and to arrange all his Story's elements to further this narrative, which *Top Gun* and *Maverick* copy exactly.

Yonay's choices to tell the Story through the eyes of Yogi, Possum, and other pilots and to pattern contrasting elements in his original arrangement is not to be discounted, as he could have told the story of the naval base in thousands of different ways, as could Paramount, though it never did. *See* 2-ER-194 ("It's all too easy to look back and say 'of course' but the cinematic world in 1983 was very different than today."). It's no accident that one's first reading of Yonay's engaging Story instantly evokes the distinctive world of the *Top Gun* films that adapted it.

In recently affirming the importance of protectable selection and arrangement of individually unprotectable elements, this Court ruled in *Hanagami*, 85 F.4th at 944:

> [R]educing choreography to "poses" would be akin to reducing music to just "notes"…The relationship between those movements and patterns, and the choreographer's creative approach of composing and arranging them together, is what defines the work.

So too with Yonay's Story, which is far more than just a bunch of facts, as portrayed by Paramount and adopted by the lower court. Yonay digested an

33

arguably dull military subject and crafted it into an exhilarating and emotionally compelling tale, which Paramount rushed to buy for that very reason. 2-ER-281; 3-ER-391.

The lower court summarily dismissed all these similarities as "random" and "scattered throughout." 1-ER-14. Not so. The similarities in the selection and arrangement of these creative choices are abundant and *central* to both Works, forming their fabric and foundation. 2-ER-191–93; *see Hanagami*, 85 F.4th at 946 (analysis is both "qualitative[] and quantitative[]"). Even a small amount of copying, if qualitatively important, readily supports a finding of infringement. *Id.* (citing *Nimmer* §13.03). These extensive similarities, pervasive (not "scattered") throughout, gave rise to a triable issue of fact, and the court erred by largely disregarding them. *Baxter*, 812 F.2d at 425 (Where "reasonable minds could differ as to the issue [of substantial similarity]…summary judgment was improper."); *Shaw*, 919 F.2d at 1355-56 (same).

## 2. *Theme*

The court erroneously ruled that the similar themes in the Works Plaintiffs identified were purportedly nonexistent, including the "aviation 'caste system,'" "anachronism of fighter aviation," and "post-war nostalgia that yearns for a simpler 1950s America." 1-ER-12.

Indeed, both Works share strong recurring themes regarding: "the

34

anachronism of fighter aviation. Even in this age of *remote-control, pushbutton warfare*, the survival and effectiveness of the entire U.S. Pacific Fleet rests on a few dozen young men getting themselves catapulted off a flight deck and hanging in the skies against numerically superior, land-based enemy planes" (3-ER-377–78 (emphasis added)) and that success comes down to the pilot, rather than his aircraft.[39] In the Sequel, after the Rear Admiral tells Maverick that flyboys like him are obsolete and soon to be replaced by unmanned drones, Maverick and the squadron he trained catapult into the sky off a carrier deck to defeat high-tech anti-aircraft systems and numerically and technically superior land-based enemy planes, winning on courage and character.[40] *See* TGM 00:52:35 (Rooster: "It's not the plane, it's the pilot"); 01:50:28 (same). Both Works feature, but ultimately discount, the importance of technology, and glorify the moxie of older pilots (e.g., Maverick).[41]

The Story expressly portrays an aviation "caste system" organized like a target where each successive ring symbolizes increasing skill until the "bullseye,"

---

[39] 3-ER-377–78; TGM 00:13:52–00:16:21, 01:30:30–1:56:00; 2-ER-176.

[40] TGM 00:13:52–00:16:21, 01:30:30–1:56:00; 2-ER-176–77.

[41] 2-ER-170–71; TGM 01:15:18; 01:17:45–01:21:15.

representing the "elite of the fighter elite…[t]he greatest of the greats[.]" 3-ER-384; 2-ER-181–82. The Sequel repeatedly emphasizes that Maverick's squadron are the elite—the best-of-the-best fighter jocks (TGM 00:33:00 (Admiral Bates: "You're all Top Gun graduates, the elite, the best of the best.")) and even uses the same "bullseye" metaphor to express the same point.[42]

Both the Story and Sequel also share an unmistakable post-war nostalgia to endear audiences by portraying a simpler America—a bygone era of old-fashioned patriotism, comradery, and chivalry.[43] The Story: "At night the darkened base could be mistaken for an old *From Here to Eternity* [(1953)] set. And even earlier in the day, when the base is bustling, it is enveloped in a time warp of unreality… because it looks like a small desert town out of the 1950s." 3-ER-378; 2-ER-181, 190. A similar post-war nostalgia pervades the Sequel, from scenes in Maverick's hangar where he works on a WWII-era P-51 Mustang fighter plane, to scenes in the old-school naval bar where the squadron gather round an upright piano to sing Jerry Lee Lewis's *Great Balls of Fire* (1957), with flashbacks to *Top Gun* where

_____

[42] TGM 00:19:55, 00:21:30, 00:33:40; 2-ER-167–69.

[43] 3-ER-378; TGM 00:16:25–00:17:20, 00:30:10, 01:00:07–01:01:20; 2-ER-181, 190–91.

Maverick and Goose sing the same song.[44] In Maverick and Penny, we see the quaint nostalgic treatment of male/female relationships, from the fun-in-the-sun beach football scene with a smitten Penny looking on, to their sailing together, to the movie ending with them flying into the sunset in Maverick's vintage plane.[45]

The Works share other similar themes ignored by the court. 1-ER-12. Both feature ideological rifts in the Navy by juxtaposing Admirals seeking to restore discipline with the hotshot pilots who crave autonomy.[46] In both, mano-a-mano duels above the desert plains evoke similar "Western" gunslinger themes.[47] 3-ER-375, 377 (Story: "At Mach 2 and 40,000 feet…it's always high noon"; "Yogi and Possum…ride shotgun."). And in *Top Gun* and its Sequel, the hotshot pilots are portrayed similarly with gunslinging cowboy bravado; even the name "Maverick" evokes Westerns.[48]

---

[44] TGM 00:03:30, 00:16:25–00:17:20, 00:30:10; 2-ER-181, 190.

