No. 24-2897

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

—————————

SHOSH YONAY, an individual, and YUVAL YONAY, an individual,,

*Plaintiffs-Appellants*,

v.

PARAMOUNT PICTURES CORPORATION, A DELAWARE CORPORATION,

*Defendant-Appellee.*

—————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE PERCY ANDERSON
NO. 22-CV-03846-PA-GJS

—————————

## ANSWERING BRIEF OF DEFENDANT-APPELLEE
## PARAMOUNT PICTURES CORPORATION

—————————

MOLLY M. LENS (S.B. #283867)
*mlens@omm.com*
MATTHEW KAISER (S.B. #304714)
*mkaiser@omm.com*
DANIELLE R. FEUER (S.B. #324174)
*dfeuer@omm.com*
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
(310) 553-6700

*Counsel for Defendant-Appellee Paramount Pictures Corporation*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Paramount Pictures Corporation states that it is a wholly owned subsidiary of Paramount Global, f/k/a ViacomCBS Inc. (successor by merger to Viacom Inc.). Paramount Global is a publicly traded company. National Amusements, Inc., a privately held company, beneficially owns the majority of the Class A voting stock of Paramount Global. Paramount Global is not aware, without further inquiry, of any publicly held entity owning 10% or more of its total common stock, i.e., Class A and Class B on a combined basis.

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ...............................................................................1

II.   STATEMENT OF THE ISSUES ......................................................2

III.  STATEMENT OF THE CASE ........................................................3

    A.    Factual Background.................................................................3

        1.    The Works at Issue......................................................3

        2.    The Assignment and Termination...............................9

    B.    Procedural History.................................................................9

IV.  STANDARD OF REVIEW ............................................................10

V.   SUMMARY OF ARGUMENT ......................................................10

VI.  ARGUMENT.................................................................................12

    A.    The Court Rightly Granted Summary Judgment to PPC. .................12

        1.    Appellants' Argument Rests on a Series of False Premises. ......................................................................12

        2.    *Maverick* Did Not Infringe the Copyright in the Article. ........22

        3.    The Court Rightly Held That Appellants Cannot Prevail on Their Contract Claim. .........................................50

    B.    The Court Properly Excluded Appellants' Literary Expert Under Rule 702. ....................................................................55

        1.    Bean's Failure to Filter Unprotectable Elements Warranted His Exclusion. .......................................56

        2.    Bean's Analysis Was Riddled With Other Methodological Flaws..............................................60

        3.    Bean's Opinions Would Not Have Created a Genuine Dispute of Fact Regardless. .......................................64

    C.    The Court Did Not Err by Considering the Testimony of PPC's Naval Aviation Expert.......................................................65

VII. CONCLUSION.............................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfaro v. Cmty. Hous. Improvement Sys. & Plan. Assn., Inc.*,
   171 Cal. App. 4th 1356 (2009) .............................................................51

*Benay v. Warner Bros. Ent.*,
   607 F.3d 620 (9th Cir. 2010)....................................................... 25, 46

*Bennett v. N.Y.C. Dep't of Corrs.*,
   705 F. Supp. 979 (S.D.N.Y. 1989)........................................................51

*Bernal v. Paradigm Talent & Literary Agency*,
   788 F. Supp. 2d 1043 (C.D. Cal. 2010) ....................................... 21, 65

*Brown Bag Software v. Symantec Corp.*,
   960 F.2d 1465 (9th Cir. 1992) ..............................................................65

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
   683 F.2d 610 (2d Cir. 1982)..................................................................13

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
   270 F.3d 863 (9th Cir. 2001).................................................................66

*Cavalier v. Random House, Inc.*,
   297 F.3d 815 (9th Cir. 2002)................................................... *passim*

*Corbello v. Devito*,
   2015 WL 5768531 (D. Nev. Sept. 30, 2015) ........................................24

*Corbello v. Valli*,
   974 F.3d 965 (9th Cir. 2020)................................................... *passim*

*DC Comics v. Towle*,
   802 F.3d 1012 (9th Cir. 2015) ..............................................................40

*De Acosta v. Brown*,
   146 F.2d 408 (2d Cir. 1944)..................................................................40

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Eggleston v. Twentieth Century Fox Film Corp.*,
  2022 WL 3371601 (E.D. Mich. Aug. 16, 2022) ..................................................40

*Esplanade Prods., Inc. v. Walt Disney Co.*,
  768 F. App'x 732 (9th Cir. 2019) ........................................................41

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) ................................................................ 1, 14, 16

*Folkens v. Wyland Worldwide, LLC*,
  882 F.3d 768 (9th Cir. 2018) ...............................................................10

*Friedman Prof. Mgmt. Co. v. Norcal Mut. Ins. Co.*,
  120 Cal. App. 4th 17 (2004) ........................................................55

*Funky Films, Inc. v. Time Warner Ent. Co.*,
  No. 8:03-cv-964-CJC-PLA, slip op. (C.D. Cal. Feb. 19, 2004), ECF
  No. 83, *aff'd*, 462 F.3d 1072 (9th Cir. 2006) ........................................65

*Funky Films, Inc. v. Time Warner Ent. Co.*,
  462 F.3d 1072 (9th Cir. 2006) ......................................................... 23, 25, 27

*Gable v. Nat'l Broad. Co.*,
  727 F. Supp. 2d 815 (C.D. Cal. 2010), *aff'd*, 438 F. App'x 587 (9th
  Cir. 2011) .................................................................................. 21, 65

*Gilbert-Daniels v. Lions Gate Ent.*,
  2023 WL 8938403 (C.D. Cal. Dec. 7, 2023) ........................................58

*Goldberg v. Cameron*,
  787 F. Supp. 2d 1013 (N.D. Cal. 2011) ...............................................37

*Gray v. Hudson*,
  28 F.4th 87 (9th Cir. 2022) ......................................................... 64, 65

*Hanagami v. Epic Games, Inc.*,
  85 F.4th 931 (9th Cir. 2023) ........................................................22

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985) ................................................................ 15, 40

iv

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*In re C.H.*,
  53 Cal. 4th 94 (2011) ...................................................................51

*In re Marriage of Nassimi*,
  3 Cal. App. 5th 667 (2016) ..........................................................51

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010).......................................................20

*Jacobsen v. Desert Book Co.*,
  287 F.3d 936 (10th Cir. 2002) .....................................................27

*Johannsongs-Publ'g, Ltd. v. Lovland*,
  2021 WL 5564626 (9th Cir. Nov. 29, 2021) ...............................58

*Jones v. Twentieth Century Studios, Inc.*,
  2023 WL 9051282 (C.D. Cal. Nov. 28, 2023)..............................65

*Kennedy v. Allied Mut. Ins. Co.*,
  952 F.2d 262 (9th Cir. 1991).......................................................59

*Knowles v. Spin Master, Inc.*,
  2019 WL 4565102 (C.D. Cal. Sept. 17, 2019) ............................58

*Kouf v. Walt Disney Pictures & Television*,
  16 F.3d 1042 (9th Cir. 1994)................................................. 23, 63

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999).....................................................................55

*Litchfield v. Spielberg*,
  736 F.2d 1352 (9th Cir. 1984) .....................................................28

*Masterson v. Walt Disney Co.*,
  821 F. App'x 779 (9th Cir. 2020) .......................................... 20, 21

*Narell v. Freeman*,
  872 F. 2d 907 (9th Cir. 1989)................................................ 24, 65

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Olson v. Nat'l Broad. Co.*,
    855 F.2d 1446 (9th Cir. 1988) .................................................................. 41, 63

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*,
    107 Cal. App. 4th 516 (2003) ...................................................................51

*People v. Schulz*,
    66 Cal. App. 5th 887 (2021) .....................................................................52

*RBB2, LLC v. CSC ServiceWorks, Inc.*,
    2019 WL 1170484 (E.D. Cal. Mar. 13, 2019) .......................................51

*Rentmeester v. Nike, Inc.*,
    883 F.3d 1111 (9th Cir. 2018) .................................................................23

*Rice v. Fox Broad. Co.*,
    330 F.3d 1170 (9th Cir. 2003) .............................................. 16, 20, 62

*Sega Enters. Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) .................................................................16

*Shay v. County of Los Angeles*,
    2019 WL 5420262 (C.D. Cal. Oct. 21, 2019)........................................25

*Shoraka v. Bank of Am., N.A.*,
    2024 WL 3468756 (C.D. Cal. Jan. 18, 2024) ........................................25

*Skidmore v. Zeppelin*,
    952 F.3d 1051 (9th Cir. 2020) (en banc) ...................................... *passim*

*Stromback v. New Line Cinema*,
    384 F.3d 283 (6th Cir. 2004)....................................................................21

*Swirsky v. Carey*,
    376 F.3d 841 (9th Cir. 2004)....................................................................19

*Tricor Am., Inc. v. Illinois Union Ins. Co.*,
    351 F. App'x 225 (9th Cir. 2009) ...........................................................52

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*United States v. Benavidez-Benavidez*,
    217 F.3d 720 (9th Cir. 2000)..................................................................10

*Van Asdale v. Int'l Game Tech.*,
    577 F.3d 989 (9th Cir. 2009)..................................................................59

**Statutes**

Cal. Civ. Code § 1641 ............................................................................54

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8......................................................................1

## I. INTRODUCTION

This appeal raises the straightforward question whether writing a non-fiction journalistic article endows its author with blocking rights to future creative works on the same subject matter. The answer is no. Copyright law requires the opposite: It "encourages others to build freely upon the ideas and information conveyed by a work," as part of its constitutional charge "[t]o promote the Progress" of the "useful Arts." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349-50 (1991); U.S. Const. art. I, § 8, cl. 8. Thus, as this Court recently recognized, it is "a feature of copyright law, not a bug or anomaly, that an author who deals in fact rather than fiction receives incomplete copyright protection for the results of his labor." *Corbello v. Valli*, 974 F.3d 965, 973 (9th Cir. 2020).

The district court rightly rejected Appellants' claim that Paramount Pictures Corporation's ("PPC") 2022 film *Top Gun: Maverick* ("*Maverick*") infringes their copyright in the 1983 non-fiction article "Top Guns" (the "Article"), as the two works have little in common beyond their shared subject of the U.S. Navy's real-life Top Gun academy. Then and now, Appellants rest their infringement claim on a hodgepodge of supposed similarities, which are either imagined or unprotectable facts and ideas. Upon reviewing the works and conducting a thorough extrinsic analysis, the court saw through Appellants' effort to obtain an effective monopoly over stories about Top Gun and granted summary judgment to PPC for lack of

1

substantial similarity. Along the way, the court properly excluded Appellants'
"expert" who failed every criterion of Rule 702, and dispensed with their breach of
contract claim over a credit provision whose plain language does not encompass
*Maverick*.

This is a textbook case for tossing an infringement suit on summary
judgment. The district court's ruling stands for no novel proposition about
copyright protection of nonfiction works. Rather, this case boils down to a
straightforward comparison of two vastly dissimilar works, and the axiomatic
principle that facts are not protected by copyright. This Court should affirm.

## II. STATEMENT OF THE ISSUES

1.    Whether the court rightly held that Ehud Yonay's nonfiction Article
about the Navy's real-life Top Gun academy was not substantially similar to PPC's
action-drama film *Maverick* about a fictional instructor training Top Gun graduates
for a death-defying mission to destroy an enemy nuclear facility, where the only
overlap between the two works is their shared subject of Top Gun.

2.    Whether the court correctly interpreted Yonay's contract with PPC
according to its plain language and held that Yonay was not entitled to credit on
*Maverick*.

3.    Whether the court appropriately exercised its discretion to exclude
Appellants' proffered literary expert under Federal Rule of Evidence 702 where he

2

failed to filter out unprotectable elements, subjectively compared the works, and otherwise provided an unhelpful and unreliable analysis.

4.    Whether the court appropriately exercised its discretion to admit PPC's naval aviation expert, a former Top Gun graduate and instructor who used his specialized knowledge and experience to opine on the factual accuracy of the Article and the purported similarities between it and *Maverick*.

### III.    STATEMENT OF THE CASE

**A.    Factual Background.**

**1.    The Works at Issue.**

<u>**The Article**</u>.  Investigative reporter Ehud Yonay contracted to write an article for *California Magazine* and to "use all reasonable care in reporting and writing the article to make sure that it is factual and accurate."  4-SER-1108–10. *California Magazine*, which specialized in "long-form non-fiction," published that article, *Top Guns*, in 1983.  3-ER-372–85; 3-ER-521–22.

