No. 24-2897

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

SHOSH YONAY, an individual, and YUVAL YONAY, an individual,

*Plaintiffs-Appellants*,

v.

PARAMOUNT PICTURES CORPORATION, a Delaware corporation,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Central District of California
No. 22-CV-03846-PA-GJS
Hon. Percy Anderson

---

## APPELLANTS' REPLY BRIEF

---

Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Alex Kozinski (S.B. #66473)
*alex@kozinski.com*
33 Marguerite Drive
Rancho Palos Verdes, CA 90275
Telephone: (310) 541-5885
Facsimile: (310) 265-4653

*Attorneys for Appellants*
Shosh and Yuval Yonay

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................1

ARGUMENT ..........................................................................................2

I.    PARAMOUNT DODGES THE STORY'S
PROTECTED EXPRESSION ..........................................................2

    A.    Paramount's Fact/Fiction Dichotomy is Wrong. ..................2

    B.    Paramount's Abstract Descriptions of the Story are Inaccurate. ..........5

II.    EXPERT EVIDENCE IS REQUIRED HERE .................................8

III.    COMPARISON OF THE WORKS CONFIRMS
SUMMARY JUDGMENT WAS IMPROPER ...........................11

    A.    Theme ................................................................................12

    B.    Mood ..................................................................................15

    C.    Plot, Sequencing, and Pacing ............................................16

    D.    Character and Dialogue ......................................................18

    E.    Setting ................................................................................20

    F.    Selection and Arrangement ................................................21

IV.    PARAMOUNT BREACHED ITS CONTRACT .........................25

V.    THE COURT'S EXPERT WITNESS RULINGS
WERE ERRONEOUS ...................................................................28

    A.    The Lower Court Abused Its Discretion by
Excluding Plaintiffs' Literary Expert. ...............................28

    B.    Paramount's "Fact" Expert Was Erroneously Admitted.....................33

CONCLUSION .....................................................................................33

ii

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages**

*Alfred v. Walt Disney Co.*,
    821 Fed.App'x 727 (9th Cir. 2020) ...........................................................7, 9

*Babb v. Maryville Anesthesiologists P.C.*,
    942 F.3d 308 (6th Cir. 2019) ......................................................................30

*Baxter v. MCA, Inc.*,
    812 F.2d 421 (9th Cir. 1987) ......................................................................24

*Cavalier v. Random House, Inc.*,
    297 F.3d 815 (9th Cir. 2002) ......................................................................29

*Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.*,
    963 F.3d 982 (9th Cir. 2020) ......................................................................29

*Corbello v. Valli*,
    974 F.3d 965 (9th Cir. 2020) .................................................................18-19

*De Acosta v. Brown*,
    146 F.2d 408 (2d Cir. 1944) .......................................................................19

*Esplanade Prods. v. Walt Disney Co.*,
    768 Fed.App'x 732 (9th Cir. 2019) .............................................................21

*Ets-Hokin v. Skyy Spirits, Inc.*,
    323 F.3d 763 (9th Cir. 2003) ........................................................................3

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ...........................................................................3-5, 19

*Gable v. NBC*,
    438 Fed.App'x 587 (9th Cir. 2011) .........................................................21-22

*Gilbert-Daniels v. Lions Gate Ent. Corp.*,
    No. CV 23-2147 SVW, 2023 WL 8938403 (C.D. Cal. Dec. 7, 2023),
    *aff'd*, No. 24-153, 2024 WL 5116299 (9th Cir. Dec. 16, 2024) ................28-29

iii

*Goldberg v. Cameron*,
　　787 F. Supp. 2d 1013 (N.D. Cal. 2011) ............................................12

*Hanagami v. Epic Games, Inc.*,
　　85 F.4th 931 (9th Cir. 2023)................................................ passim

*Harper & Row, Publrs. v. Nation Enters.*,
　　471 U.S. 539 (1985) .......................................................19

*Hyer v. City & Cnty. of Honolulu*,
　　118 F.4th 1044 (9th Cir. 2024) ..........................................30

*Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters.*,
　　945 F.2d 509 (2d Cir. 1991)...........................................4, 8

*Knowles v. Spin Master, Inc.*,
　　No. CV 18-5827 PA, 2019 WL 4565102 (C.D. Cal. Sept. 17, 2019) .............29

*Kregos v. Associated Press*,
　　937 F.2d 700 (2d Cir. 1991)...........................................23

*L.A. Printex Indus. v. Aeropostale, Inc.*,
　　676 F.3d 841 (9th Cir. 2012).................................... 11-13, 23

*MacDonald v. Pan Am. World Airways, Inc.*,
　　859 F.2d 742 (9th Cir. 1988)..........................................25

*Marvel Characters, Inc. v. Kirby*,
　　726 F.3d 119 (2d Cir. 2013)...........................................33

*Masterson v. Walt Disney Co.*,
　　821 Fed.App'x 779 (9th Cir. 2020).....................................9

*Mattel, Inc. v. MGA Entm't, Inc.*,
　　616 F.3d 904 (9th Cir. 2010)....................................... 4, 23

*Mills Music, Inc. v. Snyder*,
　　469 U.S. 153 (1985) ..................................................2

*Olson v. Nat'l Broad Co.*,
　　855 F.2d 1446 (9th Cir. 1988)................................... 30-31

iv

*Rentmeester v. Nike, Inc.*,
 883 F.3d 1111 (9th Cir. 2018)...........................................................3, 11, 28-29

*Reyher v. Children's TV Workshop & Tuesday Publ'ns*,
 533 F.2d 87 (2d Cir. 1976)...........................................................................6

*Shaw v. Lindheim*,
 919 F.2d 1353 (9th Cir. 1990)............................................................... passim

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
 81 F.2d 494 (2d Cir. 1936)...........................................................................6

*Sid & Marty Krofft TV Prods. v. McDonald's Corp.*,
 562 F.2d 1157 (9th Cir. 1977)...................................................................23

*State Comp. Ins. Fund v. Dep't of Ins.*,
 96 Cal. App. 5th 227 (2023)........................................................................27

*Stromback v. New Line Cinema*,
 384 F.3d 283 (6th Cir. 2004)........................................................................9

*Swirsky v. Carey*,
 376 F.3d 841 (9th Cir. 2004)............................................................ 7, 9, 11, 29

*Three Boys Music Corp. v. Bolton*,
 212 F.3d 477 (9th Cir. 2000)........................................................................8

*Tricor Am., Inc. v. Illinois Union Ins. Co.*,
 351 Fed.App'x 225 (9th Cir. 2009)..............................................................25

*Walt Disney Prods. v. Air Pirates*,
 581 F.2d 751 (9th Cir. 1978)................................................................. 24, 30

*Williams v. Gaye*,
 895 F.3d 1106 (9th Cir. 2018)................................................................ 9, 11

*Zindel v. Fox Searchlight Pictures, Inc.*,
 815 Fed.App'x 158 (9th Cir. 2020)..............................................................9

**Rules**

Federal Rule of Evidence 702 ..................................................................30

Federal Rule of Evidence 703 ..................................................................33

**Treatises**

1, 4 David Nimmer, Nimmer on Copyright (2024 rev. ed.)