[45] TGM 00:46:00–00:47:25, 00:59:00–01:01:20, 02:00:10.

[46] 3-ER-384; TGM 00:13:50–00:16:20, 00:17:20–00:20:39, 00:20:45–00:21:20; 2-ER-166–67, 176.

[47] 3-ER-375, 377; TGM; 2-ER-177, 183.

[48] E.g., the 1994 Western film *Maverick* (2-ER-254), based on the 1957-1962 television series *Maverick* (2-ER-265), and 1952 Western *The Maverick* (2-ER-261).

The similarity in themes goes well beyond the necessities of a story or film about a naval flight school. Reasonable jurors could readily find the Works' themes substantially similar, preventing summary judgment. *Williams*, 895 F.3d at 1137 ("[A]t summary judgment, so long as [plaintiffs] presented *indicia* of a sufficient disagreement concerning the substantial similarity of [the] two works, then the case *must* be submitted to a trier of fact.") (emphasis original; citation, quotation marks omitted).

### 3. *Mood*

The lower court erred by ruling the Works' moods were not substantially similar. It said that the Sequel does not have a nostalgic mood, but as detailed above, nostalgia pervades both Works.[49] The court further ruled that other similar moods Plaintiffs described like "the constant threat of death and violence" flowed naturally from the Story's subject. 1-ER-12. Here too the court erred. The constant threat of death and violence does not flow naturally from a story about a *training school* where pilots are educated in relatively safe simulated scenarios.[50] Yonay

---

[49] 1-ER-12; 3-ER-378; TGM 00:16:25–00:17:20, 00:30:10, 00:59:00–01:01:20; 2-ER-175, 181, 190–91.

[50] Paramount's "fact expert" explained that in 55 years, the only deadly incident at the academy occurred in 2014, three decades after Yonay wrote his Story. 3-ER-307.

*chose* to play up the pending threat of death as a mood to raise the stakes of his Story, as did both films.[51] The lower court also injected its subjective opinion that, for example, "contrast[ing] the ethereal beauty of the 'vast blue dome of sea and sky' against jarring, unpredictable competitive action" in both Works does not evoke a mood. 1-ER-12. But this is also incorrect. The Story depicts imagery of solace and serenity to create an airy mood of peace and tranquility, which it then shatters with intense, jarring action. 3-ER-376; 2-ER-187. The Sequel does the same. TGM 00:34:30–00:41:30; 2-ER-187.

The moods of the Works are quite similar and continually shift between calm earthbound life, exhilarating flight, and intense, dangerous action.[52] Character also informs mood. 2-ER-189. Fighter pilots—or as Yonay calls them, "pumped-up fighter jocks"—in the Story and Sequel are like thoroughbreds, high-strung and volatile, building tension. 3-ER-379; 2-ER-189. Severe time pressures build further tension which is then relieved by playful interactions.[53] In the sky, the mood is

---

[51] 3-ER-375, 377–78; TGM 00:32:40, 00:34:30–00:41:30, 00:42:45, 01:08:30.

[52] 3-ER-376, 379, 382; TGM 00:24:50–00:30:30, 00:34:30–00:41:30; 2-ER-187.

[53] 3-ER-377, 382; TGM 00:31:15–00:32:30, 00:42:40, 00:59:00–01:01:20, 01:02:30–01:05:50.

freedom from everything except gravity.[54] On the ground, it is restless, waiting to fly again.[55] The Story conjures an exciting mood with cinematic rather than textbook details, including Yonay's portrayals of "strapping on 25 tons of airplane" and torturously "pulling Gs"—the Sequel does the same. 3-ER-379-80; TGM; 2-ER-190.

### 4. *Plot*

The lower court erroneously ruled the Story's plot was unprotectable merely because the naval academy and graduates are "real." 1-ER-11–12. But again, copyright law does not support the court's bright-line fact/fiction framework; proper analysis requires assessment of an author's expression. *See Shaw*, 919 F.2d at 1356 (no "definitive demarcation that measures when the similarity between works involves copying of protected expression") (citations omitted).

"What is protected is the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts…and the emphasis he gives to particular developments. Thus, the essence of infringement lies… in appropriating the particular expression through similarities

---

[54] 3-ER-375, 377–78; TGM 00:32:40, 00:34:30–00:41:30, 00:42:45, 01:08:30; 2-ER-175–77.

[55] 3-ER-379; TGM 27:40–28:30, 33:30–35:00, 01:07:15, 01:01:00–01:10:32; 2-ER-185–86.

of treatment, details, scenes, events and characterization." *Wainwright Sec. v. Wall Street Transcript Corp.*, 558 F.2d 91, 95 (2d Cir. 1977) (citation omitted); *see Nihon Keizai Shimbun v. Comline Bus. Data*, 166 F.3d 65 (2d Cir. 1999) (same).

Contrary to the lower court's decision, plots like the Story's involving real people and places *are* protectable. In *Jacobsen v. Deseret Book Co.*, for instance, the Tenth Circuit reversed the district court's extrinsic analysis because the plot, although based on real people and places, qualified as protectable "original expression." 287 F.3d 936, 945-47 (10th Cir. 2002).

Here, rather than focusing on the naval academy or on war, the Story and both films foreground the humanity of pilots to explore the complexity of human beings sent off to war and to invest the audience in the narrative.[56] The plots of the Story and two derivative films are quite similar in that they journey through what it takes to be the best of the best in fighter aviation by following the demanding, intense lives of fighter pilots, and make this shared dynamic a core structural element.[57]

---

[56] 3-ER-378–79, 382, 384; TGM 00:20:00, 00:24:00–00:28:00, 00:28:15–00:31:35, 00:31:15–00:32:30, 00:59:00–01:01:20, 01:02:30–01:05:50; 2-ER-167–68, 179.