The Article centers on the real-life Navy Fighter Weapons School, aka "Top Gun," whose "mission" is to prepare the best young fighter pilots for combat.  3-ER-376–78, 4-SER-891–92.  The Article reports: "Top Gun's hotshot aces have virtually revolutionized the fighter pilot business and . . . established themselves as the international masters of the deadly art of air-to-air combat."  3-ER-378.  The Article credits the school's success to its training program, which works to

"hammer[]" two-person F-14 crews into a team. 3-ER-376–78; 3-ER-384.

Invoking "navy jargon," such as "hops" (air combat maneuvers), "dogfighting"

(air-to-air combat), and "bogeys" (enemy planes), the Article outlines that

program. 3-ER-375–85. For example, it explains, on top of tactical "lectures and

briefings," aerial exercises include "one-versus-one hops (one student crew against

one instructor), then two-versus-two hops, and then . . . the tough two-versus-

unknown hop." 3-ER-384.

The Article describes the F-14 Tomcat (among other planes), which at the

time was the Navy's "supreme air war machine" flown by Top Gun trainees. 3-

ER-380. It details the F-14's features, including its flexible wings, haul capacity,

and shooting capabilities. 3-ER-380. And the pitfalls too, such as the plane's size,

cost, and "stall-prone" engine. 3-ER-380.

The Article reports on two real-life lieutenants, Alex "Yogi" Hnarakis and

Dave "Possum" Cully—a pilot and radar intercept officer ("RIO")—who train

together as a fighter crew. 3-ER-375–85. It documents the process by which they

become a team, including a simulated training exercise in which they "escorted"

attack planes "over 'enemy' land on a bombing mission." 3-ER-375–85.

Yonay recounts his own flight in an F-5, documenting the experience of

"pulling Gs" and "withstanding several times the force of the earth's gravitational

pull." 3-ER-383. Experiencing "classic air moves," including "flying upside

4

down," Yonay notes feeling "sheer nirvana" and "physical torture" from "pressure on your chest . . . so intense that you can hardly breathe." *Id.*

The Article has a non-linear structure, switching between Yogi and Possum's personal experiences and the history of Top Gun.  3-ER-375–85.  It begins with the details of a training exercise in which Yogi and Possum are defeated by a mock bogey, 3-ER-375–77, before transitioning to a description of Naval Air Station ("NAS") Miramar and explaining the role for which Yogi and Possum are training, 3-ER-377–79.  It next provides the two trainees' biographical details, including their hometowns, education, and prior Navy experience.  3-ER-379–80.  The Article then shifts to a description of their plane and how pilots learn to fly, including the use of flight simulators and training for night landings.  3-ER-380–81.  It recalls how prior to arriving at Top Gun, Yogi and Possum—along with their squadron—went on a six-month tour aboard an aircraft carrier.  3-ER-382.  Jumping further back in time, the Article covers the history of Top Gun from its 1968 genesis.  3-ER-383–84.  Returning to 1983, the Article describes Yogi and Possum's final "hop" and concludes with their Top Gun graduation.  3-ER-384–85.

***Top Gun: Maverick***.  *Maverick* is the 2022 sequel to the 1986 film *Top Gun.* Set more than 30 years after *Top Gun*, *Maverick* features Pete "Maverick" Mitchell, *Top Gun*'s fictional protagonist, who is now a Captain and test pilot working on the Navy's hypersonic scramjet program (not located at Top Gun).

5

TGM 3:06-14:30.  After learning Vice Admiral Chester "Hammer" Cain plans to shut down the program to fund drone technology, Maverick takes one last flight in an attempt to meet the program's goal of reaching Mach 10.  TGM 5:11-5:48, 7:55-8:48.  He succeeds, but pushes the prototype beyond its limits, destroying it.  TGM 12:28-12:45.

Maverick's career has stalled due to similar insubordinate acts, and Admiral Cain wants to ground him, but Maverick's friend and former rival, Tom "Iceman" Kazansky, now an Admiral and the Pacific Fleet Commander, sends him to Top Gun at NAS North Island.  TGM 15:14-16:02.  Once Maverick arrives, he reunites with Penny Benjamin—a single mother who owns the air base's bar—with whom Maverick formerly had an on-again-off-again relationship.  TGM 22:09-22:43.

The Navy tasks Maverick with training an elite group of Top Gun graduates for a mission to destroy an unsanctioned uranium plant located at the bottom of a canyon in enemy territory.  TGM 18:01-18:44, 19:46-19:57.  To account for the surface-to-air missiles ("SAMs") and fifth-generation fighters defending the plant, Maverick devises an attack strategy with fast-paced, low-altitude flying, but air boss Vice Admiral Beau "Cyclone" Simpson and the graduates are skeptical that approach is viable.  TGM 18:44-19:57, 48:35-50:10.

Among the graduates is Bradley "Rooster" Bradshaw, the son of Maverick's late best friend, "Goose," who died in a training accident with Maverick piloting.

6

TGM 19:57-20:37.  Maverick reveals he pulled Rooster's first Naval Academy application because of a promise Maverick made to Rooster's late mother.  TGM 1:04:53-1:06:18.  Rooster resents Maverick for impeding his career and blames Maverick for Goose's death.  TGM 56:05-56:28, 1:04:50-1:06:00, 1:15:07-1:15:36.

Rooster also clashes with fellow graduate Jake "Hangman" Seresin over their contrasting styles: Rooster calls Hangman reckless, and Hangman criticizes Rooster as too cautious.  TGM 27:50-28:35, 52:33-53:03.  Other trainees include pilots Natasha "Phoenix" Trace and Reuben "Payback" Fitch, and weapons officers Robert "Bob" Floyd and Mickey "Fanboy" Garcia.  TGM 24:50-26:10.  Maverick works to earn the graduates' respect and instills teamwork and camaraderie through unconventional training.  TGM 34:12-35:02, 1:01:22-1:02:24.  He also rekindles his romance with Penny.  TGM 45:54-48:20, 1:02:55-1:04:45.

As the mission date approaches, none of the trainees is able to complete the course simulation within Maverick's parameters.  TGM 50:25-52:30.  Maverick fears sending Rooster on a mission that might result in Rooster's death.  But a meeting with Iceman—who has cancer—convinces Maverick to release his anxiety and let go of past guilt.  TGM 57:00-59:05.

Iceman dies, and Cyclone removes Maverick as instructor.  TGM 1:15:47-1:17:36.  Cyclone announces more dangerous mission parameters, but Maverick

takes an unauthorized run of the course and completes it, stunning everyone.  TGM 1:19:16-1:22:27.  Cyclone reluctantly appoints Maverick team leader, and Maverick decides the mission will be carried out by two strike teams—one led by him and the other by Rooster.  TGM 1:26:07-1:26:35.

The strike teams destroy the enemy target, but on the way out of the canyon, they are confronted by SAMs.  TGM 1:36:55-1:40:15.  Maverick sacrifices his plane to protect Rooster and gets shot down.  TGM 1:39:55-1:40:15.  Cyclone orders the remaining fighters back to the aircraft carrier, but Rooster ignores him and returns for Maverick.  TGM 1:40:55-1:42:52.  On the ground, Maverick is about to be attacked by an enemy helicopter when Rooster arrives and shoots it down.  TGM 1:41:35-1:42:52.  Rooster is hit by a SAM and ejects.  TGM 1:42:52-1:43:03.  Stranded, Maverick and Rooster steal an F-14 from a nearby base, but are intercepted by enemy fighters.  TGM 1:45:40-1:50:55.  Maverick takes out two enemy planes, but then runs out of ammunition.  TGM 1:50:55-1:54:15.

Resigned to their fate, Maverick apologizes for failing to keep Rooster safe. TGM 1:55:24-1:55:32.  Just then, Hangman, who had been on standby for the mission, shoots down the enemy fighter, all three return to the carrier in triumph, and Maverick and Rooster emotionally reconcile.  TGM 1:55:33-1:59:20.  The film ends with Rooster reflecting on his renewed relationship with Maverick, his father figure, while Maverick and Penny fly off into the sunset.  TGM 2:00:10-2:01:35.

**2.      The Assignment and Termination.**

On May 18, 1983, Yonay assigned motion picture rights in the Article to

PPC (the "Assignment"). 3-ER-391–401. As contemporaneous records

demonstrate, PPC viewed the Assignment as gratuitous—it "d[id]n't need this

article to do our movie as all the facts are public domain"—but pursued the rights

for "p[ea]ce of mind." 4-SER-1025. The Assignment has a limited credit

provision and confirms that it does not derogate any rights that PPC enjoys as a

member of the public. 3-ER-396–97.

Appellants terminated the Assignment's grant of copyright effective January

24, 2020. 2-ER-219–21.

**B.      Procedural History.**

The operative complaint asserts claims for copyright infringement,

declaratory judgment, and breach of contract. 3-ER-517–33. PPC moved to

dismiss, but the court denied the motion, citing this Court's precedents disfavoring

dismissals at the pleading stage on substantial similarity. 3-ER-402–08.

Discovery followed, confirming the Article was factual (and contained no fictional

elements), 1-SER-3–64, 4-SER-883–940, and demonstrating the lengths PPC went

to ensure *Maverick* portrayed Top Gun realistically, all in consultation with the

U.S. Navy, 1-SER-66–77, 3-SER-823–46, 4-SER-848–79, 4-SER-1013–44.

Appellants and PPC moved for summary judgment and to exclude the other side's experts. 3-ER-563–66. The court granted PPC's summary judgment motion and denied Appellants' summary judgment motion; granted PPC's motion to exclude Appellants' proffered literary expert; denied Appellants' motion to exclude PPC's naval aviation expert; and deemed moot Appellants' motion to exclude PPC's literary expert, on whom it did not rely. 1-ER-3–16.

## IV.   STANDARD OF REVIEW

A grant of summary judgment is reviewed *de novo*. *Folkens v. Wyland Worldwide, LLC*, 882 F.3d 768, 773 (9th Cir. 2018). The decision whether to exclude expert testimony is reviewed for abuse of discretion, meaning the reviewing court "cannot reverse unless [it] ha[s] a definite and firm conviction that the district court committed a clear error of judgment." *United States v. Benavidez-Benavidez*, 217 F.3d 720, 723 (9th Cir. 2000).

## V. SUMMARY OF ARGUMENT

Yonay wrote a nonfiction Article about the Navy's real-life Top Gun academy. PPC wrote a completely different, fictional story and made that story into *Maverick*, which shares with the Article its basic subject of Top Gun and nothing more. Because Top Gun is a real school, naval aviation is a real field, and *Maverick*'s producers tried to make the film realistic (with the guidance of Navy consultants), the Article and *Maverick* necessarily share some elements. But those

10

elements are factual and not Yonay's protected expression. *Maverick* did not infringe on the Article's copyright, and the court correctly dispensed with this suit on summary judgment.

Reviewing the works themselves makes that outcome crystal clear, so Appellants try to create a smokescreen. They conflate the copyrightability of the Article—which was never in dispute—with the protectability of the elements that PPC allegedly borrowed from it. They distract from the real issues with a misleading account of the parties' licensing history and an irrelevant meditation on copyright termination. And they attack the court for conducting its own extrinsic analysis of the works—the actual yardstick for Appellants' infringement claim—when they failed to proffer a reliable expert. All the while, Appellants argue their subjective characterizations of the works under the guise of the extrinsic test, trying to conjure up similarities by using the same adjectives to describe both works, misstating what happens in them, and relying on their own *ipse dixit* rather than objective record evidence. When the smoke lifts, the inescapable conclusion is that the works are not substantially similar as a matter of law.

Appellants' contract claim is equally groundless, and the court rightly granted summary judgment there too. Because *Maverick* falls outside the scope of the credit provision's plain language, Appellants advocate for an atextual interpretation that writes out limiting language. But the contract means what it

11

says, and Appellants have no factual or legal support for their contrary contention.

Finally, the court did not abuse its discretion in excluding Appellants' literary expert Henry Bean or including PPC's naval aviation expert Andrew Craig. Bean fell short on every dimension of Rule 702, and Appellants cannot blame the court for their own failure or demand it abdicate its gatekeeping responsibilities. Nor can they complain about Craig's admission, as his expertise served only to buttress the court's findings about the factual matter that must be filtered out of the extrinsic analysis—a result compelled by the asserted truths doctrine regardless (on top of Appellants' failure to identify a single fictional element in the Article). Appellants identify no reversible error in the decision below, and this Court should affirm.