    § 2.01 ........................................................................................29

    § 2.04 ........................................................................................23

    § 2.11 ........................................................................................19

    § 13D.13 ....................................................................................22

    § 13D.16 ......................................................................................8

    § 13D.24 ................................................................... 12, 24, 30

    § 13D.32 ....................................................................................3, 8

2 William F. Patry, *Patry on Copyright* § 4:7 (2024 rev. ed.) ................19

## **INTRODUCTION**

Paramount Pictures Corporation's ("Paramount") Answering Brief rests on a house of cards: the mischaracterization of copyright law's fact/expression dichotomy; conflation of a mere factual compilation with creative storytelling; and the wholesale disregard for Congress's carefully balanced statutory termination rights. By artificially reducing Ehud Yonay's ("Yonay") rich story, *Top Guns* ("Story"), to a phonebook of unprotectable facts, Paramount attempts to evade the very copyright protections from which it benefited for decades.

Yonay's Story was the unquestionable creative wellspring from which *Top Gun* and *Top Gun: Maverick* ("*Maverick*," with the Story, the "Works") flow. Producer Don Simpson's own words reveal the truth: "We got to buy this…We want this right away…What grabbed me was the colorful incidents, anecdotes and characters…we are going to make a movie about the process of becoming a Top Gun and…dramatically expose you to what it's like to go through the process, and succeed at it, and the price you have to pay to be frankly the most important warrior we have"—the exact creative approach Yonay pioneered. 2-ER-282–84. Paramount's claim that it acquired Yonay's Story rights in 1983 ("Agreement") for mere "peace of mind" is revisionist history.

The Agreement Paramount drafted required crediting Yonay when "substantially incorporating" the Story's defined literary elements, and Paramount

1

did exactly that, crediting Yonay on *Top Gun*. 2-ER-200; TG 01:48:12. This was not a "precautionary step" but rather acknowledgment of its use of the Story's creative elements. Paramount's retort that it paid for rights it didn't need and then credited Yonay gratuitously strains credibility.

The context in which this case arises matters. Congress deliberately crafted the termination right as a protective mechanism to restore economic agency to authors and their families, just like Plaintiffs. *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985). The "extrinsic test," a judicial construct to detect infringement, was never meant to facilitate the strategic circumvention of congressional intent and duly recaptured works of authorship, yet Paramount achieved exactly that. Faced with Plaintiffs' termination notice, rather than simply re-license the foundational Story so the Yonays could fairly participate in its proven market value, Paramount hired pricey counsel to hollow the Story of its protected expression and evade Congress's explicit remedial objective. The decision below cannot stand.

## **ARGUMENT**

### I. PARAMOUNT DODGES THE STORY'S PROTECTED EXPRESSION

#### A. Paramount's Fact/Fiction Dichotomy is Wrong.

Paramount's entire defense is built on a fabricated and reductive fact/fiction strawman: if a Story element is not fiction, it is fact, and facts are unprotected.

2

Predictably, Paramount labeled everything in the Story an "unprotectable fact," while incongruously acknowledging, as it must, that the Story has a valid copyright. The law, however, recognizes no such binary distinction between factual and fictional works—rather, it protects the creative *expression* in each.

Aware that no authority supports its fact/fiction dichotomy, Paramount denies it concocted one. But that is belied by the record below and Paramount's arguments here. *See, e.g.,* AAB 9 ("[the Story] contained no fictional elements"); AAB 12 ("Appellants[] fail[ed] to identify a single fictional element in the [Story]"); 3-ER-292 (designating a *fact* "expert" to bolster its strawman over a *literary* expert to compare expression).

Contrary to Paramount's bright-line binary, the protection afforded to factual works is not uniform, but exists on a spectrum that correlates to the quantum of expression therein. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350-51 (1991); *Nimmer on Copyright* ("*Nimmer*") §13D.32 ("Many copyrights represent significant creative effort, whereas others reflect only scant creativity. The former may be conceived as reasonably robust, in contrast to the more limited protection accorded the other."). This spectrum recognizes that not all factual works are created equal in terms of their levels of originality and creative expression. *See Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003); *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1120 (9th Cir. 2018). Certain factual

3

compilations like phonebooks contain minimal expression and accordingly receive limited protection. *Feist*, 499 U.S. at 349. More creative and original factual works, like Yonay's Story, written in the subjective New Journalism literary style, garner much more protection. *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 913-14 (9th Cir. 2010).

Paramount's sweeping argument that factual works categorically receive only minimal copyright protection against verbatim copying misapprehends *Feist*. There, the Supreme Court described the minimal threshold of originality necessary to protect bare factual compilations like phonebooks, while emphasizing that infringement analysis must center on the "expression" in the work. *Feist*, 499 U.S. at 348. *Feist* thus sets the floor for copyright protection of factual works, not the ceiling. *See Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters.*, 945 F.2d 509, 514 (2d Cir. 1991) ("[O]ne might interpret *Feist* to permit a finding of infringement only when a subsequent compiler produces an exact replica of a copyrighted compilation…[but w]e have not read *Feist* in such a broad and self-defeating fashion."). And unlike a phonebook's mechanical compilation, Yonay's Story represents a sophisticated piece of creative nonfiction, the value of which derives not from its informational content, but from its expressive storytelling in

selecting, arranging, and depicting that content.[1] 2-ER-281–82 (Simpson: "What grabbed me was the colorful incidents, anecdotes and characters.").

Notwithstanding *Feist*'s directive to carefully evaluate creative expression, Paramount persisted with its artificial binary. And when Yonay's expression did not fit its fact/fiction framework, Paramount improperly "distilled" the Story until it would, stripping away layers of Yonay's legally consequential expression in search of some fact underneath. *See, e.g.*, AAB 15 ("similarities between the works distilled to unprotectable facts"); AAB 57 ("virtually everything…distills to an unprotectable fact"). But comparison of barren distillations is not the analysis; the Works' expression must be compared as it is. The lower court's embrace of Paramount's faulty framework must be reversed.