[57] 3-ER-374–85; TGM; TG; 2-ER-164, 166, 182, 184.

41

The Story and Sequel similarly portray fighter jocks as exceptional individuals by emphasizing their specialized skill and competitiveness with plots led by a driven loner (Yogi; Maverick). 2-ER-166–67, 177, 183. The Story highlights that only the cream of the crop get invited back as instructors, and in the Sequel, Maverick gets invited back as an instructor. 3-ER-377; TGM 00:19:45; 2-ER-167. The Sequel incorporates the Story's "bullseye" metaphor and for the same literary purpose. In the Sequel, the squadron's highly-skilled "Hangman" (whom Maverick later bests in training) throws darts landing three-out-of-three *in the bullseye*.[58]

The plots of all works focus on a small, elite group of pilots who are bound together by their shared experiences and sacrifices in a high-stakes environment.[59] The Story portrays Yogi and Possum as an intimate "home and family." 3-ER-381–82; 2-ER-169. In *Top Gun*, Maverick and Goose are like family; the Sequel continues this portrayal with flashbacks of them, and Maverick acting as a father figure to Rooster. 2-ER-169; TGM 00:03:45–00:04:05, 00:31:15–00:32:30, 01:04:50–01:06:15, 02:01:25; TG. The Story twice suggests that life as an elite

---

[58] TGM 00:21:30; 2-ER-167–69; 3-ER-384; 2-ER-181–82.

[59] 3-ER-375, 377–79; TGM 00:31:15-00:32:40, 00:34:30–00:41:30, 00:42:45, 00:59:00–01:01:20, 01:02:30–01:05:50, 01:08:30; 2-ER-167, 179.

pilot strains a marriage (3-ER-379, 382), and in the Sequel, Maverick's life as an elite pilot strained his prior relationship with Penny. TGM 01:07:15, 01:14:40; 2-ER-167, 185–86.

The plots of both Works emphasize the importance of rigorous training for combat against a three-week deadline, with particular focus on dogfighting tactics and extreme mental and physical demands.[60] In both, the training itself serves as a major driver of the narrative, showcasing the pilots' "shit-hot" bravado, challenges, growth, and preparation for real combat.[61] Agonizing training is countered in both Works by reflective moments on the ground, bar revelry, and lighthearted recreational sailing.[62]

Both Works capitalize on the fighter jocks' "frat-house" culture. In the Story, the pilots place a big brass bell in their favorite bar to be rung when someone breaks "house rules" and must buy a round for all.[63] The same brass bell

---

[60] 3-ER-377, 379, 382–84; TGM 00:34:30–00:41:30, 00:42:40, 01:08:18, 01:10:36; 01:12:00–01:14:00; 2-ER-172–73, 178.

[61] *Id.*; 3-ER-378, 384; TGM 00:20:00, 00:24:00–00:28:00; 2-ER-167-68.

[62] 3-ER-376–77, 379, 382; TGM 00:46:00–00:47:25, 00:50:05–00:53:35, 00:24:50–00:30:30; 2-ER-162, 167, 182, 188.

[63] 3-ER-382.

shows up in the Sequel *twice* for similar comedic relief.[64] The Story amplifies conflict by introducing an Admiral who wants to "restore discipline and naval decorum" causing hotshot fighter jocks to leave. 3-ER-384. For the same literary purpose, the Sequel introduces an Admiral who espouses discipline and wants to get rid of irreverent hotshots like Maverick.[65]

Remarkably, the lower court failed to address nearly all of these detailed similarities which gave rise to a triable issue of fact. 1-ER-10–12. *See Shaw*, 919 F.2d at 1363 ("Even if none of these plot elements is remarkably unusual in and of itself, the fact that both [Works] contain all of these similar events gives rise to a triable question of substantial similarity of protected expression.").

### 5.  *Sequencing*

The court ruled the sequencing in the Works was dissimilar because purportedly, the Story is non-linear and the Sequel is linear. 1-ER-12. This is superficial, inaccurate, and disregards the important function of the Works' similar sequencing. Neither the Story nor Sequel are completely linear or non-linear. Rather, both Works are linear, broadly speaking, but use non-linear flashbacks and

---

[64] TGM 00:24:24, 00:30:02.

[65] TGM 00:13:50–00:16:20, 00:17:20–00:20:39, 00:20:45–00:21:20; 2-ER-166–67, 176**.**

cutaways as shortcuts to deepen the audience's emotional attachment to the characters.[66]

In fact, the Works employ quite similar sequencing. In both, scenes of idyllic flying are unexpectedly shattered, suddenly and violently with agonizing climbs, dives, and dogfights. 3-ER-376; TGM 00:34:30–00:41:30; 2-ER-187. Both Works mix these aerial sequences with reflective or convivial scenes on the ground and at sea.[67] In the Story, after a protracted tour of duty, the Wolfpack is taken for a sail on a fancy boat; in the Sequel, after protracted aerial "combat," Maverick goes out on Penny's beautiful sailboat. 3-ER-382; TGM 00:46:00–00:47:25. Both Works use such sequencing to build momentum and engage the audience through unexpected changes in temper and tone. 2-ER-188. The court erred by reducing the inquiry to "linearity"—a trait both Works in fact *share*. 1-ER-12.

### 6. *Pacing*

The lower court ruled the works' pacing was dissimilar but failed to explain its decision other than to say the Sequel "has a consistent pace." 1-ER-12. But this

---

[66] The flashbacks in the Sequel return the audience to *Top Gun*, on which Yonay is credited. 3-ER-375–85; TGM 00:03:45, 00:17:00–00:17:25, 00:31:15–00:32:30, 02:01:25; 2-ER-164–65, 187–88.

[67] 3-ER-376–77, 379; TGM 00:34:30–00:41:30, 00:50:05–00:53:35, 00:24:50–00:30:30; 2-ER-162, 167, 182, 187–88.