## VI.    ARGUMENT

### A.    The Court Rightly Granted Summary Judgment to PPC.

#### 1.    Appellants' Argument Rests on a Series of False Premises.

To prevail, Appellants must show there is a genuine dispute of material fact that the Article and *Maverick* are substantially similar in their protected expression.  Tellingly (and improperly) Appellants do not even include a summary of the Article or *Maverick*.  Instead, they distract from the analysis at hand with a series of strawmen.

12

### a.   False Premise #1: Licensing History and the Copyright Termination Context Impact the Infringement Analysis.

Appellants argue that the parties' licensing history and the spirit of copyright termination somehow inform the substantial similarity analysis.  Br. 3-4, 13, 64-66.  Neither does.

Licensing history does not bear on whether works are substantially similar; that one author once obtained a license from another does not, for example, render the dialogue in their works any more similar or align their themes.  *Accord Burroughs v. Metro-Goldwyn-Mayer, Inc*., 683 F.2d 610, 623-28 (2d Cir. 1982) (copyright claim failed for lack of substantial similarity notwithstanding defendant's previous purchase of (since-terminated) license from plaintiffs).  The substantial similarity test remains the same—it hinges on an analysis of the works themselves rather than the parties' historical relationship.

Appellants also get the history wrong.  PPC always viewed the Assignment as gratuitous; PPC "d[id]n't need this article to do our movie as all the facts are public domain," but nonetheless purchased the rights (for just $20,000) for "p[ea]ce of mind," i.e., to avoid being mired in frivolous litigation.  4-SER-1025.  When PPC purchased the rights in 1983—less than a month after publication, 3-ER-521–22; 3-ER-391—PPC also did not know how its then-hypothetical film would take shape.  The Assignment gave PPC *freedom* to borrow what it wanted from the Article, but did not *obligate* PPC to use any of its protected expression.  A

13

studio's precautionary step of acquiring adjacent rights is common practice and common sense, not the basis for an adverse inference.[1]

Appellants' long-winded discussion of the purported purpose behind copyright termination is equally misguided. While Appellants bemoan that the court "disregarded . . . the remedial purpose of the [Copyright] Act's termination provisions," Br. 64, even Appellants do not advocate for a different substantial similarity test when an infringement claim intersects with copyright termination. Put simply, the copyright termination statute has no bearing on whether one work is substantially similar to another.

> **b.    False Premise #2: The Court's Extrinsic Analysis Traded the Fact/Expression Dichotomy for a "Fact/Fiction Dichotomy."**

Appellants falsely accuse PPC and the court of rebuffing the fact/expression dichotomy in favor of a "fact/fiction dichotomy." Br. 10-13. First, PPC and the court both heeded the fact/expression dichotomy—though that doctrine does not aid Appellants' case but rather "limits severely the scope of protection in fact-based works" like the Article. *Feist*, 499 U.S. at 350. Second, to the extent PPC and the court concerned themselves with fact versus fiction, they did so only because *Appellants* refused to submit to application of the asserted truths doctrine,

---

[1] Relatedly, although Appellants claim PPC "renounced" the Article's copyright, Br. 13, the parties actually dispute only the *scope* of that copyright.

2-ER-62, and repeatedly claimed factual elements as the basis for their infringement claim.

The fact/expression dichotomy instructs how to understand the copyright in factual works like the Article, given that "[n]o author may copyright his ideas or the facts he narrates." *Harper & Row Publishers, Inc. v. Nation Enters*., 471 U.S. 539, 556 (1985). A factual work can be copyrighted, but "[t]he copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality." *Id*. at 547. This Court's recent decision in *Corbello* exemplifies this principle. In *Corbello*, this Court held that the creators of a play about the musical quartet the Four Seasons did not infringe one band member's nonfiction autobiography, "even if the writers of the Play 'appropriated [plaintiff's] historical research.'" 974 F.3d at 984; *see also id.* at 973 ("an author who deals in fact rather than fiction receives incomplete copyright protection"). As here, the proffered similarities between the works distilled to unprotectable facts (or asserted truths, which are treated as facts), so the works failed the substantial similarity test as a matter of law. *Id.* at 975-84.

Ironically, it is Appellants who misapply the fact/expression dichotomy. Appellants repeatedly conflate the copyrightability of the Article—which was never in dispute—with the protectability of the elements that PPC allegedly borrowed from it. And they suggest that, because the Article used original

expression to convey facts, that expression endows Appellants with the rights to those underlying facts too.  *E.g.*, Br. 11-12.  It does not.  No matter how "colorful" the Article's descriptions may be, Br. 11, the underlying facts are just that—facts belonging to the public, not to Appellants.  And to any extent facts or ideas are inextricably intertwined with expression, they are *all* unprotected, not the other way around.  *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1174-75 (9th Cir. 2003), *overruled on other grounds by Skidmore v. Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (en banc); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1524 (9th Cir. 1992).

Appellants' own authorities make this clear.  As the Supreme Court explained in *Feist* (misleadingly excerpted by Appellants, Br. 11): When an "author clothes facts with an original collocation of words, he or she may be able to claim a copyright in this written expression.  *Others may copy the underlying facts from the publication, but not the precise words used to present them*."  499 U.S. at 348 (emphasis added).  Thus, while the Article's prose is protected, copyright law not only tolerates but "encourages" other creators "to build freely upon the ideas and information conveyed" by it.  *Id.* at 350.

It is thus unclear what Appellants hope to gain by pointing out, for example, that the Article described pilots' "'shit-hot' machismo," Yogi and Possum's "'security blanket' bond," and "their place in 'Camelot' at 'King Arthur's Round

16

Table [with] the gathering of the greatest of the greats in fighter aviation.'"  Br. 11.  These descriptors may be original, but the underlying attributes are not.  *See Corbello*, 974 F.3d at 976 (personality traits of real people, as depicted in narrative work, are "not original to the [w]ork, and so not a protectable element").  And these descriptors are not in *Maverick*.  Thus, the court did not hold unprotectable "any expression in Yonay's Story containing a kernel of fact," Br. 11; it correctly recognized the protected expression was not copied, and the overlapping facts themselves were not protected.

Nor did the court impose a "fact/fiction dichotomy," as Appellants' claim.  Br. 10.  Underscoring the absurdity of this argument, the court's order used the terms "fiction," "fictional," or "non-fiction" just three times collectively—and only then to describe (correctly) the nature of the works themselves.  1-ER-3; 1-ER-11.  Moreover, to the extent the court paid heed to the factual accuracy of the Article, that served only to bolster its determination that such facts were appropriate for filtration in the extrinsic analysis.  *Corbello*, 974 F.3d at 975 (court must "filter out" from extrinsic analysis "non-protectable elements" including facts).  Below, Appellants protested that the asserted truths doctrine—whereby "elements of a work presented as fact are treated as fact, even if the party claiming infringement contends that the elements are actually fictional," *Corbello*, 974 F.3d at 978— should not apply to the Article.  2-ER-62.  The court did not accept Appellants'

17

argument, 1-ER-12, but to insulate its decision, it also confirmed against the record evidence that the overlapping elements between the Article and *Maverick* were factual. This act of hyper-caution only could have worked in *Appellants'* favor.

### c.    False Premise #3: The Court "Broadly Disregard[ed]" Similarities as Scènes-à-Faire.

Appellants falsely claim "[t]he court repeatedly ruled that the [Article's] elements were unprotected *scènes à faire*." Br. 16. The court applied *scènes-à-faire* only *twice* in its decision, once noting that "fighter pilots landing on an aircraft carrier, being shot down while flying, and carousing at a bar" are "unprotected facts, familiar stock scenes, or scènes à faire," and once stating that "settings[] such as a jet's cockpit, the sky, a classroom, an aircraft carrier, and a bar or 'officer's club' are unprotectable scènes à faire." 1-ER-12–13. Thus, the "*scènes-à-faire*" in question were not literary contrivances, but rather factual features of naval aviation and/or Top Gun and, at minimum, unprotectable for that additional reason—*mooting* this whole argument. The court itself catalogued various overlapping reasons for finding Appellants' proffered similarities unprotectable (general ideas, facts, stock scenes, and scènes-à-faire).

For this same reason, Appellants' argument that the court required "expert guidance" to assess "the stock elements of naval literature in 1983," Br. 16, misses the mark. Regardless whether "aerial action scenes" were common in movies in 1983—and they were, 4-SER-991–92—no expert testimony is necessary to

understand that air-to-air combat involves "aerial action scenes."  Br. 17.

Likewise, unlike *Swirsky*'s niche analysis whether similarities in musical

"motives" could "be explained by the common-place presence of the same or

similar 'motives' within the relevant field," *Swirsky v. Carey*, 376 F.3d 841, 850

(9th Cir. 2004), the Article's "*scènes-à-faire*" could be ascertained with common

sense alone—for example, that scenes in a cockpit, in the sky, and in the classroom

"flow necessarily or naturally from [the] basic plot premise" of the fighter pilots

who teach and train at Top Gun, *Corbello*, 974 F.3d at 975.

### d. False Premise #4: Courts Must Consider Expert Testimony in Conducting a Substantial Similarity Analysis, Irrespective of Rule 702.

Appellants' next troubling argument is that the court was *required* to

consider literary expert evidence to rule on substantial similarity, even though they

failed to proffer an expert whose testimony satisfied Federal Rule of Evidence 702.

Br. 13-15.  It was Appellants' responsibility to proffer an admissible expert.  They

did not.  Rule 702 does not fall to the wayside when a court must evaluate

substantial similarity.  Indeed, Appellants recognized as much when they moved to

exclude PPC's literary expert.  3-ER-564.

Bean's exclusion was not just permissible but required.  Rule 702 was

amended just last year to *reinforce* the judicial gatekeeping role, in response to too

many courts incorrectly holding that "the critical questions of the sufficiency of an

expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Rule 702 is irreconcilable with Appellants' exhortation that a court may not conduct its extrinsic analysis without expert guidance. Indeed, acceptance of Appellants' "no-extrinsic-test-without-expert-evidence rule" would enable an infringement plaintiff to strategically avoid summary judgment and proceed to trial simply by proffering an inadmissible expert—or worse yet, none at all.[2]

Appellants' authorities stand for the unremarkable proposition that expert testimony *can* be helpful for evaluating substantial similarity, not that it is *essential*. A panel of this Court recently addressed this argument head-on, expressly holding that "determining substantial similarity does not necessarily require expert testimony." *Masterson v. Walt Disney Co.*, 821 F. App'x 779, 781 (9th Cir. 2020); *see also, e.g.*, *Rice*, 330 F.3d at 1180 (holding that court "clearly" did not abuse discretion in disregarding both parties' experts "in light of its gatekeeping role" and affirming summary judgment for defendants on substantial

---

[2] Nor can Appellants protest that infringement defendants should proffer their own experts to avoid that result. On summary judgment, "[w]here the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

20

similarity).  Indeed, this Court has affirmed dismissals on substantial similarity grounds *even before discovery* "repeatedly over the last decade."  *Masterson*, 821 F. App'x at 780 & n.1 (collecting cases).  Of course, if a court can properly rule on substantial similarity on a motion to dismiss, then expert testimony is definitionally not required across the board.

The idea that expert testimony is always necessary is especially strained where, as here, the works in question are regularly consumed by and broadly understandable to the general public, such as popular movies or magazine articles.[3] *See Gable v. Nat'l Broad. Co*., 727 F. Supp. 2d 815, 836 & n.18 (C.D. Cal. 2010), *aff'd*, 438 F. App'x 587 (9th Cir. 2011); *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1062 (C.D. Cal. 2010).  This case does not require the dissection of a computer program or analysis of the chord progressions of a symphony, where experts could illuminate technical aspects of the works beyond the ken of the typical jurist.  Appellants misleadingly claim "[t]his Court's consistent precedent recognizes that judges and lawyers are often unqualified and/or ill-equipped to conduct the multifaceted *literary* analysis copyright

---

[3] Other circuits have called into question whether expert testimony should even be allowed in cases that "involve[] a literary work aimed at a general audience" rather than "complex or technical" subject matter "such as a computer program or functional object."  *E.g.*, *Stromback v. New Line Cinema*, 384 F.3d 283, 295 (6th Cir. 2004).

infringement cases frequently require" and cite *Hanagami v. Epic Games, Inc.,* 85 F.4th 931, 945 (9th Cir. 2023), in support. Br. 14 (emphasis added). But *Hanagami* says no such thing. Moreover, *Hanagami* concerned the mechanics of choreography, a niche art form far less familiar to courts than a popular movie or magazine article. This case, in contrast, requires no special expertise.