## B. Paramount's Abstract Descriptions of the Story are Inaccurate.

Paramount improperly reduced Yonay's protectable expression to overbroad abstractions or *scènes-à-faire*-sounding descriptions, which it then rejected as too "general" to be protectable. *Compare* AAB 40-41 (Paramount arguing the "men's men" story element is "generic") *to* Br. 49 (Plaintiffs describing "'men's men' consumed by their trade" and quoting "Story: 'With raw sex waving in front of

---

[1] Paramount's argument that Plaintiffs claim rights in underlying facts is false. At every stage, Plaintiffs distinguished protected expression from underlying facts in their infringement analysis. *See, e.g.,* 2-ER-226–52.

their eyes, these supremely healthy young males are standing around in twos and threes and talking about the hop.'"). As with facts, Paramount "distills" Yonay's expression into generic ideas to toss it out. *See, e.g.,* AAB 30 (regarding the Works' similar emphasis on rigorous combat training against the same three-week deadline, Paramount argues: "Unprotectable general plot idea (to the extent it *distills* to achieving a goal under time pressure)") (emphasis added).

But Paramount's oversimplifications are obfuscatory—a sleight of hand enabling it to superficially discuss the Story without *actually* confronting any of Yonay's detailed expression. This tactic worked on the lower court, which made its rulings based on Paramount's self-serving abstractions, but it will not do here. The expression itself, rather than broad characterizations, must be the center of analysis. *Reyher v. Children's TV Workshop & Tuesday Publ'ns*, 533 F.2d 87, 91 (2d Cir. 1976) ("[T]he essence of infringement lies in taking not a general theme but its particular expression[.]") (citing *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 494, 5 (2d Cir. 1936)).

Paramount also argues, citing nothing, that expert testimony is unnecessary because "common sense" supports the lower court's holding that "aerial action scenes" are *scènes à faire*. But Paramount's description is strategically reductive and ignores Yonay's compelling expression. *See, e.g.,* 3-ER-376 (Story: "From where they sit, however, it's not their silver rocket that's rocking but the entire vast

6

blue dome of sea and sky. There are no ups or downs up here, no rights or lefts, just a barely perceptible line separating one blue from another, and that line is spinning and racing like mad in the distance."). Plaintiffs do not claim rights in all "aerial action scenes," they simply showed with expert evidence that the specific high-tech, high-testosterone scenes Yonay's Story originated are protectable.

Indeed, because the *scènes-à-faire* analysis demands careful historical context, such expert evidence proves indispensable. *See Alfred v. Walt Disney Co.*, 821 Fed.App'x 727, 729 (9th Cir. 2020). As Plaintiffs' literary expert explained, these types of high-octane aerial scenes were original and uncommon in 1980s naval literature when the Story was published, 2-ER-194, and Paramount cited no contemporaneous literature to suggest otherwise.

Paramount's attempt to minimize the clear guidance in *Swirsky v. Carey*, barring summary judgment in cases like this, as "niche" falls flat. In *Swirsky*, this Court ruled "[i]t is inappropriate to grant summary judgment on the basis of *scenes a faire* without independent evidence, unless the allegation of *scenes a faire* is uncontested." 376 F.3d 841, 849-50 (9th Cir. 2004). But neither is true here. The lower court, having rejected both sides' literary experts, considered no independent evidence that the Story contained *scènes à faire*, a characterization Plaintiffs contested. Summary judgment was therefore improper.

Failing all else, Paramount retreats to its debunked fact/fiction argument, claiming that *scènes-à-faire* analysis is unnecessary because supposedly the Story is just a bunch of facts. But copyright law does not permit such casual dismissal of Yonay's creative expression merely because it is nonfiction. *Nimmer* §13D.32 (copyright protection for factual works is not "anorexic") (quoting *Key*, 945 F.2d at 514). The lower court's adoption of Paramount's simplistic approach must be reversed.

## II.  EXPERT EVIDENCE IS REQUIRED HERE

Paramount mischaracterizes Plaintiffs' position. Plaintiffs do not suggest that expert testimony is mandatory in all cases. Rather, expert analysis was essential *here*, given that Paramount's copying transformed literary elements from a short story into a full-blown feature-length film. *Nimmer* §13D.16 ("[O]bservations of a person untrained in the special requirements and techniques of…the short story, and the motion picture…may fail to note similarities that, if [expertly] analyzed and dissected, would be only too apparent.").

Conversely, Paramount appears to argue that expert testimony is *never* required, but that is not the law. This Court has repeatedly recognized that "the extrinsic test often *requires* analytical dissection of a work *and* expert testimony." *Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 485 (9th Cir. 2000) (emphasis added); *Hanagami v. Epic Games, Inc.*, 85 F.4th 931, 945 (9th Cir. 2023);

*Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018); *Swirsky*, 376 F.3d at 845. That it is not *always* required does not mean that expert testimony is not often or usually required. *See Masterson v. Walt Disney Co.*, 821 Fed.App'x 779, 781 (9th Cir. 2020).

Paramount relies on the outdated, out-of-circuit *Stromback v. New Line Cinema*, 384 F.3d 283 (6th Cir. 2004), decision, which would restrict expert testimony to software disputes. That reliance is misguided and ignores controlling Ninth Circuit precedent demanding expert evidence in cases comparing written works to popular films. *See, e.g., Zindel v. Fox Searchlight Pictures, Inc.*, 815 Fed.App'x 158, 160 (9th Cir. 2020) (calling for expert evidence to compare play to film); *Alfred*, 821 Fed.App'x at 729 (calling for expert evidence to compare screenplay to film). Paramount contradicts its own position by urging this Court to review testimony from its literary expert,[2] which the lower court disregarded as moot.[3]

─────────────

[2] Competing expert opinions creates a factual dispute precluding summary judgment. *City of Pomona v. SQM N. Am. Corp.,* 750 F.3d 1036, 1049 (9th Cir. 2014) ("A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat.").