45

is also incorrect. The Sequel, like the Story, jumps back and forth between intense action-packed scenes and slower-paced reflective ones (e.g., Maverick and Penny). 3-ER-376–77; TGM 01:03:50–01:15:42; 2-ER-187–88. The Sequel juxtaposes a sing-along bar scene with flashback cutaways to a deadly plane crash. TGM 00:28:15–00:31:35. There is nothing "consistent" about the Sequel's pacing.

Indeed, the pacing of both Works is similar, if not the same. Both contrast the sublime beauty of flight against jolting, unpredictable action. 3-ER-376; TGM 00:34:30–00:41:30; 2-ER-187. Both Works appose more evenly paced scenes on the ground, in the classroom, and R&R with adrenaline-charged aerial scenes to keep their audiences engaged.[68]

### 7. *Setting*

The court erroneously focused on differences and only superficially considered the Works' similar settings. 1-ER-12. It is inconsequential whether the Works take place at Naval Air Station Miramar or North Island (*id*.), as both feature the same topography, including the desert, Pacific Ocean, and beaches of California, even though "in fact" the school moved to land-locked Fallon, Nevada in 1996. 3-ER-377; TGM 00:16:35; 2-ER-179–80. The setting of a work

---

[68] 3-ER-379, 382; TGM 00:24:24, 00:29:00, 00:24:50–00:30:30, 00:46:00–00:47:25; 2-ER-162, 167, 182.

46

encompasses more than just its geographic coordinates and date; it includes its socio-cultural environment as well. 2-ER-181. Here, the Story not only influenced the Sequel's settings, it taught Paramount *how to see and use* those settings. 2-ER-180.

For instance, both Story and Sequel chose *to feature* the bar with the big brass bell, walls with wooden plaques, and "Fightertown" signage.[69] These reveal Yonay's view of the Academy's culture, i.e., both of valor and decorum and the jocular bravado of "pumped-up fighter jocks."[70] Both Works depict the social environment as ultra-competitive, but collegial.[71] Even though set in their respective present, both Works color the base as a place of 1950s nostalgia, sheltered from the fraught world outside.[72] This quaint backdrop in no way "flows naturally" from a story about a naval base. Not only are the settings substantially similar, the Story and Sequel deploy them in the same way and for the same purpose.

---

[69] 3-ER-377, 380, 382; TGM 00:17:00–00:17:25, 00:24:24, 00:29:00; 2-ER-180–81.

[70] 3-ER-378–79, 382, 384; TGM 00:24:50–00:30:30; 2-ER-189.

[71] 3-ER-382; TGM 00:34:30–00:41:30; 2-ER-181–82.

[72] 3-ER-378; TGM 00:16:25–00:17:20, 00:30:10, 01:00:07–01:01:20; 2-ER-181, 190–91.

### 8. *Characters and Dialogue*

The court ruled the Story's characters were unprotected because they were "real" (1-ER-13), but the correct analysis is not so simplistic, as the court *must* evaluate the protectable expression Yonay used to portray them.

The court relied on *Corbello v. Valli*, where a biographical play about an "historical figure" allegedly infringed his autobiography, presenting very different considerations. 974 F.3d 965, 971-73 (9th Cir. 2020); 1-ER-12–13. The Works' characters hardly qualify as "historical figures" and neither is a biography. To sweepingly interpret *Corbello* as abrogating all copyright protection for characters based on real people, as the lower court did (1-ER-12–13), runs afoul of decades of precedent *and Corbello* itself. 974 F.3d at 976 ("the creative expression…is protected by copyright"); *Harper & Row*, 471 U.S. at 548-49 (original expression of actual characters is protected); *De Acosta*, 146 F.2d at 410 ("original treatment of…historic character…entitled to protection"); *Eggleston v. Twentieth Century Fox Film Corp.*, 2022 WL 3371601, at *4 (E.D. Mich. Aug. 16, 2022) (distinguishing *Corbello*: "the way [plaintiff's] life story is expressed…would be protected—a memoir is not a bulleted list of facts"); *Nimmer* §2.11 ("original biographical treatment of an historical character or event may be subject to copyright"); *Patry* §4:7 (cautioning courts applying *Corbello* to "take a respectful approach to expressive material…discuss[ing] historical events").

48

Yonay's expressive characterizations of people are protected. In the Story, *Top Gun*, and its Sequel, the pilots are largely depicted as "men's men" consumed by their trade. TGM 01:07:15, 01:14:40; 2-ER-185–86; 3-ER-379 (Story: "With raw sex waving in front of their eyes, these supremely healthy young males are standing around in twos and threes and talking about the hop [(flight)]."). Yonay portrays Yogi (pilot) and Possum (RIO) and other pilots as jocular, confident, competitive with "shit-hot" bravado, good-humored and deeply committed.[73] The main characters in the films (Maverick-pilot, Goose-RIO, and his son Rooster) and other pilots share these traits.[74] Both Works portray the pilots as tight-knit, but Maverick (like Yogi) is more a focused loner. 3-ER-381–82; 2-ER-169; TGM 00:11:35–00:13:20; TG . Yogi and Maverick are both portrayed as bold and cheeky (e.g., waving at enemy fighters in midair). TGM 01:49:38-1:50:45; 3-ER-382; 2-ER-187. Indeed, the court ignored Yonay's protectable expression of numerous additional character traits appearing in both Works, as detailed on pages 24-29, *supra*, and incorporated here by reference to avoid excessive repetition.

Certainly, Yonay's expressive characterization of the pilots' "shit-hot"

---

[73] 3-ER-375–85; 2-ER-166-68, 185; 3-ER-378; TGM 00:20:00, 00:24:00–00:28:00.

[74] TGM 00:17:00–00:17:25, 00:31:15–00:32:30, 02:01:25; 3-ER-88; 2-ER-166, 185.