Appellants next try to use the court's motion to dismiss order against it, essentially arguing that, after the court denied PPC's motion to dismiss, it was bound to deny PPC's summary judgment motion too. Br. 15. But just because the court gave Appellants the *opportunity* to leverage expert testimony does not mean expert evidence was *required* for the court to rule on the merits. The court exercised caution in allowing this case to proceed to summary judgment—based largely on this Court's precedents disfavoring infringement dismissals on the pleadings—and that caution cannot now be weaponized against the court. Any contrary rule would mean winning a motion to dismiss automatically entitles a plaintiff to a jury trial. That is not the law.

### 2. *Maverick* Did Not Infringe the Copyright in the Article.

#### a. On Summary Judgment, the Only Question Is Whether Appellants Can Satisfy the Objective Extrinsic Test for Substantial Similarity.

A copyright plaintiff must prove substantial similarity between "protected elements" of his work and the allegedly infringing work. *Rentmeester v. Nike,*

*Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018), *overruled on other grounds by Skidmore*, 952 F.3d 1051. Even if a plaintiff can establish that the defendant actually copied his work, that does not establish liability because the Copyright Act does not prohibit all copying, but only "unlawful appropriation"—that is, where the defendant copied enough "expression" "to render the two works 'substantially similar'" in their "protected elements." *Id.*

"[D]etermining whether works are substantially similar involves a two-part analysis consisting of the 'extrinsic test' and the 'intrinsic test.'" *Rentmeester*, 883 F.3d at 1118. The extrinsic test "assesses the *objective* similarities of the two works, focusing only on the protectable elements of the plaintiff's expression," *id.* (emphasis added), whereas the intrinsic test "examines an ordinary person's *subjective* impressions," *Funky Films, Inc. v. Time Warner Ent. Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006) (emphasis added), *overruled on other grounds by Skidmore*, 952 F.3d 1051. On summary judgment, only the extrinsic test is relevant; if the works fail that test, the court must enter judgment for the defendant. *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).

The extrinsic test's objective analysis "focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the two works. *Id.* Courts applying the extrinsic test "must take care to inquire only whether the *protectible elements, standing alone*, are substantially

23

similar," and therefore must "filter out and disregard the non-protectible elements." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) (cleaned up).

Chief among these unprotected elements are *facts*, which inherently are not original to an author. *Corbello*, 974 F.3d at 973. Copyright "in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts," *Narell v. Freeman*, 872 F. 2d 907, 911 (9th Cir. 1989), and it is "a feature of copyright law, not a bug or anomaly, that an author who deals in fact rather than fiction receives incomplete copyright protection for the results of his labor," *Corbello*, 974 F.3d at 973.

Copyright protection does not extend to facts even where the idea at issue is an "interpretation" of a historical event. *Corbello v. Devito*, 2015 WL 5768531, at *12 (D. Nev. Sept. 30, 2015). After all, "every relation of a historical fact beyond direct observation is tainted to some degree by some person's interpretation, so distinguishing between historical facts and 'interpretations' of those facts . . . would destroy the rule that historical facts are unprotected." *Id.*; *see also Corbello*, 974 F.3d at 976 (depiction of non-fiction character's "cool" personality not protectable). Thus, "[h]istorical facts and theories may be copied, as long as the defendant does not 'bodily appropriate' the expression of the plaintiff." *Narell*, 872 F.2d at 910-11.

24

**b.  The District Court Rightly Found That Appellants Cannot Satisfy the Extrinsic Test for Substantial Similarity.**

A comparison of the works confirms Appellants cannot satisfy the extrinsic test.[4]  Bereft of evidence, Appellants fill their brief with subjective and frequently false characterizations of the works.  They conjure false similarities—easily rebutted by review of the works—in an effort to make two vastly different works seem alike.  But no amount of attorney argument can substitute for what the evidence plainly shows, and what the court correctly held: As a matter of law, the Article and *Maverick* are not substantially similar.  Indeed, this Court routinely affirms summary judgment on substantial similarity for infringement defendants even with far more similar *fictional* works.  *E.g.*, *Benay v. Warner Bros. Ent.*, 607 F.3d 620, 625 (9th Cir. 2010), *overruled on other grounds by Skidmore*, 952 F.3d 1051; *Funky Films*, 462 F.3d at 1075-78.

i. **PLOT, SEQUENCE OF EVENTS, AND PACING.**

As explained above, *see supra* Section III.A.1., the plots, sequence, and

---

[4] While reference to the works themselves lays bare that *Maverick* does not infringe the Article, on this Court's de novo review, it can also consider the expert opinions of PPC's literary expert James McDonald (4-SER-944–1011), whose opinions the court did not hold inadmissible.  Exclusion of one side's affirmative expert does not require exclusion of the other's rebuttal expert, because "[t]here is still a theory to rebut, even if an affirmative expert will not testify in support of that theory."  *Shoraka v. Bank of Am., N.A.*, 2024 WL 3468756, at *2 (C.D. Cal. Jan. 18, 2024) (citation omitted); *Shay v. County of Los Angeles*, 2019 WL 5420262, at *5-6 (C.D. Cal. Oct. 21, 2019) (same).  Indeed, Appellants argue the court should have considered both sides' experts.  Br. 13, 15.

pacing of the two works are fundamentally dissimilar. The Article is a non-fiction piece about the U.S. Navy Fighter Weapons School. 3-ER-375–85. Structured in non-linear fashion, the Article bounces back and forth between two young pilots' then-current training at the school, the history of the school, an overview of fighter jets, and a first-hand account of what it is like to experience G-force. 3-ER-375–85; 1-SER-81–100. *Maverick*, by contrast, is a narrative fictional tale, with consistent pace and linear sequence, about a veteran fighter pilot, Maverick, who returns to Top Gun to train a new generation of pilots—including Rooster, who blames Maverick for the death of Rooster's father—for an attack on an enemy installation. TGM 3:06-1:59:22; 1-SER-100–02, 1-SER-113–15. None of the graduates can complete the mission's training course. TGM 48:30-53:07, 1:07:54-1:14:05, 1:17:10-1:17:19. Maverick takes an unauthorized flight through the course, proving it can be done, and is then appointed team leader. TGM 1:19:21-1:23:32. Maverick leads a successful mission, then sacrifices his jet to protect Rooster, who in turn saves Maverick. TGM 1:25:45-1:42:52. The two steal a plane from an enemy base, survive an aerial chase, and are saved by Hangman. TGM 1:45:40-1:56:11. The court rightly found no substantial similarity in these elements, explaining that the Article and *Maverick* were "largely dissimilar" in these respects and "any similarities are based on unprotected elements." 1-ER-10.

Any similarity between the works' "plots" stems from the fact that both are

26

set (in part) at Top Gun—a real naval academy neither invented by Yonay nor owned by Appellants. This Court must dispense with similarities grounded in "the assertedly historical elements" in the Article, which are not protected by copyright law (and comprise virtually all of the Article's "plot"). *Corbello*, 974 F.3d at 976. Appellants contest this binding authority with an out-of-circuit case they claim held plot "based on real people and places" qualifies for copyright protection. Br. 41 (citing *Jacobsen v. Desert Book Co.*, 287 F.3d 936, 945-47 (10th Cir. 2002)). *Jacobsen* says nothing of the sort. In reality, it held that an author's "verbatim copying" of a memoir supported an infringement claim. 287 F.3d at 947-48.

Appellants do not and cannot identify specific, articulable similarities between the works' actual narratives or storylines, as required. They resort to generalities that are, at best, unprotectable "general plot ideas," *Funky Films*, 462 F.3d at 1081, like "journey[ing] through what it takes to be the best of the best in fighter aviation"; "following the demanding, intense lives of fighter pilots"; "focus[ing] on a small, elite group of pilots who are bound together by their shared experiences and sacrifices in a high-stakes environment," and showing pilots' "challenges," "growth," and "preparation for real combat" during training.[5] Br.

---

[5] It is unclear what Appellants refer to when they say both works show pilots' "'shit-hot' bravado" through training. Br. 43. Characters' bravado is not plot, nor is it protectable (and the "shit-hot" descriptor is not shared).

27

41-43.  Others are not only vague, but also not plot at all, like "foreground[ing] the humanity of pilots"[6] or portraying pilots "as exceptional individuals."  Br. 41-42.  And Appellants insert comparisons to the 1986 *Top Gun* film, *e.g.*, Br. 42, but that film is not owned by them and irrelevant to the infringement analysis.  The rest are "random similarities scattered throughout the works," which cannot give rise to an infringement claim, *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984), and in any event are strained or altogether false (not to mention unprotectable), as shown in the following chart.

| Purported Similarity | Response |
|---|---|
| Both works' "plots [are] led by a driven loner (Yogi; Maverick)."  Br. 42. | Unprotectable general plot idea.<br>Not accurate—Yogi is not a loner (none of Appellants' cited evidence suggests as much) and to the contrary is a team player whose close relationship with his RIO is profiled in the Article.  3-ER-377, 3-ER-381–82, 3-ER-384–85.  To the extent Maverick begins as a loner (a dubious assertion, as he has strong relationships with his scramjet team, TGM 5:04-11:47), he grows into strong personal relationships with Penny, Rooster, and others by the end of the film, TGM 1:57:37-1:59:20, 2:00:13-2:01:27. |

---

[6] Appellants assert both works do this to "explore the complexity of human beings sent off to war and to invest the audience in the narrative," Br. 41, but that is inaccurate (Yogi and Possum are sent on a cruise, not into war, 3-ER-385) and irrelevant (the extrinsic test examines specific, objective plot points, not speculation about an author's motives).

| | |
|---|---|
| "The Story highlights that only the cream of the crop get invited back as instructors, and in the Sequel, Maverick gets invited back as an instructor." *Id.* | Unprotectable fact.<br><br>Not "highlight[ed]"; a single sentence in the Article states: "If they play it right and look sharp, they might even get invited back as Top Gun instructors -- which is as high as a fighter pilot can get." 3-ER-377.<br><br>Not similar; Maverick is *ordered* back to Top Gun against his will after an act of insubordination, in lieu of being grounded.  TGM 5:15-17:49. |
| Both works share a "'bullseye' metaphor and for the same literary purpose." *Id.* | Not plot.<br><br>Not accurate.  *Maverick* does not use a bullseye as a metaphor.  Rather, Hangman is shown excelling at bar games; he hits the bullseye of a dartboard in a game of darts and later sinks a no-look pool shot.  TGM 21:30-21:39, 24:49-24:52.<br><br>Not similar; the cited portion of the Article likens the aviation "caste system" to the concentric "circles around the bull's-eye of a gunnery target."  3-ER-384.  The bar scene does not depict this caste system or even feature a gunnery target. |
| The Article "portrays Yogi and Possum as an intimate 'home and family,'" and "Maverick act[s] as a father figure to Rooster."  *Id.* | Unprotectable fact (that a squadron develops family-like ties, 4-SER-902).<br><br>Not plot.<br><br>Not accurate.  The Article describes the *Wolfpack squadron* as Yogi and Possum's temporary "home and family," from which they are *separated* while at Top Gun.  3-ER-381–82.<br><br>Not similar; Yogi and Possum are |

29

| | |
|---|---|
| | contemporaries, 3-ER-379–80, whereas Maverick and Rooster develop a father-son type bond, *e.g.*, TGM 2:00:13–2:01:36.  Maverick's bond with Rooster also derives from their distinctive history, with Maverick feeling lasting guilt over the death of Rooster's father in an accident when they were trainees together long ago. *E.g.*, TGM 31:03-32:37, 1:55:15-1:55:30.  There is no parallel in the Article. |
| The Article "suggests that life as an elite pilot strains a marriage," and "Maverick's life as an elite pilot strained his prior relationship with Penny."  Br. 42-43. | Unprotectable fact. Not plot. Not similar.  The Article's "Heater" talks about not being able to tell his wife about his mission or to explain the feeling of flight, 3-ER-379, but the source of strain in Penny and Maverick's relationship is his absence, *e.g.*, TGM 22:11-24:10, 1:07:01-1:07:30.  There is also no suggestion that Possum is anything but happily married.  Maverick is not married and to the contrary had an on-again-off-again dating relationship with Penny. TGM 22:11-24:10. |
| Both works "emphasize the importance of rigorous training for combat against a three-week deadline, with particular focus on dogfighting tactics and extreme mental and physical demands."  Br. 43. | Unprotectable fact. Unprotectable general plot idea (to the extent it distills to achieving a goal under time pressure). Not accurate.  Yogi and Possum train at Top Gun for *five weeks*, not three.  And in *Maverick*, the pilots have *less than two weeks* to train for their mission.  3-ER-377; TGM 19:34-19:38, 1:07:39-1:07:54. |