[3] The lower court ruled the testimony of Paramount's literary expert James McDonald was moot but failed to address Plaintiffs' motion to exclude him. 1-ER-007. McDonald's unreliable report was a legal brief comprising inadmissible

As this Court recently emphasized in *Hanagami*: "In many cases, application of the extrinsic test *requires* analytical dissection of a work and expert testimony because most judges are not sufficiently trained in the specifics of the art form at issue to make reliable conclusions about similarity." 85 F.4th at 945 (cleaned up) (emphasis added). Paramount attempts to minimize *Hanagami*'s expert directive as limited to dance, an art form it calls "niche."[4] But dancing is hardly "niche" and Paramount's claim, that comparing dance moves in a live video to dance moves in an animated one presents complexities uniquely requiring expert evidence, fails. The simple visual comparison of dance moves is far more straightforward than examining how interwoven literary elements such as character traits, themes, metaphors, and moods translate from a short story to a two-hour film. This latter analysis demands precisely the kind of expert evaluation the lower court erroneously disregarded.

---

hearsay submitted under the guise of expert opinion. For these reasons, and those in Plaintiffs' Motion to Exclude McDonald's Testimony, FER-3–28, incorporated herein by reference, the Court should disregard his report.

[4] Paramount's recurring characterization to sideline inconvenient Ninth Circuit precedent.

### III.   COMPARISON OF THE WORKS CONFIRMS SUMMARY JUDGMENT WAS IMPROPER

Paramount's literary argument demonstrates precisely why summary judgment in its favor was inappropriate. "Where reasonable minds could differ on the issue of substantial similarity…summary judgment is improper." *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990); *see also Williams*, 895 F.3d at 1137 ("[A]t summary judgment, so long as [plaintiffs] 'presented '*indicia* of a sufficient disagreement concerning the substantial similarity of the two works,' then the case *must* be submitted to a trier of fact.'") (emphasis original) (cleaned up) (quoting *Swirsky*, 376 F.3d at 844).

Paramount's comparative analysis repeatedly raises factual disputes and interpretive questions about the Works' meaning and creative expression that, by their very nature, should have precluded summary judgment. *L.A. Printex Indus. v. Aeropostale, Inc.*, 676 F.3d 841, 851 (9th Cir. 2012) ("The differences noted by the district court do not compel the conclusion that no reasonable juror could find that Defendants' design is substantially similar…[rather,] the differences support the opposite conclusion, that there is a genuine dispute of material fact on substantial similarity."). The more Paramount dissects the Works to prove their differences, the more it demonstrates that genuine disputes exist regarding how the Works should be viewed, which should have been resolved by a factfinder, not disposed of as a matter of law. *See Rentmeester*, 883 F.3d at 1127 ("[Substantial similarity]

11

is an inherently factual question which is often reserved for the jury[.]"). The lower court's erroneous ruling must be reversed.

## A.    Theme

Paramount's theme arguments, which the lower court adopted wholesale, do not withstand scrutiny. That *Maverick* may include additional themes of guilt, reconciliation, and redemption, as Paramount argues, is legally irrelevant to whether it shares the Story's protected themes. *L.A. Printex*, 676 F.3d at 851; *Nimmer* §13D.24 ("It is entirely immaterial that…plaintiff's and defendant's works are dissimilar[.]"). The presence of additional themes does not negate the substantial similarity of those shared by both Works.

Paramount does not dispute *Maverick* incorporates the anachronism of fighter aviation theme, but wrongly dismisses this central theme as just a "brief description" in the Story. The Story presents an explicit thematic focus on how human pilots remain essential despite advancing technology and weaves it throughout, including in its discussion of the Vietnam War, where all the Pentagon's advanced planes and missile technology proved useless until pilots returned to fundamental dogfighting skills. 3-ER-377–78, 383. The Story, like Paramount's derivative *Top Gun* sequel, is a testament to this anachronism: it's not about cutting-edge technology, but rather the pilots and art of old-school aerial combat. That Paramount disputes this thematic interpretation only demonstrates

12

why summary judgment was improper. *L.A. Printex*, 676 F.3d at 851; *Shaw*, 919 F.2d at 1355.

Paramount cites *Goldberg v. Cameron*, 787 F. Supp. 2d 1013, 1020 (N.D. Cal. 2011), to argue "man-versus-machine" themes are common, but in actuality, *Goldberg* held: "a futuristic conflict between man and machines, specifically computers and robots…is a commonplace [theme] in science fiction." The Works are not science fiction, nor do they pit humans against machines.

Further, the Western themes in both Works are not merely "diction" as Paramount claims, but rather a fundamental parallel between fighter pilots and Old West gunslingers that shapes how both Works present their characters and conflicts. 3-ER-375, 377; TGM; 2-ER-177, 183. The Story explicitly frames aerial combat through this lens, which *Maverick* embraces with its portrayal of individualistic pilots who, like Western heroes, operate at the edges of institutional control, trust their instincts over protocol, and ultimately prove their worth through personal courage and skill rather than conformity—traits Paramount admits Maverick's callsign itself reflects. AAB 38.

Paramount argues that the aviation caste system is not a theme in the Story because it appears in one paragraph, and discounts the ideological tension between military authority and hotshot pilots as a mere "digression." But word count does not define theme. *See Hanagami*, 85 F.4th at 946 (requiring "qualitative[] and

13

quantitative[]" assessment). Both Works portray this caste system repeatedly and manifest this hierarchical conflict throughout, pitting authority figures who prioritize institutional control against pilots who believe effective combat requires initiative and daring, to explore the balance between discipline and the moxie required for effective combat. 3-ER-384; TGM 00:19:55, 00:21:30, 00:33:40; 2-ER-167–69, 181–82.

Both Works also share a distinctive post-WWII nostalgia that Paramount wrongly dismisses. The Story deliberately frames its narrative through this lens, describing the base as resembling "an old *From Here to Eternity* [(1953)] set" and looking "like a small desert town out of the 1950s." 3-ER-378; 2-ER-181, 190. *Maverick* does not merely include nostalgic elements, it is structured around this same romanticism of a simpler era through carefully chosen symbols: Maverick's WWII-era P-51 Mustang, the old-school naval bar where pilots sing *Great Balls of Fire* (1957), and the classic romance between Maverick and Penny, from sailing to their final sunset flight in a vintage plane. TGM 00:03:30, 00:16:25–00:17:20, 00:30:10, 00:46:00–00:47:25, 00:59:00–01:01:20, 02:00:10; 2-ER-181, 190.

Paramount's argument that nostalgia only exists when characters look at old photographs misunderstands it. The analysis is not whether characters experience nostalgia, but how both Works objectively express this theme and mood. Paramount is also wrong that Penny's role as a "businesswoman" somehow

14

negates this nostalgia. Like the Story, *Maverick*'s modern elements do not eradicate its nostalgic framework, they exist within it, creating a world where modern progress is reconciled with traditional values, suggesting that, despite technological and social changes, fundamental human qualities remain as vital as they were in simpler times. 2-ER-190–91. Paramount's divergent interpretations simply raise factual issues that should have been resolved by a jury, not hastily dismissed by the lower court.