49

swagger and deep focus despite "raw sex waving in front of their eyes" are not "facts" that can be traced back to naval records. 3-ER-379, 384. His Story's portrayals go well beyond a mere recounting of people at a naval base and must be accorded due protection. *See Shaw*, 919 F.2d at 1363 (finding triable issue of fact over substantial similarity where both works have "similar lead characters…both leads are well dressed, wealthy, and have expensive taste…[and are] self-assured[]").

The lower court also broadly denied copyright protection to the Story's dialogue because it was "presented as real." 1-ER-12–13. But dialogue cannot be overlooked *per se* just because it may have been spoken. *Patry* §4:7 ("Calling dialogue a fact just because it is dialogue would render all interviews unprotectible, and perhaps speeches as well."). The court failed to consider expert evidence explicating how Yonay's *chosen* dialogue advances the Works' similar tones, themes, characters, and other elements. 1-ER-12–13. For instance, the characters in both Works speak in a way that is at once droll, idiomatic, techy, and charmingly unguarded, which informs the Works' similar moods.[75] Quips in the Story like "Fight's on," "It's Miller time," and "I *like* pulling Gs. I *like* strapping on 25 tons of airplane" help create the Story's distinct world and characters, which carried

---

[75] 3-ER-376–77, 379; TGM 00:35:08, 00:37:20, 00:39:05; 2-ER-177–78.

through to *Top Gun* and its infringing Sequel. *Id.*

_____

Given all of the above, it is nigh impossible to objectively "conclude after viewing the evidence and drawing all inferences in a manner most favorable to the non-moving party [the Yonays,] that no reasonable juror could find substantial similarity of ideas and expression." *Swirsky*, 376 F.3d at 844.

## III.  THE LOWER COURT ABUSED ITS DISCRETION BY EXCLUDING PLAINTIFFS' LITERARY EXPERT HENRY BEAN.

A trial court's decision to admit or exclude expert testimony is reviewed for an abuse of discretion. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The construction or interpretation of Federal Rules of Evidence 702 and 703 is reviewed *de novo. United States v. Wells*, 879 F.3d 900, 914 (9th Cir. 2018).

### A.     Bean Properly Analyzed Yonay's Protectable Expression.

The court erroneously excluded Plaintiffs' literary expert Henry Bean ("Bean") because he purportedly "fail[ed] to filter out the elements of the [Story] and Sequel that are not protected by copyright law (i.e., facts)." 1-ER-6. However, Bean applied the fact/expression dichotomy, considered the *scènes à faire* issue, and properly focused his *analysis of each extrinsic element* on the Works' original *expression*:

- "It is worth pausing here to discuss the essential difference between mere facts and a dramatic story[.]" 2-ER-163–64.

51

- " "The Story, like most, necessarily conveys factual material but does so through the lens of its author's subjective expression." 2-ER-193–94.

- "Having read the article several times, I cannot think of anything in it that constitutes a naked 'fact,' unfiltered through Yonay's sensibility." 2-ER-163.

- "There's all sorts of facts in there, but everything comes filtered through not only [Yonay's] prose, but his telling, and he puts it all together in a very distinctive way." 2-ER-89.

- E.g., Bean evaluating *scènes à faire*: "I further do not believe that the Story contains stock elements or tropes.…In 1983, when Yonay wrote his Story, and before the 1986 Film popularized the Story's elements, these sort of high-tech, high-testosterone aerial action scenes were by no means common." 2-ER-194.

- E.g., Bean evaluating mood: "The Story features cinematic, rather than textbook details…we read: '*they're floating in their glass bubble through a blue-on-blue crystal morning…There are no ups or downs up here, no rights or lefts, just a barely perceptible line separating one blue from another, and that line is spinning and racing like mad in the distance.*'" 2-ER-190. *See also* plot (2-ER-173); theme (2-ER-176); character (2-ER-183).

It is a fact that fighter jets have clear glass windows and the sky and ocean are blue, but Plaintiffs do not claim rights in bare facts like these, nor do Bean's opinions rely on them. Rather, Bean's testimony is helpful and admissible because his analysis properly focuses on Yonay's original *expression of* those facts, which is what copyright and this case are all about. 2-ER-162–94; 2-ER-112 ¶9.

The court cited *Johannsongs-Publ'g Ltd. v. Lovland*, which excluded plaintiff's music expert for admitting he never "consider[ed]" whether similar

52

elements were "unprotectable prior art." 2020 WL 2315805, at *4-6 (C.D. Cal. Apr. 3, 2020). 1-ER-6. But here, as shown, Bean *did* "consider" *scènes à faire* and applied the fact/expression analytical framework. *Gilbert-Daniels v. Lions Gate Ent. Corp.*, 2023 WL 8938403, at *5 (C.D. Cal. Dec. 7, 2023) (distinguishing *Johannsongs* and holding that "[plaintiff's expert] does focus on comparing elements that he found were protectible, thereby suggesting that he filtered out those he did not find protectible").

Further, Bean's declaration and deposition testimony are consistent. 1-ER-6. To strike an affidavit for inconsistency, the inconsistency "must be clear and unambiguous." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009). "[E]laborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition…afford no basis for excluding an opposition affidavit." *Messick v. Horizon Indus. Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995).

Here, Bean declared: "I believe I considered the expression of facts as opposed to the underlying facts themselves…[and] I tried as best as I could to compare the elements of the works at issue that are protectable, while disregarding those that are not." 2-ER-112 ¶9. Bean's declaration describing his process of foregrounding Yonay's protectable expression is admissible and is consistent with

53

both his expert report and deposition testimony.[76] 1-ER-6 n.2. To the extent there is any inconsistency, it is not so "clear and unambiguous" as to warrant exclusion.

## B. The Court Erroneously Excluded Bean for Not Rendering Legal Conclusions.

It is also not the role of an expert witness to render legal conclusions as to copyrightability. "[T]he issue of whether an item is copyrightable is a question of law," and "[m]atters of law are for the court's determination, not that of an expert witness." *Russell v. Walmart Inc.*, 2020 WL 9073046, at *4 (C.D. Cal. Oct. 16, 2020); *see Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (citations omitted) (Rendering legal conclusions is the "distinct and exclusive province" of the courts.); *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 835 (C.D. Cal. 2010) (excluding expert report by the author of *Nimmer on Copyright* for containing legal conclusions). Bean was correct to focus his analysis on similarities in the Works' expression while leaving legal determinations to the courts.