30

| | |
|---|---|
| | Not similar; Yogi and Possum complete a general Top Gun training course (not mission-driven training) and go off on a cruise (not combat) two weeks after they finish the course. 3-ER-382, 3-ER-385. Their only time pressure is to "make [] up" for getting shot down in a training exercise before graduation. 3-ER-377. In *Maverick*, the pilots proceed to a deadly combat mission immediately after their less-than-two-week training. TGM 1:26:00-1:57:35. |
| "Agonizing training is countered in both Works by reflective moments on the ground, bar revelry, and lighthearted recreational sailing." *Id.* | Unprotectable abstract idea. |
| | Not plot. |
| | Unprotectable facts (that Top Gun instruction includes aerial training and living and studying on the ground; that pilots spend some of their downtime in bars, including the one located at Top Gun; that the Wolfpack squadron went on a yacht while in Australia). |
| | Not similar. The "ground" scenes in *Maverick* advance its specific plot described above, including the deepening relationship between Maverick and Penny, and Maverick healing his relationship with Rooster, which have nothing in common with the Article. The sole bar scene in *Maverick*, TGM 21:24-32:38, precedes training and diverges from the scene in the Article with "nearly nude dancers" performing on "a small stage lit in reds and greens," 3-ER-378–79. The sailing in the Article occurs on another continent during Yogi and Possum's tour with their squadron *before* their |

31

| | |
|---|---|
| | time at Top Gun, and the "glorious sailing yacht" with champagne transporting an entire squadron from an aircraft carrier bears no resemblance to Maverick and Penny manually sailing her broken two-person sailboat through rough seas to get the boat's engine repaired.  3-ER-382; TGM 45:41-47:29. |
| In the Article, "the pilots place a big brass bell in their favorite bar to be rung when someone breaks 'house rules' and must buy a round for all," and "[t]he same brass bell shows up" in *Maverick*.[7]  Br. 43-44. | Unprotectable fact (that the Wolfpack hung a brass bell, and that such bells are common in Navy Officers Clubs worldwide and used to enforce the Clubs' rules, 4-SER-892, 4-SER-904–05).[8] <br><br> Not accurate.  The Article's bell is hung at NAS Miramar, 3-ER-382, and the bell in *Maverick* is at NAS North Island (which also has a bell in real life, 4-SER-904–05), TGM 15:25-15:56, so this is not the "same brass bell." <br><br> Not similar.  The plot point in the Article is the act of hanging the bell, but the bell in *Maverick* is already established.  3-ER-382; TGM 24:25-24:49.  The Article's bell is to be rung "when someone walks into the club with his hat on, or when a customer finds himself behind the bar," but |

---

[7] Appellants also assert both works "capitalize on" pilots' "'frat-house' culture," Br. 43, but that general statement is not accompanied by evidence and appears to refer to the quoted passages about the bell.

[8] Indeed, when *Maverick*'s director visited one such Officers Club, he put his cellphone on the bar, against Club rules.  The bell was rung, and he had to buy a round for everyone there.  That inspired the parallel scene in *Maverick*.  3-SER-826–27.

| | Maverick violates the club's rules by putting his cellphone on the bar. *Id.* |
|---|---|
| The Article "introduc[es] an Admiral who wants to 'restore discipline and naval decorum' causing hotshot fighter jocks to leave," and *Maverick* "introduces an Admiral who espouses discipline and wants to get rid of irreverent hotshots like Maverick."  Br. 44. | Unprotectable fact. Not plot (this statement in the Article merely describes the history of Top Gun as part of its background on the school).  3-ER-382–84. Not similar. Admiral Cain wishes to do away with fighter pilots altogether (not just "hotshots") in favor of drone technology, TGM 5:15-5:42, 14:48-15:15, thus bearing no resemblance to the real-life Admiral Fellows in the Article.  Admiral Fellows also is not described as *wanting* to cause an exodus of hotshots pilots versus inadvertently *causing* one when he began to enforce old rules, 3-ER-384. |

Appellants' arguments on sequencing and pacing fare no better.  They mischaracterize the Article as having a linear sequence, Br. 44-45, when it bounces forward and backward in time and topic, 4-SER-1001–02.  The Article begins midway through Yogi and Possum's 1983 training at Top Gun, then zooms out to describe Miramar and how the Wolfpack squadron fits into the broader Navy, then turns to explaining the role and history of fighter pilots dating back to World War I, then returns to the then-present with a description of the Officers Club at Miramar and a happy hour unfolding in it, then shifts gears to an interview of a lieutenant explaining what being a fighter pilot is like, then travels back to the

33

1960s to recount Yogi's childhood through his graduation from flight school in 1980, then returns again to the 1960s to recount Possum's youth through his flight school graduation in 1980, then goes on a lengthy interlude about the mechanics of F-14 planes, then offers an anecdote from the Wolfpack's cruise in the Indian Ocean in 1982, then rewinds further to Yogi and Possum's 1981 assignment to the Wolfpack before advancing again to their six-month cruise with the squadron in 1982, then returns to delve more deeply into the history of Top Gun from the 1960s to the then-present, interrupted midway through with a real-time, first-person account of Yonay's flight in a fighter jet, then goes back to the start of Yogi and Possum's training at Top Gun, and concludes with their Top Gun graduation and the start of their next cruise.  3-ER-375–85.  Meanwhile, the only interruption to *Maverick*'s linear, dramatic narrative is a single, short flashback sequence when Maverick sees Rooster for the first time.  TGM 31:18-32:20; 1-SER-102–03.  (The other "flashbacks" Appellants reference are not flashbacks at all, but rather photographs adorning the present-day set.  Br. 45 n.66 (citing TGM 3:45, 17:00-17:25, 2:01:25).)

Because the sequence of events is entirely different across the two works, Appellants resort to broad statements about "idyllic flying" interrupted by "agonizing climbs, dives, and dogfights."  Br. 45.  Not only is this generic "sequence" (if it can be called that) unprotectable, but *Maverick* does not portray

34

any "idyllic flying" until its last scene with Maverick and Penny flying off into the sunset.  TGM 2:01:02-2:01:28.  The other flight scenes are depicted with intensity amid pilots' training and combat (or, for Maverick's first flight, the strain and danger of pushing the scramjet to—and past—its limit).  TGM 6:42-12:51, 35:40-41:46, 48:30-52:31, 1:08:03-1:14:05, 1:19:21-1:22:34, 1:29:53-1:57:20. Appellants further contend that both works mix aerial scenes with scenes on the ground and at sea, Br. 45, but (1) that is not sequencing, and (2) that was not original to Yonay, whose Article was about a *naval aviation school* and reflects the reality that pilots cannot spend all of their time in flight.  In any event, the respective scenes, and the order in which they appear, are completely different. And while Appellants concede the Article has an inconsistent pace, they mischaracterize *Maverick*'s pace as inconsistent too, Br. 45-46, when in reality it builds steadily toward its climax.  2-SER-304–06, 4-SER-1002–03; *see generally* TGM.

ii.   **THEME AND MOOD.**

*Maverick*'s primary themes are guilt, reconciliation, and redemption.  1-SER-189–94, 1-SER-197–202, 1-SER-203–13, 4-SER-974.  It features an older hero, facing the end of his career, who makes peace with his past, while also achieving great victory and disproving his doubters.  1-SER-178–79, 1-SER-198–202, 1-SER-216–22.  Along the way, he mends relationships—reconciling and

35

forming a father-son connection with Rooster, and entering into a renewed romance with Penny. 1-SER-142–44, 1-SER-198–202, 1-SER-216–22. The need to make peace with one's past to move forward is reinforced in the emotional scene where Iceman advises: "IT'S TIME TO LET GO." TGM 56:15-59:07; 4-SER-983. Nothing resembling these themes appears in the Article, which is a non-fiction piece about two pilots at Top Gun, the history of the school, and the features of fighter planes. 1-SER-194–97, 1-SER-202–03, 1-SER-213–14, 4-SER-974. The works' overarching moods also diverge: *Maverick* embodies a serious and intense mood, whereas the Article is generally upbeat and lighthearted. 1-SER-275–77, 1-SER-279–80, 2-SER-282–86, 4-SER-996.

Appellants point to three ostensibly shared themes that the court held "are not present in either the Article, Sequel, or both," namely: the "aviation 'caste system,'" "anachronism of fighter aviation," and "post-war nostalgia that yearns for a simpler 1950s America." 1-ER-12; Br. 34-36. That remains true.

First, the aviation caste system is not a theme of the Article but rather a single-paragraph explanatory passage in its historical overview of Top Gun. 3-ER-384. It is not a theme of *Maverick* either, which never mentions this caste system and simply references the prowess of Top Gun graduates, *e.g.*, TGM 1:26:00-1:26:06—an unprotectable fact given that only the best fighter pilots are selected for Top Gun. 4-SER-899.

Second, the anachronism of fighter aviation is not a theme of the Article but rather part of a brief description of why fighter pilots remained important in the 1980s. 3-ER-377–78. And the fact that *Maverick* emphasizes the importance of skill and training—not just technology—is hardly surprising, since it is, after all, about the Top Gun *academy*. The Article also does not discount the importance of technology or refer to technologically-superior enemy planes—it reports that the F-14 is a "supreme air war machine" that "could have been designed by the Star Wars special effects crew." 3-ER-380. And while *Maverick* mentions the possibility of pilots being replaced by drones, this is a real-world, factual issue, 4-SER-915, involving technology that *did not even exist* when the Article was written. In any case, man-versus-machine themes are "commonplace." *Goldberg v. Cameron*, 787 F. Supp. 2d 1013, 1020 (N.D. Cal. 2011).

Third, postwar nostalgia is not a theme (or mood) of *Maverick*, which, to the contrary, emphasizes modernity. 1-SER-237–44, 4-SER-999–1000. For example, Admiral Cain wants to replace pilots with drones, TGM 5:15-5:42, 14:48-15:15; Penny is an independent single mother and business-owner who refuses to wait around for Maverick, TGM 22:10-24:50, 45:00-45:35, 1:59:30-2:00:08; and Phoenix is a confident female fighter pilot who fends for herself, TGM 25:00-26:59, 1:25:58-1:26:53, 1:37:18-1:41:20. The only nostalgic moments in *Maverick* are Maverick and Rooster briefly looking back at old photos, TGM 17:04-17:30,

2:01:28-2:01:42, and Maverick's quick banter with Iceman about who was a better pilot, TGM 59:46-1:00:04—which reflect back to the 1980s (the Article's present-day) and not the postwar period.  4-SER-999–1000.

Nor does *Maverick* have a "'Western' gunslinger" theme.  4-SER-977; Br. 37.  Appellants' use of the same "Western" diction to describe both works does not make it so—nor, even if true, would this be a theme.  And Appellants' aside that "the name 'Maverick' evokes Westerns," Br. 37, is not objective, unsupported by admissible evidence, and ignores that this callsign simply describes Pete Mitchell's personality.  Likewise, "ideological rifts" between discipline-driven admirals and "hotshot pilots," Br. 37, is not a theme of *Maverick* (Admiral Cain's drive is to replace human pilots with drones, not to instill discipline, TGM 5:15-5:42, 14:48-15:15), or of the Article (it is a two-sentence digression as Yonay relates the history of Top Gun, 3-ER-384).  Nor does the Article "glorify the moxie of older pilots," Br. 35, by referencing that only "one or two instructors could speak with the authority of actual combat experience," 3-ER-384.

Appellants' discussion of mood is likewise flawed.  The "constant threat of death and violence," Br. 38, is not a mood,[9] and even if it were, (i) it is a factual

---

[9] Appellants' suggestion that fighter pilot training is not dangerous, Br. 38, is inconsistent with the facts asserted in the Article itself and those established during discovery, 4-SER-898.  It also ignores that *Maverick* (unlike the Article) features pilots embarking on an actual, deadly *mission*.

38

aspect of fighter pilot training, 4-SER-898, and (ii) the Article is largely *upbeat* despite its topic—for example, portraying Yogi and Possum as feeling "great" about their "hop," "shrug[ging]" about being "shot down" in training, and declaring it "Miller time" as they go out for drinks afterward.  3-ER-375–77.  Appellants are also wrong to suggest *the court* "injected its subjective opinion" by dismissing the "contrast[] [of] the ethereal beauty of the 'vast blue dome of sea and sky' against jarring, unpredictable competitive action" as not a mood.  Br. 39.  It isn't, and, to the extent they argue it merely "evoke[s]" a mood, *id.*, they defy the extrinsic test's mandate to identify objective, articulable similarities between the works.  Appellants' remaining "moods" are their own flowery descriptions of the works, Br. 39-40, with no grounding in the works themselves or what a "mood" actually is (the "predominant emotion" evoked by a work, *Mood*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/mood).