### B. Mood

Paramount's argument that the "constant threat of death and violence" can be disregarded as merely "factual" misunderstands how both Works employ danger as a deliberate mood-setting device.[5] As Paramount's "fact" expert admitted, in Top Gun's 55 years, there was only one fatal incident, which occurred decades after the Story was written. 3-ER-307. The relative safety of the training environment is precisely what makes Yonay's choice to emphasize danger so significant—it was a creative decision to build tension, not "factual" reportage.

Paramount fails to meaningfully address the many other similar moods Plaintiffs identified, from the tense mood built with portrayals of volatile

---

[5] Paramount faults Plaintiffs for describing moods "evoked" by the Works, yet in the very same breath defines mood as "the 'predominant emotion' *evoked* by a work." AAB 39 (emphasis added).

"pumped-up fighter jocks" under severe time pressures, to the buoyant mood created by playful interactions, to the restless mood on the ground contrasted with freedom in the air, to excitement expressed through vivid details of flight.[6] Paramount broadly dismisses these similarities as "flowery descriptions," but in fact, they are supported by objective expert literary analysis and readily apparent in the Works themselves.

### C.    Plot, Sequencing, and Pacing

Paramount's plot argument raises numerous factual disputes that should also have precluded summary judgment. For instance, the Story's plot is led by Yogi, depicted as a driven loner who prioritizes professional excellence over fitting in with the squadron's more social culture. 3-ER-379, 382 ("[Yogi] was almost too serious for the Wolfpack"); 2-ER-177, 182. Paramount disputes whether Yogi is a "loner," but in so doing, creates a factual dispute.

Similarly, both Works emphasize that only the best-of-the-best are invited back as instructors, but Paramount argues Maverick was "ordered" not "invited" back. This superficial distinction ignores the core parallel: only the best-of-the-best

---

[6] 3-ER-375–379, 382; TGM 00:24:50–00:42:45, 00:59:00–01:10:32; 2-ER-175–77, 185–87.

return. Whether the voluntariness of Maverick's return carries significance creates yet another factual dispute.

Paramount incorrectly argues that, while both Works depict targets, *Maverick*'s lacks a metaphor. The Story uses a target as a metaphor for a pilots' precision with the bullseye representing Top Gun's most skilled aces. 3-ER-384; 2-ER-181-82. In *Maverick*, Hangman, the best of the young pilots, demonstrates his prowess by effortlessly landing three-out-of-three darts in the bullseye. TGM 00:19:55, 00:21:30, 00:33:40. Hangman's accuracy obviously represents (i.e., is a metaphor for) his skill as a pilot. 2-ER-167. At the very least, a reasonable juror could disagree with Paramount's interpretation, precluding summary judgment.

Paramount's sequencing argument presents similar factual issues. It argues, without legal or expert support, that juxtaposing scenes of idyllic flying against agonizing G-force combat training is "generic." But that is inaccurate. From countless possible scenes, Yonay depicted specific moments in specific order to craft compelling narrative tension and emotional resonance. 3-ER-375–77 ("Even the weather is great, and they're floating in their glass bubble through a regulation Southern California blue-on-blue crystal morning...That's when it happens…and by the time Possum spots the little F-5 behind them it's too late…[the F-5 just] simulated slipping a heat-seeking missile up their exhaust pipe…Their glorious hop is all screwed up…It is evening, and the briefing room is quiet."). Both Works

17

orchestrate this interplay between tranquility and tension in exactly the same way. 3-ER-376, 382; TGM 00:34:30–00:47:25; 2-ER-187–88.

The Works are also similar in their pacing. Both share a distinctive rhythm, alternating between gripping action scenes, quiet moments of introspection, and spirited camaraderie.[7] Paramount disputes that *Maverick*'s pacing is "inconsistent," but in the process, simply raises another factual issue for the jury.

### D.    Character and Dialogue

Paramount's argument, that characters based on real people are not protectable, misapprehends copyright law. Paramount cites *Corbello v. Valli*, which addressed a biographical work about a celebrity where the infringing work was another biographical portrayal of that same figure. 974 F.3d 965, 971-73 (9th Cir. 2020). Here, the Story's Yogi and Possum were not celebrities, but were chosen by Yonay out of dozens to drive the narrative of his Story. Unlike in *Corbello*, *Top Gun* and *Maverick* were not biographical works, but rather films that exploited Yonay's original creative choices and characterizations.

Paramount misreads *Corbello* as eliminating all copyright protection for characters based on real people—a position that contradicts established precedent

---

[7] 3-ER-376–77, 379, 382; TGM 00:24:24–00:30:30, 00:34:30–00:41:30, 00:46:00–00:47:25, 01:03:50–01:15:42; 2-ER-162, 167, 182, 187–88.

and *Corbello*'s own reasoning. *Id*. at 973 ("'copyright assures authors the right to their original expression'") (quoting *Feist*, 499 U.S. at 349); *Harper & Row, Publrs. v. Nation Enters*., 471 U.S. 539, 547-48 (1985) (protecting original expressions of real people); *De Acosta v. Brown*, 146 F.2d 408, 410 (2d Cir. 1944) (same).

The correct analysis is not based on Paramount's *Corbello* soundbites, but a broader understanding of established copyright law. While historical figures themselves are not copyrightable, their creative portrayal is. *Corbello*, 974 F.3d at 976 ("Though the creative expression that is in the Work—the 'writing style and presentation'—is protected by copyright, the assertedly historical elements are not."); *Nimmer* §2.11[C] ("original biographical treatment of an historical character…[is] subject to copyright"); *Patry on Copyright* §4:7 (cautioning courts applying *Corbello* to "take a respectful approach to expressive material…discuss[ing] historical events").

Here, Yonay's Story reveals distinct characterizations that go beyond mere biographical facts. 3-ER-378, 381, 384 (Story describing pilots' "shit-hot" machismo, the Wolfpack as a "security blanket and confessional circle," and their place in "Camelot" at "King Arthur's Round Table [with] the gathering of the greatest of the greats in fighter aviation"). Yonay's pilots are portrayed through carefully constructed contrasts: simultaneously macho yet sensitive, part of a tight-

19

knit community yet inherently loners, intensely serious about flying yet playful in their interactions. 3-ER-379, 381-82; 2-ER-169, 185–87. *Maverick*'s are the same. TGM 00:11:35–00:13:20, 01:07:15, 01:14:40, 01:49:38-1:50:45. That multiple characters share these traits does not make them indistinctive or unprotectable, as Paramount claims, it demonstrates Yonay's consistent creative vision that Paramount copied. When properly analyzed, Yonay's character expression represents precisely the kind copyright law protects.