---

[76] *Compare* Bean's Report (2-ER-163–64; 2-ER-193–94) *to* his deposition (2-ER-89 ("There's all sorts of facts in there, but everything comes filtered through not only [Yonay's] prose, but his telling, and he puts it all together in a very distinctive way."); 2-ER-90 ("[I]n an intuitive way, I was doing some [filtration], but I was not sitting there thinking, well, this goes in the protected bucket and that goes in the unprotected bucket.")).

Further, evaluation of "selection and arrangement" entails no filtration because the selection and combination of even unprotected elements is protected. *See Rentmeester*, 883 F.3d at 1119. Therefore, at minimum, the court abused its discretion by excluding Bean for analyzing the Works' selection and arrangement without filtration, when none was required. *Id.*; *see Hyer v. City & Cnty. of Honolulu*, __F.4th__, 2024 WL 4259862, at *8 (9th Cir. 2024) (reversing "wholesale exclusion" of expert report: "even if this portion of [expert's] opinion had been properly excluded, it would not justify excluding his remaining conclusions").

Given that substantial similarity in selection and arrangement is alone sufficient to support infringement, the decision below prejudiced Plaintiffs and must be reversed. *See Hanagami*, 85 F.4th at 943 (citing *Rentmeester*, 883 F.3d at 1120); *Hyer*, 2024 WL 4259862, at *9 (wholesale exclusion prejudiced plaintiffs because "expert reports, if admitted…would have helped raise genuine disputes of material fact"); *Swirsky*, 376 F.3d at 845-46 (reversing summary judgment because expert provided "'indicia of a sufficient disagreement concerning…substantial similarity'") (citation omitted).

### C. Bean Objectively Compared the Works.

The court also erroneously excluded Bean as "unhelpful" merely because he used the word "feel" in his report, and on this semantic basis wrongly concluded

55

Bean was opining on the "intrinsic test." 1-ER-6.

Whereas the extrinsic test focuses on individual literary elements such as theme and mood, the "total concept and feel" assessment "compar[es] the works *as a whole*." *Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994) (emphasis added). Here, Bean used "feel" to explain how particular *extrinsic* elements were expressed by Yonay and its impact. *See, e.g.*, 2-ER-189 (Mood: "Yonay's Story make[s] us feel it"); 2-ER-193 (Yonay explores characters' backstories so readers "know them much better and can feel [i.e., understand] what both their initial 'failure' and ultimate 'success' mean to them"); 2-ER-163 ("Yonay's writing is highly subjective…to the extent it conveys facts, those facts are expressed with the feeling [i.e., vibrancy] of fiction."). Bean's use of the word "feel" this way is not cause to exclude him.

Indeed, this Court's precedent supports reversal. In *Swirsky*, an expert's opinion was disregarded below because he "concentrate[d] on how the two choruses sound[ed] to his expert ears, which led the district court to conclude that his testimony related to intrinsic and not extrinsic similarity." 376 F.3d at 847. This Court reversed, because like Bean, the expert adequately explained his personal impression of the works "based on objective criteria." *Id.* Bean's opinions, despite occasionally using "feel," are tied to his analysis of the extrinsic test's objective

56

literary elements. 2-ER-178–82, 188–89, 193. He does not opine on the intrinsic test.

## IV. THE LOWER COURT ERRED BY ADMITTING PARAMOUNT'S "FACT EXPERT" ANDREW CRAIG.

### A. The Sole Function of Craig's Report was to Support Paramount's Misleading Fact/Fiction Strawman.

Federal Rule of Evidence 702 requires that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony that does not speak to a real issue "is not relevant and, ergo, nonhelpful." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 591 (1993).

Paramount's expert Andrew Craig ("Craig") simply opines that Yonay's Story is factually "accurate" (e.g., 3-ER-300), when the issue here is whether Paramount pirated Yonay's protectable *expression* and *selection and arrangement* of content. *Harper & Row*, 471 U.S. at 547. No one asserted mere "facts" are copyrightable, and therefore Craig's stated purpose was to determine a nonissue. 3-ER-293 (Paramount "asked me to opine whether [the Story]…is accurate and factually correct."). The real reason for Paramount's fact expert was simply to push its legally unsupported "fact/fiction" strawman, serving only to confuse and mislead the fact finder. Fed. R. Evid. 403.

**B.    Craig's Testimony is a Mere Conduit for Hearsay.**

The lower court also erred by admitting and repeatedly relying on Craig's torrent of inadmissible hearsay as "expert testimony." 1-ER-7, 10–14. "[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (cleaned up). Moreover, "[t]he law is clear…that an expert report cannot be used to prove the existence of facts set forth therein." *In re Citric Acid Litigation*, 191 F.3d 1090, 1102 (9th Cir. 1999). But this is exactly what the court permitted here. Craig provided no "opinion"; he merely regurgitated hearsay to establish its truth. *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1262 (9th Cir. 1984) (an expert may not "disclose hearsay…as general proof of the truth of the underlying matter, Fed. R. Evid. 802."); *see, e.g.*, 3-ER-310 (Craig opining on the nature of the personal relationships between pilots and RIO that were "typical in 1983" when he was four); 3-ER-322 (opining on intraorganizational tensions that existed in 1977). And what he was not purportedly told, he makes up. *See, e.g.,* 3-ER-307 ("[I]nstructors took personal responsibility for [training accidents]. They undoubtedly replayed the event on loop in their minds, theorizing about preventative measures they could have taken.").