### iii.    CHARACTERS, DIALOGUE, AND SETTING.

The court rightly held that neither the Article's characters nor its dialogue are protected, because they are historical people and real statements made by them.  1-ER-12–13.  Appellants say this conclusion "runs afoul" of *Corbello*.  Br. 48.  Not so.  It is exactly what *Corbello* requires.  "A character based on a historical figure is not protected for copyright purposes"—bland biographical facts and colorful personality traits alike.  974 F.3d at 976 (real person's "voice, cool

demeanor, and braggadocio" not protectable).  Dialogue that an author "holds []
out as historically accurate dialogue" is "unprotected by copyright" too.  *Id.* at 983.
That is dispositive.

Appellants' authorities cannot help them escape this rule.  *Harper & Row*
concerned verbatim copying of an author's "original language," 471 U.S. at 548-
49, and stands only for the unremarkable proposition that copyright protects the
original prose used to describe facts.  *De Acosta v. Brown* is inapposite as it
concerned an *invented* love interest and other "fictionalized happenings" that an
author "added to the life of a historical character."  146 F.2d 408, 409 (2d Cir.
1944).  And *Eggleston v. Twentieth Century Fox Film Corp*. is an isolated out-of-
circuit decision by a Michigan trial court that found *Corbello* (by which it was not
bound) to be "of minimal value" to the issue before it, but nevertheless *dismissed*
the complaint, holding that "using some of the facts of [plaintiff's] life—even if
they were transferred into a new, fictional character—does not violate copyright
protections."  2022 WL 3371601, at *4 (E.D. Mich. Aug. 16, 2022).

Appellants' comparison of characters and dialogue would fail without this
rule too.  Even fictional characters are only protectable when they are "especially
distinctive" and "contain some unique elements of expression," *DC Comics v.
Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015), yet the "similarities" on which
Appellants rely are generic and indistinct, like the pilots uniformly being "men's

40

men" or cocky.  Br. 49-50.  Appellants claim Yogi, Possum, Maverick, and

Rooster (and Goose of *Top Gun*) are "jocular, confident, competitive with 'shit-

hot' bravado, good-humored and deeply committed," but these traits are too

generic to be protectable—as Appellants' lumped-together comparison of five

discrete characters confirms.  Br. 49.

Appellants' argument on dialogue is even flimsier.  As the court held, "[t]he

dialogue in [*Maverick*] is not similar to that in the Article."  1-ER-12.  Appellants

point to exactly one two-word phrase that appears in both the Article and

*Maverick*: pilots say "Fight's on" at the outset of aerial training exercises.[10]  Br. 50.

But this is (a) factual (not just its reportage in the Article, but its broader usage to

kick off military training exercises, 3-SER-671–72, 3-SER-676); (b) an

unprotectable "[o]rdinary phrase[]," *Corbello*, 974 F.3d at 977-78; and, in any

event, (c) a far cry from the "extended similarity of dialogue" that is "needed to

support a claim of substantial similarity," *Olson v. Nat'l Broad. Co*., 855 F.2d

1446, 1450 (9th Cir. 1988); *Esplanade Prods., Inc. v. Walt Disney Co*., 768 F.

App'x 732, 734 (9th Cir. 2019) ("single common line of dialogue" is

"insufficiently significant to constitute protected expression").

Appellants' setting comparison likewise hinges on unprotectable elements

---

[10] The other "quips" Appellants call out from the Article do not appear in *Maverick*
and find no support in Appellants' citations.  Br. 50 & n.75.

that do not belong in the extrinsic analysis—not to mention the works are actually set in *different* places and *different* time periods. Most significantly, the Article's setting at NAS Miramar—including its Officers Club and "Welcome to Fightertown" sign—is an unprotectable fact. As Yonay reported, NAS Miramar was the real-life home of the Navy's Top Gun academy and the place where most events recounted in the Article actually occurred. 4-SER-891. In any event, in *Maverick*, Top Gun is at NAS North Island—another real-life Naval Air Station—not Miramar.[11] TGM 15:25-15:56.

Appellants' unsupported contention that it "taught Paramount *how to see and use* those settings," Br. 47, also has no place in the extrinsic test's *objective* comparison of articulable similarities. No matter how they phrase it, Appellants ultimately seek the exclusive right to the factual reality of the Navy's Top Gun academy. On their theory, the only way PPC could avoid infringing the Article would be to produce an *unrealistic* film about Top Gun—perhaps designing the Officers Club like a Manhattan cocktail bar, or inventing a different social hub entirely for an alternate-reality Top Gun. Copyright law requires no such thing.

---

[11] Appellants' discussion also strays from setting altogether. Notwithstanding Appellants' citation to their excluded expert's report, "Yonay's view of the Academy's culture" and a "social environment" that is "ultra-competitive, but collegial," Br. 47, are not settings. *See Setting*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/setting (defining "setting" as "the time and place of the action of a literary, dramatic, or cinematic work").

\*     \*     \*

In sum, the Article and *Maverick* share virtually no objective, articulable similarities in plot, themes, dialogue, mood, setting, pace, characters, or sequence of events. The little they share is unprotectable and thus irrelevant to the extrinsic analysis. Viewing these elements in the aggregate only confirms that the Article and *Maverick* are not substantially similar as a matter of law.

iv.    SELECTION AND ARRANGEMENT.

Facing that obvious result, Appellants retreat to asserting a selection-and-arrangement copyright, which protects "the *particular* way in which the artistic elements form a coherent pattern, synthesis, or design," and is infringed "only where the works share, in substantial amounts, the 'particular,' *i.e.*, the 'same,' combination of unprotectable elements." *Skidmore*, 952 F.3d at 1074-75. An infringement plaintiff cannot state a selection-and-arrangement claim simply by identifying "random similarities scattered throughout . . . the works" and "[l]abeling them a 'combination' of unprotectable elements." *Id.* at 1075. Without showing how these unprotectable elements were originally "selected" and specifically "arranged"—and how such "arrangement" was copied by the defendant—"there is no liability for taking ideas and concepts from the plaintiff's work, even in combination." *Id.*

As explained above, the Article provides a completely different sequence of

events from *Maverick*, which is a fictional action movie culminating in a daring attack on an enemy target.  That sharply undercuts—if not defeats entirely—Appellants' selection-and-arrangement argument, because, for literary works, sequence is how *selected* story elements are *arranged*.  That there are some alleged similarities between the works is not enough: a plaintiff cannot "establish substantial similarity by reconstituting the copyrighted work as a combination of unprotectable elements and then claiming that those same elements also appear in the defendant's work, in a different aesthetic context."  *Id*.  But that is exactly what Appellants do—trying to exploit a selection-and-arrangement theory to circumvent the fact/expression dichotomy, and relying on any arbitrary overlap they can find (or invent) between the works.

Appellants also protest this Court's articulation of the selection-and-arrangement standard, namely that a plaintiff must demonstrate the "same" combination of elements in both works.  Br. 19-20.  They try to distinguish *Skidmore*—the source of this "same" language—by its facts, namely, the purportedly limited ways to arrange the musical elements there.[12]  But *Skidmore*'s statement of law did not hinge on the thinness or thickness of the copyright.  952 F.3d at 1076 n.13.  Where that comes in is "the degree of overlap" that is "required

---

[12] Appellants also incorrectly invoke a concurrence as the statement of "this Court."

44

for the similarity to be substantial," i.e., how *much* of the same combination(s) must appear. *Id.*

Appellants challenge the selection-and-arrangement standard because they cannot meet it. For all their conclusory assertions that Yonay's "original *choices*" must be protected, Br. 23, Appellants *still* do not identify the "particular" manner in which the Article's "artistic elements form a coherent pattern," or how *Maverick* possibly borrows that "same" combination. At minimum, a successful selection-and-arrangement claim in the context of a literary work requires that the unprotectable elements be arranged in such a similar way that the works tell a similar story, but here, the stories are *completely different*, and only share a *topic* (and elements that flow therefrom). *See Corbello*, 974 F.3d at 974 n.2.

Unable to point to any such similar arrangement, Appellants largely ignore the works' plots and sequences of events, and instead point to general, unoriginal decisions for a narrative work, such as focusing on personal stories rather than "offer[ing] an encyclopedic narration" of Top Gun, Br. 23, or "tell[ing] the Story through the eyes" of pilots, Br. 33—though, to be clear, much of the Article actually comprises Yonay's historical narration of Top Gun's history and the mechanics and pros/cons of F-14 planes.

Appellants also lay out a laundry list of facts about Top Gun and its pilots that Yonay included in his Article that they contend also appear in *Maverick*. That

45

practice is exactly what *Skidmore* cautioned against.  Even if the inclusion of these facts could constitute a "selection," they do not constitute a protectable *arrangement*—and Appellants cannot have a copyright interest in merely "selecting" to tell a story about fighter pilots at a real-life training facility.  Any feature-length film about Top Gun, especially one that endeavors to be realistic, is bound to have some factual overlap with the Article.  To any extent the Article "evokes" the "world" of *Maverick*, Br. 33—which goes to the "total concept and feel of the works" under the intrinsic test and not the objective extrinsic one, *Benay*, 607 F.3d at 624—it is only because *both works* "evoke" the real-life "world" of Top Gun.

On top of that, almost all of Appellants' proffered similarities are inaccurate. By way of example only (and in addition to those "similarities" debunked above):

- Inside a fighter jet is not "the only place Maverick is at home"—that is Appellants' subjective take—and neither of Appellants' *Maverick* citations supports that statement.  Br. 25 & n.14.

- While Maverick waves at an enemy pilot, it is not a "cheeky exchange" and has a different context from Yogi's interaction, 3-ER-382; Maverick has stolen an enemy plane and waves (and makes "hand signals") at the enemy pilot to keep up the illusion they are on the same team to stave off a dogfight.  TGM 1:45:40-1:50:05.  Br. 25-26.

46

- The Article spends just two sentences describing Admiral Fellows' short-lived disciplinarian command of Top Gun in the late 1970s, without broader attention to "tension between naval brass and fighter jocks."  3-ER-384. *Maverick*'s Admiral Cain wishes to replace pilots with drones, not just "hotshots," and that position is far from "by the book" (not to mention the Article predates drones).  TGM 5:15-5:42, 14:48-15:15.  Br. 26.

- The pilots in *Maverick* do not display any "denial mechanism" after a near-fatal accident, but rather are shaken by it.  TGM 1:10:45-1:15:40.  Br. 26.

- Maverick's "death-defying crash landing on an aircraft carrier" is nothing like the Article's factual description that landing on an aircraft carrier is a "controlled crash."  Br. 26.  These are opposite phenomena: The "controlled crash" in the Article is a standard fighter jet landing, 3-ER-381, whereas Maverick's landing was an atypical, actual crash landing, rendered perilous by damage to the aircraft, TGM 1:56:26-1:57:20.

- *Maverick*'s dogfights are not "collegial."  Br. 26.  For example, Rooster gets so angry with Maverick that he nearly crashes, the pilots repeatedly insult each other, and Rooster and Hangman physically fight.  TGM 38:07-41:45, 53:16-53:43.

- The training sequences in the Article and *Maverick* are different and mischaracterized by Appellants.  Br. 26-27.  Appellants misrepresent the

sequence in the Article by using an ellipsis to eliminate the "two-versus-two hops" that follow the "one-versus-one hops"—since there are none in *Maverick*. 3-ER-384. They likewise use an ellipsis to change the Article's description of the "two-versus-unknown hop," which actually refers to two student crews "tak[ing] off not knowing how many bogeys are waiting out there or where they'll come from or in what order"—again, something that never occurs in *Maverick*. 3-ER-384. Appellants inaccurately describe *Maverick*'s training sequence too: Every dogfight training sequence in *Maverick* begins with a two-versus-one hop (not described in the Article), with Maverick facing off against two trainee planes. TGM 35:42-41:45.

- Yogi and Possum are not deflated and downcast when they get shot down in training, Br. 27; they shrug, joke, and go out for drinks. 3-ER-376–77.

- There is no similarity between the Article's description that poor air flow at high angles of flight can cause a plane's engines to die, 3-ER-380, and the cited scene in *Maverick* where a plane ingests birds, causing its engine to catch fire (which also does not occur "in the middle of [a] vertical stunt," contrary to Appellants' description), TGM 1:13:00-1:14:00. Br. 31.