Paramount's superficial dialogue analysis ignores how Yonay uses dialogue to create a distinctive mood and advance the Story's themes, and instead focuses solely on the shared verbatim phrase "Fight's on." The proper analysis must look at how an author's use of dialogue contributes to the work more broadly. 2-ER-177–78. Here, the Story's dialogue helped establish its distinctive world and characters, which *Maverick* deliberately copied.

### E.    Setting

Contrary to Paramount's argument and the lower court's ruling, the Story did not merely document the factual reality of Top Gun. It crafted a distinct atmospheric setting through careful curation and depictions of elements and imbued them with meaning: the wooden plaques transform from mere decorations to symbols of legacy and aspiration; the "Fightertown" sign evolves from cheeky signage into a symbol of elite identity. 3-ER-377, 380; 2-ER-180–81. *Maverick*

20

reproduces not just these physical elements, but their exact symbolism as well. TGM 00:16:30–00:17:25.

Maverick's identical use of environmental elements (desert, coast, Pacific Ocean) as portrayed by Yonay is particularly revealing given the real academy's relocation to land-locked Nevada in 1996. This demonstrates that these parallels stem not from documenting reality, as Paramount insists, but from deliberately copying the setting portrayed in the Story. Paramount's facetious suggestion that avoiding infringement would require Maverick's "Officers Club [to look] like a Manhattan cocktail bar" ignores the significant range of protectable expression between the two.

### F.    Selection and Arrangement

Paramount, without legal support, tries to limit the "arrangement" analysis within the selection-and-arrangement test solely to "sequence of events." But courts consistently recognize selection and arrangement as a distinct basis for protection, well beyond mere sequencing, precisely because it safeguards the broader creative patterns that emerge from an author's choices in selecting and combining protected and unprotected elements to create a coherent artistic work. See Esplanade Prods. v. Walt Disney Co., 768 Fed.App'x 732, 733 (9th Cir. 2019) (analyzing sequencing and separately, selection and arrangement as a distinct ground for infringement of literary work); Gable v. NBC, 438 Fed.App'x 587, 588-

21

89 (9th Cir. 2011) (same); *Nimmer* §13D.13 ("Even in the absence of a similar sequence of events, it has been held that a *combination* of many different elements of similarity may be sufficient to constitute infringement[.]") (emphasis original) (citing *Sid & Marty Krofft TV Prods. v. McDonald's Corp.*, 562 F.2d 1157, 1169 (9th Cir. 1977)). Collapsing the analysis into mere ordering of scenes would render the doctrine duplicative of the dedicated sequencing analysis in the extrinsic test. Selection and arrangement must protect more than mere sequence, or it would be redundant, protecting nothing at all.

Here, the Story's original arrangement emerges through myriad creative choices beyond sequencing, including Yonay's selection of characters and events, his interweaving of themes, orchestration of moods, careful balance of action and reflection, and juxtaposition of contrasting elements. 2-ER-191–93. For example, Yonay chose to portray his characters through deliberately coordinated contradictions—they are simultaneously fierce competitors and loyal squadron-mates, technical experts and emotional risk-takers, regimented military officers and maverick pilots. 3-ER-379, 381-82; 2-ER-169, 185–87. This patterning of character traits and relationships forms a crucial part of the Works' creative core, yet exists independently of mere sequencing.

Paramount also argues (again, citing nothing) that Plaintiffs are not entitled to protection of Yonay's selection of facts unless they can also show an

22

arrangement as well. But that is incorrect. "The requisite originality [for protection] may inhere in selection or arrangement alone, even if the other ingredient is lacking." *Nimmer* §2.04; *see Kregos v. Associated Press*, 937 F.2d 700, 709-10 (2d Cir. 1991) (protection for work with original selection, but not arrangement). Here, the Story has both an original selection *and* arrangement.

Paramount's effort to dismiss the extensive similarities between the Works as "random" and "scattered" ignores how these elements are deliberately curated and arranged to create specific, artistic storytelling effects. The shared creative choices, from the portrayal of pilots' contradictory personality traits to the juxtaposition of ethereal and intense flying sequences with playful scenes on the ground and at sea form an intentional and coherent artistic pattern and is therefore, not "random." This particular combination is pervasive throughout and central to both Works, and is thus, not "scattered."

Importantly, the proper analysis is not concerned with whether each parallel in the Works is identical, but whether the overall selection and arrangement of elements is substantially similar. *See Hanagami*, 85 F.4th at 945 (reversing lower court because "select[ion] and arrang[ement of] elements…are substantially similar"); *L.A. Printex*, 676 F.3d at 851 (a work's selection and arrangement "will infringe if it's 'substantially similar' to the copyrighted work") (quoting *Mattel*, 616 F.3d at 913-14). Paramount argues that the precise number of pilots in the

Works' training sequence differs, but whether Paramount included every element of the Story is not the standard and does not eliminate the substantial similarity in how both Works *do* creatively portray the combat-training process. *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 756 (9th Cir. 1978) (finding infringement though stories differed entirely)); *Shaw*, 919 F.2d at 1364 (reversing summary judgment "[d]espite these dissimilarities"); *Nimmer* §13D.24 ("It is entirely immaterial that…works are dissimilar…If substantial similarity is found, the defendant will not be immunized from liability[.]").

Paramount's attempt to nitpick individual similarities with its alternative interpretations only underscores why summary judgment was improper. *See Baxter v. MCA, Inc*., 812 F.2d 421, 425 (9th Cir. 1987) (summary judgment inappropriate where "reasonable minds could differ"). Paramount cites heated exchanges between pilots after dogfights in *Maverick* to argue that, unlike in the Story, there is no collegiality in the film. But despite intense moments, both Works depict the core collegiality that coincides with fierce competition. 3-ER-382; TGM 00:34:30-00:41:30; 2-ER-182, 188. The shared portrayal is not collegial *or* conflictual, it's both.

Paramount asserts that Maverick's wave to the enemy pilot "is not a 'cheeky exchange'" because it serves a different narrative purpose. But that is inaccurate. Both serve as comedic relief to break tension, and whether two similar scenes

24

serve different purposes is precisely the type of factual determination that must be left to the jury, not a legal determination warranting summary judgment. *See Shaw*, 919 F.2d at 1358.