58

While Paramount tried to color all this as "opinions" about "facts", Craig added no expertise or analysis to the secondhand hearsay he recites (and embellishes)—and the fact finder needs none. *See Fujifilm Corp. v. Motoral Mobility LLC*, 2015 WL 757575, at *27 (N.D. Cal. Feb. 20, 2015). Indeed, courts routinely exclude expert reports like Craig's that try to introduce hearsay "facts" under the guise of expert opinions. *See Paddack*, 745 F.2d at 1262 (9th Cir. 1984); *Caldwell v. Cty. of San Francisco*, 2021 WL 1391464, at *5 (N.D. Cal. Apr. 13, 2021) (collecting cases).

The two cases cited by the lower court do not support admitting Craig's hearsay testimony. 1-ER-7 (citing *EcoServices, LLC v. Certified Aviation Services, LLC*, 312 F. Supp. 3d 830, 839 (C.D. Cal. 2018) and *Hilt v. Foster Wheeler, LLC*, 690 F. App'x 482, 483 (9th Cir. 2017)). In contrast to Craig, the experts in those cases applied their own expertise and included some hearsay as just one of many factors underlying their broader opinions.

## V.  THE LOWER COURT COMMITTED SERIOUS ERRORS IN DISMISSING THE YONAYS' BREACH OF CONTRACT CLAIM.

This Court reviews the district court's construction of a contract *de novo*. *Mattel, Inc.*, 616 F.3d at 912. The lower court erred in its interpretation of Paramount's 1983 Agreement. Paragraph 7(b) broadly requires Paramount:

> [T]o announce on the film of any motion picture photoplay that may be produced by it hereunder and substantially **based upon** or adapted from said work [Story] **or any** version or **adaptation thereof**, substantially

59

> incorporating the plot, theme, characterizations, motive and treatment of said work **or any** version or **adaptation thereof**, that said motion picture photoplay is based upon or adapted from or suggested by a work [Story] written by the Author, or words to that effect[.]

3-ER-396 ¶7(b) (emphasis added). Thus, the contract questions are: (i) Did *Top Gun* "adapt[]" the Story?; (ii) Was *Top Gun: Maverick* "based upon" *Top Gun*?; and (iii) Did *Maverick* "substantially incorporate[] the [listed elements] of said ... adaptation [i.e., *Top Gun*]"? All are readily answered in the affirmative.

The Sequel was "based on" and "substantially incorporated" key elements of *Top Gun*, which "adapted" Yonay's Story, *Top Guns*—purchased by Paramount in the Agreement for that exact purpose. 3-ER-392 ¶II(B)(2) (providing payments to Yonay upon "commencement of…the first motion picture…based upon the [Story]"). Indeed, as mandated by Paragraph 7(b), Paramount credited Yonay on the "adaptation"—*Top Gun*—because it "substantially incorporate[d] the plot, theme, characterizations, motive and treatment" of the Story. As *Top Gun* is an obvious "adaptation" of Yonay's Story, and Paramount's Sequel is an obvious "adaptation" of *Top Gun*, the **Yonays** were entitled to summary judgment on their breach of contract claim for Paramount's willful failure to credit Yonay on the Sequel. 3-ER-396 ¶7(b). Even if one were to read "substantially incorporating" as modifying "any version or adaption" preceding it, Paramount was still required to credit Yonay because *Top Gun*'s screenplay was an obvious "adaptation" of the Story and *Top Gun* "substantially adapt[ed]" the elements of its own screenplay.

60

The lower court's interpretation of the Agreement erred in many respects.

*First*, it ruled that Paragraph 7(b) imposes *an independent condition* that the film be "produced under" the Agreement when "produced…hereunder and …adapted from [the Story]" are clearly not distinct conditions. 1-ER-14–15. The phrase is a hendiadys—the two are part and parcel of the same thing. *See, e.g., Bennett v. N.Y.C. Dep't of Corr.*, 705 F. Supp. 979, 987 (S.D.N.Y. 1989) ("I read the [two conditions]…as a hendiadys, the expression of a single idea using two phrases connected by 'and.'"). If a film is "based upon" the Story or "an adaptation thereof," then it was "produced under" Paragraph 7(b).

Courts regularly construe "and" in context to mean "or" and vice versa. *See Tricor Am. v. Illinois Union Ins. Co.*, 351 F.App'x 225, 227 (9th Cir. 2009) ("the word 'and' must be read as 'or' to effectuate the mutual intent of the parties.") (citing *Univ. Sales Corp. v. Cal. Press Mfg. Co.*, 20 Cal.2d 751, 775-76 (1942) (same)); *People v. Schulz*, 66 Cal.App.5th 887, 896-900 (2021) (rejecting argument "that [] the ordinary and usual usage of 'and' is as a conjunctive, meaning 'an additional thing'"). Here, the only reasonable interpretation is that "and" suggests the second part ("based upon"/"adapted from") is a descriptive continuation of the first ("produced hereunder"). Indeed, it's hard to envision how a film could possibly be produced under the Agreement, yet not be based upon the Story or an adaptation thereof. The two go hand-in-hand.

61

Next, the court erred by concluding the Sequel was not "produced under" the Agreement because the copyright termination took effect before the Sequel was completed.[77] 1-ER-15. This misapprehends copyright law. Since the Act has no extra-territorial application, termination is solely of the "transfer" of rights under the Story's U.S. copyright, not the entire Agreement. *See* 17 U.S.C. §304(c)(6)(E). The Yonays' statutory termination not only left the Agreement's credit provision intact, but Paramount retained foreign rights to the Story "under" the Agreement and distributed its derivative Sequel *worldwide*. *See Nimmer* §11.02[B][2].

Thereafter, the court ruled the Sequel was not "produced under" the Agreement because "it does not infringe on the [Story's] copyright." 1-ER-15. But the Agreement does not impose "copyright infringement" standards. All it requires is that the Sequel be based upon the Story **or** an "adaptation thereof" (e.g., *Top Gun*) and incorporate key elements of the Story **or** an "adaptation thereof," which it obviously did.