Beyond these falsities, Appellants try to invent similarities by using the same flowery diction to describe both works. That does not pass muster. Just because Appellants call the flight sequences in both the Article and *Maverick* "an

48

aerial ballet, at once lyrical and violent," or postulate that "beauty and terror spring from each other" in both works, Br. 30, does not render them similar.  Nor are the cited similarities "*central* to both Works," Br. 34, just because Appellants say so.

Appellants also argue *Maverick* "mimics Yonay's cinematic descriptions of fighter jets," Br. 30, but this is not selection and arrangement, and reduces to an argument that, because Yonay once described aerial combat, no one else can ever depict it (using real planes, much less).  Appellants have no claim to the real features of planes described in the Article, nor can they block any film from showing them in action, simply because Appellants label Yonay's descriptions "cinematic."

Appellants also lay claim to an unoriginal "rhythm" inherent to any story about fighter pilot training, in that both works alternate between scenes in the air and scenes on the ground, action scenes and quieter moments.  Br. 30.  But Appellants do not own the factual reality that fighter pilots are not always flying (and are not actively dogfighting every second of flight), *see Corbello*, 974 F.3d at 974 n.2, and as explained above, the order and context in which the respective scenes occur are completely different in the two works.

*Maverick* tells a very different story, in a very different way, and in a very different sequence, from the Article.  Despite repeated chances, Appellants fail to articulate what original combination of elements, selected and arranged in what

particular way, purportedly appears the same way in the Article and *Maverick*.

**3.    The Court Rightly Held That Appellants Cannot Prevail on Their Contract Claim.**

With no infringement claim to rest on, Appellants resort to contract law to drum up a cause of action against PPC.  The court rightly dispensed with that claim too.

Appellants premise their contract claim on Paragraph 7(b) of the Assignment, which provides that PPC will credit Yonay on "any motion picture photoplay that may be produced by it hereunder and substantially based upon or adapted from [the Article] or any version or adaptation thereof, substantially incorporating the plot, theme, characterizations, motive and treatment of [the Article] or any version or adaptation thereof."  3-ER-396.  Broken down, it imposes a credit obligation for any motion picture that is both (1) "produced by" PPC "[]under" the Assignment, and (2) "substantially based upon or adapted from [the Article] or any version or adaptation thereof," as defined therein.  *Maverick* is neither.  Most significantly, *Maverick* cannot have been "produced []under" a terminated assignment of rights which, for the same reasons the infringement claim fails, were not used to make *Maverick*.

The language of Paragraph 7(b) is unambiguous—"and" means "and," providing two conditions that must both be satisfied—and the Court is therefore "bound to give effect to the plain and ordinary meaning of the language used by

50

the parties." *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co*., 107 Cal. App. 4th 516, 524 (2003). The California Supreme Court has confirmed "[t]he ordinary and usual usage of 'and' is as a conjunctive, meaning an 'additional thing,' 'also' or 'plus.'" *In re C.H*., 53 Cal. 4th 94, 101 (2011). Consistent with that common understanding, California courts have repeatedly interpreted "and" as a conjunctive term used to connect distinct contractual requirements. *E.g.*, *RBB2, LLC v. CSC ServiceWorks, Inc*., 2019 WL 1170484, at *5 (E.D. Cal. Mar. 13, 2019); *Alfaro v. Cmty. Hous. Improvement Sys. & Plan. Assn., Inc*., 171 Cal. App. 4th 1356, 1379 (2009).

Appellants' contrary argument—that the operative clause is a "hendiadys" such that the "produced []under" prong has no independent meaning, Br. 61—has no grounding in contract law or the Assignment. Their sole "hendiadys" citation is decades-old, out-of-circuit sex discrimination case, which did not even address contract interpretation. Br. 61 (citing *Bennett v. N.Y.C. Dep't of Corrs*., 705 F. Supp. 979, 987 (S.D.N.Y. 1989)). Appellants offer no justification for writing the "produced hereunder" language out of the Assignment, which violates the basic tenet of contract interpretation that a "contract term should not be construed to render some of its provisions meaningless or irrelevant." *In re Marriage of Nassimi*, 3 Cal. App. 5th 667, 688 (2016).

Appellants contend that courts "regularly construe 'and' in context to mean

'or,'" Br. 61, but that argument concedes that their interpretation departs from the ordinary meaning of "and." Appellants' two citations also do not support their position. *Tricor* departed from the ordinary meaning of "and" only because, on its facts, the ordinary meaning "leads to absurd results." *Tricor Am., Inc. v. Illinois Union Ins. Co.*, 351 F. App'x 225, 227 (9th Cir. 2009). But reading the Assignment to mean what it says yields no such absurdity—it is the only interpretation that harmonizes all provisions of the contract. And *People v. Schulz*, 66 Cal. App. 5th 887, 896-99 (2021), does not concern contract interpretation at all, and was driven by the rule against surplusage, which *Appellants'* interpretation violates.

### a. *Maverick* Was Not "Produced Hereunder."

*Maverick* cannot have been "produced []under" the Assignment for two separate reasons. First, because *Maverick* is not substantially similar to the Article as explained in Section VI.A.2., *supra*, and thus did not infringe the rights to the Article irrespective of the Assignment, *Maverick* was necessarily produced independent of the rights conveyed in the Assignment rather than "under" it. Second, because Appellants terminated the Assignment before the production of *Maverick* was complete, *Maverick* cannot have been produced "under" that terminated Assignment.

Appellants have no answer to the first point, which is dispositive. They

simply revert to their hendiadys argument, asserting that "produced by [PPC] hereunder" does not mean what it says, and instead takes on the meaning of the second requirement in the credit trigger (the "substantially based upon or adapted from" clause). Br. 62. That argument fails for the reasons discussed above.

On the second point, Appellants argue their termination is immaterial because it encompassed only the transfer of U.S. copyright in the Assignment and not the transfer of foreign rights, which they claim PPC relied upon to "distribute[] [*Maverick*] *worldwide*." Br. 62. But PPC's distribution of *Maverick* internationally cannot salvage Appellants' claim, because the provision expressly concerns the "*produc[tion]*" and not the *distribution* of a motion picture, and PPC could not have produced *Maverick* in the first place had it required Appellants' rights to do so.

### b.    *Maverick* Was Not "Substantially Based Upon or Adapted From" the Article or an Adaptation Thereof.

Appellants cannot satisfy the latter condition either, though this issue is mooted by the dispositive failure of the first. Appellants do not even argue *Maverick* is substantially based upon or adapted from the Article, likely because, for the same reasons discussed on infringement, they cannot show *Maverick* substantially incorporates the Article's plot, theme, characterizations, motive, and treatment. Nor do they show that the 1986 *Top Gun* film was an "adaptation" of the Article, which would be necessary for them to leverage the connection between

53

*Maverick* and the 1986 film.

Appellants contest the court's conclusion that they did not offer sufficient support for the proposition that the 1986 *Top Gun* film was an adaptation of the Article, but all they did then and all they do now is conclusorily say so and point to Yonay's "suggested by" credit on *Top Gun*.  Br. 63-64; 2-ER-35-36; 2-ER-69-70; 2-ER-147.  That gratuitous nod to Yonay confirms only that *Top Gun*'s producers took inspiration from the Article—a far cry from rendering it an adaptation.

### c. Paragraph 8 of the Assignment Confirms No Credit Obligation Attaches Here.

Appellants face yet another problem in Paragraph 8 of the Assignment, which provides: "Nothing contained in this agreement shall be construed to be or operate in derogation of or prejudicial to any rights, licenses, privileges or property which [PPC] may enjoy or to which [PPC] may be entitled as a member of the public even if this agreement were not in existence."  3-ER-397.  But if, as Appellants contend, a credit obligation attaches to *Maverick* irrespective of whether it uses protectable expression from the Article, and irrespective of whether it would infringe on the Article's copyright, then PPC would be worse off than the general public, in defiance of Paragraph 8.

Appellants do not meaningfully contend with Paragraph 8, notwithstanding the basic principle that "[t]he whole of a contract is to be taken together" with "each clause helping to interpret the other."  Cal. Civ. Code § 1641.  The best they

muster is an argument that it is irrelevant because only PPC—not the general public—promised to credit Yonay on such films.  Br. 63.  That makes a mockery of Paragraph 8.  Everything in a contract is a promise to do or abstain from doing something.  On Appellants' reading, no person *except PPC* would need to give a nod to Yonay to make a film like *Maverick*.

Appellants alternatively argue that, even if their interpretation is wrong, the credit provision takes precedence over Paragraph 8 as the "more specific" provision.  Br. 63.  Not so.  It is blackletter law that a court must "try to give effect to every clause [of a contract] and harmonize the various parts with each other." *Friedman Prof. Mgmt. Co. v. Norcal Mut. Ins. Co*., 120 Cal. App. 4th 17, 33 (2004).  Because Appellants' reading is not only atextual but also creates internal conflict, while PPC's adheres to plain language and harmonizes the various provisions of the Assignment, PPC's commonsense interpretation controls.

## B.    The Court Properly Excluded Appellants' Literary Expert Under Rule 702.

Appellants also challenge the court's exclusion of their literary expert Henry Bean.  His exclusion was not only permitted but required by Rule 702.

Rule 702 "imposes a special obligation upon a trial judge to ensure that any and all [expert] testimony is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (cleaned up).  Bean's opinions were neither. Not only did Bean fail to filter out unprotectable elements when analyzing the

55

works for substantial similarity, but his analysis was full of methodological errors that made his opinions unreliable and unhelpful on the extrinsic test.

### 1. Bean's Failure to Filter Unprotectable Elements Warranted His Exclusion.

Appellants argue the court abused its discretion by excluding Bean for failure to filter unprotectable elements from the works before comparing them. Br. 51-55. They claim Bean did filter—and alternatively was not required to do so because they advance a selection-and-arrangement theory. *Id.* They are wrong on both fronts.

Bean repeatedly admitted he did not filter unprotectable elements from the works. He testified, for example, that his methodology involved trying to "identif[y] as many similarities as [he] could." 4-SER-1072–75. He explained he was "not sitting there thinking, well, this goes in the protected bucket and that goes in the unprotected bucket," and that purported "similarities" he identified may have included both protected and unprotected elements. 4-SER-1074.

Consistent with that error, Bean spent much of his report drawing similarities between *factual elements* of the Article and *Maverick*. For example, he pointed to the presence of real-life, historical figures at Top Gun (like Randy Cunningham, who famously "downed three MiGs in one day, and five in his career to become the first official 'ace,'" 2-ER-168), and real-life facts about fighter jets (like the fact that pilots cannot practice using a jet's ejection seat, and the fact that

56

an F-14 plane has wings that "sweep back" or "open to the sides"), as overlapping "similarities."  2-ER-172, 2-ER-174.

Appellants claim that Bean properly analyzed "expression" of facts—but they point only to vague statements in Bean's report where he asserted, without support, that there were *no* unprotectable elements in the Article to filter.  Br. 51-52.  That is plainly contradicted by the Article itself.  Bean relied on similarities throughout his report that stemmed from *purely factual* material in the works, as the following examples illustrate:

- The Article and *Maverick* both contain "a Big Brass Bell placed in the pilot's favorite bar," which is rung "when anyone breaks the 'house rules'" to signify that "he must buy a round for everyone in the bar," 2-ER-167;

- The reality of G-forces is shown in both the Article and *Maverick,* 2-ER-173;

- The Article references Rear Admiral Paul "Gator" Gilchrist, an actual historical figure who "comes to the Top Gun school and restores its lost glory" in a manner purportedly similar to a military officer in *Maverick.*  2-ER-166.

Bean's claim that there was nothing to filter out from his analysis is demonstrably false—and also underscores why his report was correctly excluded.

Indeed, virtually everything he discussed distills to an unprotectable fact or

57

idea.  As explained in Section VI.A.2.a., *supra*, all factual material should have been filtered, no matter how much "expression" Yonay layered on top of it.  The court acted well within its discretion to exclude Bean's testimony as a result.  *See Johannsongs-Publ'g, Ltd. v. Lovland*, 2021 WL 5564626, at *1 (9th Cir. Nov. 29, 2021) (affirming exclusion of expert reports that "failed to filter out similarities that [were] attributable to prior art, as required under the extrinsic test"); *Knowles v. Spin Master, Inc.*, 2019 WL 4565102, at *4 (C.D. Cal. Sept. 17, 2019) (finding expert's opinions "not helpful to the Court" under Rule 702 because "she does not attempt to differentiate between protectable and unprotectable elements of the works").