\*     \*     \*

It is undisputed that Paramount, itself, submitted *Maverick* to the 2023 USC Scripter Awards for consideration in its "Film Adaptation" category, 2-ER-274–76, as follows: "*Top Gun: Maverick*: based on characters from the 1983 California magazine article 'Top Guns' (author Ehud Yonay)." 2-ER-267–71.

## IV.   PARAMOUNT BREACHED ITS CONTRACT

Paramount's argument that Paragraph 7(b)'s "produced…hereunder and substantially based upon" are two independent conditions ignores established contract principles and leads to absurd results. Paramount makes much of the word "and," but "just because the ordinary meaning of 'and' is typically conjunctive does not mean 'and' cannot take on other meaning in context." *Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.*, 963 F.3d 982, 990 (9th Cir. 2020); *Tricor Am., Inc. v. Illinois Union Ins. Co.*, 351 Fed.App'x 225, 227 (9th Cir. 2009) (reading "and" as "or" to effectuate parties' intent because reading "and" as conjunctive leads to absurd results); *MacDonald v. Pan Am. World Airways, Inc.*, 859 F.2d 742, 744-45 (9th Cir. 1988) (rejecting conjunctive reading of "and").

Paramount's reading leads to absurdities. How could a film be "produced...[]under" the Agreement (purchasing film rights to the Story), yet not be "based upon" the Story? In context, interpreting "and" to establish two separate conditions creates a logical impossibility.

Paramount has no response, except to undermine its own position. It circularly argues *Maverick* was not "produced...[]under" the Agreement because it is not substantially similar to the Story, but that contradicts its two-separate-conditions theory. Claiming *Maverick* was not "produced...[]under" the Agreement due to lack of similarity to the Story reveals that satisfying the first condition necessarily requires satisfying the second ("based upon"). In other words, there are not two conditions, there is one.[8]

Paramount's argument also superimposes an infringement standard on the Agreement's broad *contractual* credit provision.[9] For instance, Paragraph 7(b)

---

[8] Paramount's argument that *Maverick* cannot be "produced...[]under" the Agreement after Plaintiffs' termination, which the lower court erroneously adopted, ignores that termination affects *only* U.S. rights, leaving foreign rights and the broader Agreement and credit provision intact and enforceable. *See* 17 U.S.C. §304(c)(6)(E). Paramount responds with wordplay, that "produced...hereunder" means *physical* production, implying without evidence that *Maverick*'s "production" all occurred in the U.S. But that is also false. FER-45, 91-92, 94-95.

[9] By imposing the "extrinsic" test alone, rather than copyright law's "extrinsic" and "intrinsic" analysis, Paramount seeks to narrow the inquiry even further.

26

obliges Paramount to credit Yonay on works that draw from a wider range of elements than comprise the extrinsic test, like "treatment" and "motive," and only requires a subsequent work be "based upon" the Story—expansive phrasing that contemplates a looser connection between the Story and derivative works (e.g., *West Side Story* is "based upon" *Romeo and Juliet*).

As stated above, Paramount admitted, in submitting *Maverick* under the "Film **Adaptation**" category to the 2023 USC Scripter Awards, 2-ER-274–76, that "*Maverick* [was] **based on characters** from the 1983 [Story,]" 2-ER-267–71, thus supporting two independent bases to credit Yonay under Paragraph 7(b).

Finally, Paramount's tortured interpretation of Paragraph 8 would render Paragraph 7(b)'s credit requirement meaningless—a cardinal sin of contract interpretation. *See State Comp. Ins. Fund v. Dep't of Ins.*, 96 Cal.App.5th 227, 237 (2023) ("Courts must interpret contractual language in a manner which gives force and effect to *every* provision.") (emphasis original). Paragraph 7(b) explicitly requires Paramount to credit Yonay when using elements of his Story, whether protected by copyright or not. And while Paragraph 8 preserves Paramount's "rights" as a member of the public, it leaves intact the separate contractual *obligations* that it drafted and undertook. Whereas Paramount's interpretation conveniently nullifies its explicit credit obligations, Plaintiffs' straightforward reading harmonizes the entire Agreement.

## V.   THE COURT'S EXPERT WITNESS RULINGS WERE ERRONEOUS

### A.   The Lower Court Abused Its Discretion by Excluding Plaintiffs' Literary Expert.

Paramount does not dispute the qualifications of Plaintiffs' literary expert Henry Bean as both an accomplished screenwriter and Columbia University and NYU film professor. Bean duly conducted an extrinsic analysis of similar themes, moods, settings, etc. by focusing on the protected expression in the Works, while his selection-and-arrangement analysis considered both protected and unprotected elements following this Circuit's established precedent. *Rentmeester*, 883 F.3d at 1119; *Hanagami*, 85 F.4th at 942-43. Paramount's contrary arguments are based on its legal misapprehensions and own subjective view of the Works, neither of which justify excluding Bean's testimony.

Resurrecting its invented fact/fiction dichotomy, Paramount wrongly suggests Bean should have filtered "all factual material…no matter how much 'expression' Yonay layered on top of it," and faults him because "virtually everything he discussed distills to an unprotectable fact or idea." But Paramount's argument improperly restricts copyright protection to fiction alone. That is not the law. The correct inquiry examines the Works' original *expression*, not "distilled" or purely fictional elements.

Bean's intuitive focus on the Works' protected expression meets the standard for expert admissibility. 2-ER-112 ¶9. *Gilbert-Daniels v. Lions Gate*

28

*Entertainment*, 2023 WL 8938403, at *5 (C.D. Cal. Dec. 7, 2023) (The expert's

"performance of the extrinsic test…[is] implied….[The expert] does focus on

comparing elements that he found were protectible, thereby suggesting that he

filtered out those he did not find protectible.").[10] Paramount argues Bean could not

have filtered because he did not understand what made an element legally

protectable, citing his testimony that Yonay's original treatment of otherwise

"stock" elements renders them protectable. But it is *Paramount* that

misunderstands the law, which supports Bean's analysis exactly. *See Nimmer*

§2.01[A][2] ("Even [as to] an old or stock situation, copyright protection may still

be available for original material interpolated therein.").

Further, the selection-and-arrangement analysis does not require filtration.

*Rentmeester*, 883 F.3d at 1119; *Hanagami*, 85 F.4th at 942-43; *Swirsky*, 376 F.3d

at 848-49. Paramount's contrary view is based on a misapplication of *Cavalier v.*

*Random House, Inc.*, which had nothing to do with expert testimony and instead

addressed filtration "under the intrinsic test." 297 F.3d 815, 826 (9th Cir. 2002).