Paramount did not contest, and thereby admitted that it drafted the Agreement. 2-ER-125, 145, 147. *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016). To the extent Paragraph 7(b) presents any ambiguity, the court

_____

[77] Elsewhere, Paramount argued that the Sequel's principal photography was substantially completed before the termination took effect. 3-ER-440–41.

was therefore required to construe it against (*not in favor of*) Paramount which "caused the uncertainty to exist." *Moore v. Wells Fargo Bank, N.A.*, 39 Cal.App.5th 280, 288 (2019) ("'[W]hen different constructions of a provision are otherwise equally proper, [the one] to be taken [is the one] most favorable to the party in whose favor the provision was made.'") (citation omitted); Cal. Civ. Code §1654. The court failed to do so, committing error upon error given that, on Paramount's motion for summary judgment, this evidence was *also* to be construed in the light most favorable to the Yonays. *Alfred*, 821 F.App'x at 728.

Nor does Paragraph 8 of the Agreement, allowing Paramount to enjoy the same rights with respect to the Story as the public, relieve Paramount of its duty to credit Yonay. *See* 1-ER-15–16. Even if Paramount could produce *Maverick* the same as the public, Paramount *still* must credit Yonay because it, not the public, contractually promised to do so. To the extent Paragraph 8 is inconsistent, Paragraph 7(b)—the more specific provision—controls. *Starlight Ridge South Homeowners Assn. v. Hunter-Bloor*, 177 Cal.App.4th 440, 447 (2009) (citing Cal. Code Civ. Proc. §1859).

Further still, the court hand-waved away the fact that *Top Gun* is an unmistakable **adaptation** of Yonay's Story *Top Guns*, purchased by Paramount for that purpose. 1-ER-15 n.5. The court curiously ruled the Yonays had not sufficiently briefed the issue, *id.*, when they specifically had (2-ER-147–48; 2-ER-

63

48–49; 2-ER-35), and repeatedly addressed the use of the Story's elements in both

*Top Gun* and *Maverick* throughout their briefs.[78]

The Yonays likewise drew the court's attention to the undisputed fact that

Paramount credited Yonay's Story on *Top Gun* per the Agreement, and had even

submitted its Sequel's screenplay to the 2023 USC Scripter Awards in the "Film

**Adaptation**" category, which Paramount billed as "*Top Gun: Maverick*: based on

characters from the 1983 California magazine article 'Top Guns' (author Ehud

Yonay)." 2-ER-48-49; 2-ER-267–71. When Paramount Legal realized what it had

publicly admitted, it hurriedly removed the Sequel from the contest. 2-ER-273–79.

## VI.   THE LOWER COURT DISREGARDED THE CONTEXT IN WHICH THIS CASE AROSE AND THE REMEDIAL PURPOSE OF THE ACT'S TERMINATION PROVISIONS.

The remedial termination right was enacted to benefit authors and their

families and redress authors' vastly inferior bargaining position. *See Mewborn*, 532

F.3d at 984-85; *Ray Charles Found. v. Robinson,* 795 F.3d 1109, 1112 (9th Cir.

2015). "[T]he termination right was expressly intended to relieve authors of the

consequences of…unremunerative grants that had been made before the author had

---

[78] 2-ER-225 (three-column comparison chart); 2-ER-124–26, 128–29, 132–36, 138, 140, 142–44, 146–48; 2-ER-46–49, 52–53, 55–61, 64, 66–70; 2-ER-25–29, 35.

a fair opportunity to appreciate the true value of his work product." *Mills Music, Inc.*, 469 U.S. at 172-73. The Act's termination right is arguably *the* most important authorial right, short of copyright itself. Congress was extremely protective of an author's termination interest and enacted strong provisions to safeguard it. *See, e.g.*, 17 U.S.C. §203(a)(5).

Its legislative history reflects a deliberate intent by Congress to "produce an accommodation and a balancing among various [competing] interests." *Mills Music, Inc.*, 469 U.S. at 174 n.41 (citing H.R. Rep. No. 94-1476, at 124); *see Mewborn*, 532 F.3d at 984. Congress anticipated that the exercise of the termination right would usually result in a new grant to the terminated grantee (Paramount) and provided them the *exclusive* opportunity to relicense recaptured copyrights after "notice or termination has been served," but before its "effective date." 17 U.S.C. §203(b)(4).

Here, a new license of Yonay's Story would have been meaningful to his family and negligible to Paramount, considering *Maverick*'s $170 million budget and the billion-dollar franchise the Story inspired. It would have allowed Yonay's family to finally participate in some small way in the proven value of his Story, just as Congress intended. Paramount, however, made no attempt whatsoever to relicense it. Rather than comply with the Act, it hired pricey counsel to reduce

65

Yonay's compelling Story—which Paramount had rushed to purchase and benefitted from for decades—to an oil slick.

Terminated grantees like Paramount are becoming increasingly obdurate, thumbing their noses at the Act. The district court cast a blind eye to Paramount's prior acquisition of the Story and the Yonays' exercise of termination rights under circumstances which fit the Act's remedial purposes exactly.

## CONCLUSION

For the foregoing reasons, the judgment of the lower court should be reversed, and the case remanded for trial.

DATED: September 26, 2024      Respectfully submitted,

**TOBEROFF & ASSOCIATES, P.C.**

By:  */s/ Marc Toberoff*
      Marc Toberoff

*Attorneys for Appellants*
Shosh and Yuval Yonay

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s)** _____24-2897_____

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature:** _/s/ Marc Toberoff_____        **Date:** September 26, 2024_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** _____24-2897_____

I am the attorney or self-represented party.

**This brief contains 13,988 words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/ Marc Toberoff*_____      **Date:** September 26, 2024_____

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2024, I electronically filed the foregoing document with the Clerk for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. I certify that the document will be served via ACMS on all parties or their counsel of record.


DATED: September 26, 2024          By:  */s/ Marc Toberoff*
                                            Marc Toberoff

                                       *Attorneys for Appellants*
                                       Shosh and Yuval Yonay