Appellants cite *Gilbert-Daniels v. Lions Gate Entertainment* to support their position that Bean filtered, but its fact pattern has no bearing here.  Br. 53 (citing 2023 WL 8938403, at *5 (C.D. Cal. Dec. 7, 2023)).  The expert in *Gilbert-Daniels* "focus[ed] on comparing elements that he found were protectible," 2023 WL 8938403, at *5, a step Bean admittedly did not take before beginning his analysis.  Bean's testimony made clear he did not even understand what would make an element unprotectable: He asserted, for instance, that parts of the Article that were present in "every article or every characterization of that world" could not be "stock" elements because Yonay's "skill made [them] feel original."  4-SER-

58

1085.[13]

Because Bean so clearly failed to filter, Appellants contend he was not required to do so given their selection-and-arrangement claim. But this Court has explained that filtration is mandatory even when considering selection and arrangement. (And of course, this argument does nothing to salvage Bean's unfiltered opinions on the heart of the extrinsic test.)

This Court's precedent is clear: "unprotectable elements" of the works "*have to be identified, or filtered*, before the works can be considered as a whole." *Cavalier*, 297 F.3d at 826 (emphasis added); *id.* at 822 (the court "must take care to inquire only whether the protectible elements, standing alone, are substantially similar"). That rule holds true even where a copyright infringement claim is "based on original selection and arrangement of unprotected elements." *Id.* at 826.

---

[13] Appellants contend the court should not have stricken Bean's declaration. As an initial matter, the court did not strike the declaration. *See* 1-ER-6 n.2 (no order striking declaration). But even if it had, striking Bean's declaration would be entirely proper because his *post hoc* explanations for his expert report created a "clear and unambiguous" inconsistency with prior testimony. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998-99 (9th Cir. 2009). At his deposition, Bean admitted to "not thinking about the Ninth Circuit's definition" when rendering his opinions, and "not sitting there thinking, well, this goes in the protected bucket and that goes in the unprotected bucket." 4-SER-1071, 4-SER-1074. In his declaration, Bean reversed that position. 2-ER-111–12. Bean's reversal was a clear attempt by Plaintiffs to "create an issue of fact by an affidavit contradicting [] prior deposition testimony," *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991), and the court rightly disregarded it.

59

In short, before engaging in its substantial similarity analysis, the court was obligated to first "filter out and disregard the non-protectible elements" of the works, *id.* at 822—a task Bean overlooked.

Moreover, even if Appellants were right that failure to filter is not fatal to Bean's selection-and-arrangement discussion, it would do them no good. His cursory, two-page analysis of selection and arrangement remains indefensible under Rule 702: it is inaccurate, abstract, subjective, citationless, and belies a misunderstanding of what selection and arrangement is. *See* 2-ER-191–93. Bean focuses largely on purported similarities between the Article and the original *Top Gun*, which is not at issue. *Id.* Although he describes some of Yonay's basic creative choices, he does not begin to explain how *Maverick* supposedly copies Yonay's "particular" selection or arrangement of elements. The best he musters is to point out that the Article and *Maverick* share a (general) subject in Top Gun, "give[]" their protagonists a "problem" to overcome (i.e., a "conflict"—an essential element of virtually every literary work), and feature a mix of scenes in the sky and on the ground. 2-ER-191–93. Those generalities come nowhere close to showing a "substantial" overlap in the "same" combination of elements.

### 2. Bean's Analysis Was Riddled With Other Methodological Flaws.

The court also did not rely exclusively on Bean's failure to filter in excluding his opinions. It explained that Bean's opinions were also "unhelpful"

60

because he "provide[d] a subjective, rather than objective, comparison" of the

works, and more broadly "d[id] not meet the standards for admissibility set forth in

Rule 702." 1-ER-6.

*First*, factual inaccuracies pervaded Bean's comparison of the works. For

example, Bean falsely characterized the "last scene" of *Maverick* to conjure a

similarity to the Article: His report says that "the last scene" of *Maverick* depicts

Maverick "'just stand[ing] there' by himself, pleased with his success, at peace

with himself and – as always with the cowboy – alone." 2-ER-177. That is not

how *Maverick* ends. When Bean was shown the film's *actual* ending at his

deposition (depicting Maverick and Penny flying off together), Bean admitted he

was "inaccurate" in his report, and claimed he "erased" the film's subsequent

scenes because they "seem[] to me utter bullshit." 4-SER-1089–90. Similarly,

Bean drew comparisons between the "glorious sailing yacht" described in the

Article and a so-called "beautiful sailing yacht" in *Maverick*, 2-ER-182, but that

too was inaccurate. The *actual* scene shows Maverick sailing with Penny on a

broken, two-person sailboat to get its engine repaired. TGM 45:49-47:27. Indeed,

Bean's report mirrors the many false similarities outlined in Section VI.A.2.b.,

*supra*. Only by inaccurately describing these scenes could Bean "find"

similarities—on which no factfinder could rely.

*Second*, Bean described the works in abstract terms, rendering his analysis

even less helpful. The court must evaluate the "articulable similarities" in the works' "specific expressive elements," *Cavalier*, 297 F.3d at 822, and the "abstract nature" of an expert's opinion on substantial similarity is grounds for exclusion. *Rice*, 330 F.3d at 1180 (court properly disregarded expert's testimony after "deem[ing] it unhelpful due to its abstract nature"). Bean drew similarities between the works on the basis of such abstract features as:

- The Article and *Maverick* both portray combat training as "arduous and demanding," 2-ER-170;

- Both works "portray[]" pilots as "audacious cowboys," 2-ER-177;

- The Article has a "very palpable tone which informs the dialogue and tone" of *Maverick*, 2-ER-178;

- The Article contains descriptions of jets flying that resemble the "dizzying and dazzling aerial footage" in *Maverick*, *id.*

*Third*, these defects were compounded by Bean's failure to include any citations in his report. He did not cite a single page in the Article or timestamp in *Maverick*, leaving the court with no way to verify Bean's (often inaccurate) conclusions. And while Bean purported to rely on "tons" of film sources for his analysis, he did not track or cite a single one. 4-SER-1091–92.

*Fourth*, Bean compiled a simplistic list of purported similarities between the works while ignoring vast dissimilarities. A simple "list[] of similarities" is

"inherently subjective and unreliable." *Olson*, 855 F.2d at 1450. But that is exactly what Bean set out to identify, making his methodology even less helpful. *See* 4-SER-1068, 4-SER-1092–93 (Bean testifying that it "wasn't [his] assignment" to address dissimilarities between the works, and he "did not think it was [his] job to do that").[14]

*Fifth*, Bean made clear that he did not understand the literary elements he attempted to analyze. The extrinsic test requires a comparison of specific literary elements in the works, *Kouf*, 16 F.3d at 1045, but Bean's analysis routinely misapplied those categories. For example, he labels as "plot" the (false) shared bullseye metaphor and the works' ostensible portrayal of fighter pilots as "elite 'hotshots,' both macho and cool," 2-ER-167–68; classifies as "theme" that "everybody knows" who the "[r]eally great fighter pilots are," 2-ER-177; describes the "enormous cost" of fighter jets as a setting, 2-ER-182; and so forth. His analysis was unmoored from the literary elements he purported to evaluate and applied no reliable methodology.

*Sixth*, Bean's analysis veered into the subjective intrinsic test ("the total concept and feel of the works," *Cavalier*, 297 F.3d at 822), even though that test

---

[14] Appellants also falsely contend Bean was improperly excluded for failing to "render legal conclusions as to copyrightability." Br. 54. They cite nothing from the court's opinion to support that assertion.

must be performed "with no expert assistance." *Gray v. Hudson*, 28 F.4th 87, 96 (9th Cir. 2022). Bean repeatedly opined on the "feeling" of the works, which is not only unhelpful but outright improper. 2-ER-160–62; 2-ER-178–80; 2-ER-195. Appellants argue this was not a proper basis to exclude Bean, reducing it to a ban on the word "feel" and contending that its usage was meant to "explain how particular extrinsic elements were expressed by Yonay and its impact." Br. 56. That is a caricature of the court's holding. In reality, much of Bean's "feeling" discussion was about the works in their totality. But even when it wasn't, Bean's subjective and non-specific musings about the works are not somehow transformed into proper extrinsic analysis by their placement under the heading of a literary element.

For all these reasons, Bean's exclusion was not an abuse of discretion.

### 3.    Bean's Opinions Would Not Have Created a Genuine Dispute of Fact Regardless.

Even if Bean's testimony had been admitted, that would not have created a genuine dispute of material fact. Nothing in Bean's report could change the reality that the works are not substantially similar. What Appellants really value from Bean is his unsupported *conclusions* of similarity—conclusions no court would be required to accept.

It is well established that "the existence of dueling expert reports does not necessarily present a triable issue of fact for the jury. Numerous cases have found

in favor of defendants on the issue of substantial similarity despite the existence of expert testimony offered by plaintiffs." *Bernal*, 788 F. Supp. 2d at 1062; *Gable*, 727 F. Supp. at 836-37 (similar); *Gray*, 28 F.4th at 97-103 (affirming judgment as a matter of law for defendant on substantial similarity upon finding that overlap in works was unprotectable, notwithstanding dueling experts).[15] Bean's invented similarities—often of unprotectable elements—would not give rise to genuine or material disputes, just because they are funneled through an "expert." Bean's report not only fails Rule 702, but adds nothing of substance to Appellants' case.

## C.  The Court Did Not Err by Considering the Testimony of PPC's Naval Aviation Expert.

The court properly admitted the testimony of Andrew Craig, an industry expert and Commanding Officer in the Navy Reserve. 1-ER-7. Craig has nearly 15 years of experience at Top Gun as both a student and an instructor. 4-SER-887–89. Far from being a "conduit for hearsay," Br. 58, Craig based his opinions on a

---

[15] *See also, e.g.*, *Jones v. Twentieth Century Studios, Inc.*, 2023 WL 9051282, at *3, *11-12 (C.D. Cal. Nov. 28, 2023) (granting summary judgment for defendants on substantial similarity despite finding plaintiff's substantial similarity expert admissible); *Funky Films, Inc. v. Time Warner Ent. Co.*, No. 8:03-cv-964-CJC-PLA, slip op. at 5-14 (C.D. Cal. Feb. 19, 2004), ECF No. 83 (granting summary judgment for defendant and finding it "unnecessary" to rely on competing expert reports and "instead bas[ing] its decision on its own independent review and careful evaluation of [the works]"), *aff'd*, 462 F.3d 1072 (9th Cir. 2006); *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1472-77 (9th Cir. 1992) (affirming summary judgment for defendants on substantial similarity despite considering plaintiff's expert affidavit); *Narell*, 872 F.2d at 913 (same).

combination of his own lived experience, what he learned from other Top Gun pilots over the years, and historical knowledge he developed through research in the Navy Archives and viewing photographs at Top Gun.  *E.g.*, 4-SER-892–94, 4-SER-896, 4-SER-898.  And as the court recognized, Rule 703 permits an expert to rely on hearsay in forming his opinions.  1-ER-7; *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 873 (9th Cir. 2001).

Appellants also wrongly question Craig's relevance.  Br. 57.  The court's caution—confirming the factual nature of Appellants' proffered similarities after Appellants protested application of the asserted truths doctrine, 2-ER-62—was not legal error.  To the contrary, the court was required to "carefully examine whether the alleged copying or similarities are based on protectable elements of the copyrighted work," *Corbello*, 974 F. 3d at 975, with "facts" and "historical elements" not protected, *id* at 976.  Regardless, Appellants' questioning of Craig's relevance serves only to confirm that his inclusion did not move the needle on summary judgment and therefore would not warrant reversal even if erroneous.

## VII.   CONCLUSION

For the foregoing reasons, the decision below should be affirmed.

Dated: November 27, 2024          Respectfully submitted,

**O'MELVENY & MYERS LLP**

_____
_/s/ Molly M. Lens_
Molly M. Lens

_Attorneys for Defendant-Appellee_
_Paramount Pictures Corporation_

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Ninth Circuit Rule 32-1, as modified by Ninth Circuit Rule 32-2 in light of the amicus brief submitted in support of Plaintiffs-Appellants, because it contains 15,400 words, counted using the Microsoft Word program used to prepare it.

2.      This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6).  It is double-spaced, except for footnotes and indented quotes, and was produced using a proportionally spaced, serif typeface of size 14 font.


Dated: November 27, 2024                    _____
                                                                      */s/ Molly M. Lens*
                                                                      Molly M. Lens