Even if the court found Bean had not sufficiently filtered his analysis of plot,

characters, etc., his selection-and-arrangement analysis should still have been

---

[10] Paramount also cites *Knowles v. Spin Master, Inc.*, but that case primarily turned
on *access*, and importantly, did not concern filtration in the context of selection
and arrangement. 2019 WL 4565102, at *4 (C.D. Cal. Sept. 17, 2019).

admitted. *See Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1059 (9th Cir. 2024) ("[W]e have 'little doubt' that some of the experts' statements and opinions would be inadmissible…[but] conclude that the district court abused its discretion by excluding the expert reports in their entirety."); *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019) (reversing exclusion of expert because "the district court used a sledgehammer, when the law required that it use only a scalpel.").

Paramount further faults Bean's selection-and-arrangement analysis because it is not convinced that there is "'substantial' overlap" in shared expression between the Works. But that argument goes to the weight of Bean's testimony, not admissibility under Federal Rule of Evidence 702.

Paramount's sundry methodology arguments fare no better. Paramount argues Bean did not address any dissimilarities between the Works, but that is both incorrect and irrelevant. Where applicable, Bean discussed dissimilarities. *See, e.g.,* 2-ER-166 ("The relationships are not precisely parallel—Maverick and Rooster are not a team [and] don't fly together[.]"), 175 ("This theme is gentler in the Story [and] more dramatic in the Sequel[.]"). Further, differences do not negate the Works' similarities. *Walt Disney*, 581 F.2d at 756; *Shaw*, 919 F.2d at 1364; *Nimmer* §13D.24. Paramount's argument is additionally irrelevant because it once again goes to weight, not admissibility, as its only cited authority confirms. *Olson*

*v. Nat'l Broad Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988) (giving testimony less "weight" but *not* excluding it).

Paramount also mislabels its disagreements with Bean's conclusions as "factual inaccuracies." Paramount attacks Bean's reference to "the last scene" of *Maverick*, when the film includes some epilogue material that follows. This is not a "factual inaccuracy" but a literary disagreement concerning what constitutes a "last scene." As Bean explained, the scene where Maverick stands alone is "not the final scene in terms of sequence, but the…ending of the story." 2-ER-103. Paramount also disagrees that the romantic sailboat in *Maverick* is "beautiful" because its engine needed repair. But the mechanical condition of a boat has nothing to do with its beauty. These kinds of subjective, if not semantic, disagreements provide no basis to exclude Bean's testimony.

Paramount faults Bean for not furnishing pin citations to the Works, but provides no legal authority to exclude him on that basis. And indeed, Bean's direct quotes from the Story and detailed descriptions of *Maverick* make his references to the Works clear. Paramount's other claim, that Bean's analysis "did not track or cite a single" other film, is demonstrably false. *See, e.g.,* 2-ER-160, 183 (citing *The Maverick* (1952), *Psycho* (1960), *The Godfather* (1972), *Maverick* (1993)).

Paramount's argument that Bean opines on the intrinsic test because he uses the word "feel" to describe the Works misunderstands literary analysis. As

31

Paramount itself defined: "'mood' [is] the 'predominant emotion' evoked by a work." AAB 39. Paramount thus agrees that assessing the extrinsic mood of the Works requires examining the "predominant emotion" (i.e., feeling) the Works elicit and convey, exactly as Bean did. 2-ER-178–82, 188–89, 193.

Paramount also cherry-picks quotes from Bean's report to attack his analysis, but ignores their grounding context. It claims Bean's analysis that pilots are "portrayed as audacious cowboys" is too abstract and that Story quotes like "[e]verybody knows" who the "really great fighter pilots are" do not portray themes, but omits Bean's analysis drawing detailed comparisons between the Works in their usage of "Old West" motifs:

> [Quotes Story]…Maverick and some of the other pilots are portrayed as audacious cowboys with slick combat maneuvers -- the pilot equivalent of fast draw -- engage in one-on-one showdown duels, evoking the same Western mythos…[Quotes Story]…Maverick is portrayed…as the most legendary of the top gunfighters…Maverick arrives at the bar, he is relaxed and silent, watching the other hotshot pilots show off….[A]fter the mission has been[] accomplished, we see [Maverick] 'just stand[ing] there' by himself, pleased with his success, at peace with himself and -- as always with the cowboy -- alone.

2-ER-177. Bean's analysis illuminates how the Works share not just surface similarities but deeper patterns of literary expression—precisely the type of expert assessment that aids the trier of fact, and should have been admitted.

### B.    Paramount's "Fact" Expert Was Erroneously Admitted.

Paramount emphasizes Andrew Craig's experience as a pilot, but such credentials cannot salvage testimony that served as a mere conduit for inadmissible hearsay to prop up Paramount's fact/fiction strawman and confuse, rather than elucidate, the core copyright issues. While experts may rely on hearsay in forming their opinions, Federal Rule of Evidence 703 does not allow them to simply repackage hearsay as expert testimony without adding any meaningful analysis, as Craig did here. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (cleaned up).

Paramount's claim that Craig helped identify "unprotectable elements" misses the mark. The issue is not whether aviation or a nonfiction story involves facts (it obviously does), but whether Paramount copied Yonay's protected expression of those facts. The district court's repeated reliance on Craig's hearsay testimony to reach summary judgment for Paramount was clear error.

### **CONCLUSION**

For the foregoing reasons, the decision of the lower court must be reversed.

33

DATED: February 20, 2025          Respectfully submitted,


**TOBEROFF & ASSOCIATES, P.C.**

By:  */s/ Marc Toberoff*
　　　　Marc Toberoff

*Attorneys for Appellants*
Shosh and Yuval Yonay

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** _____24-2897_____

I am the attorney or self-represented party.

**This brief contains 6997 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
　　[ ] it is a joint brief submitted by separately represented parties;
　　[ ] a party or parties are filing a single brief in response to multiple briefs; or
　　[ ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/ Marc Toberoff*_____    **Date:** February 20, 2025_____

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2025, I electronically filed the

foregoing document with the Clerk for the United States Court of Appeals for the

Ninth Circuit by using the ACMS system. I certify that the document will be

served via ACMS on all parties or their counsel of record.

DATED: February 20, 2025          By:  */s/ Marc Toberoff*
                                       Marc Toberoff

                                  *Attorneys for Appellants*
                                  Shosh and Yuval Yonay