No. 24-2897

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

SHOSH YONAY, an individual and YUVAL YONAY, an individual,

*Plaintiffs-Appellants*,

v.

PARAMOUNT PICTURES CORPORATION, a Delaware corporation,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Central District of California
No. 2:22-cv-03846-PA-GJS
Hon. Percy Anderson

APPELLANTS' FURTHER EXCERPTS OF RECORD

Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Alex Kozinski (S.B. #66473)
*alex@kozinski.com*
33 Marguerite Drive
Rancho Palos Verdes, CA 90275
Telephone: (310) 541-5885
Facsimile: (310) 265-4653

*Attorneys for Appellants*
Shosh and Yuval Yonay

## <u>INDEX TO APPELLANTS' FURTHER EXCERPTS OF RECORD</u>

| Date | Docket | Description | Page |
|------|--------|-------------|------|
| 11/06/2023 | 56 | Plaintiffs' Motion to Exclude Expert Report and Testimony of James McDonald | 3 |
| 11/06/2023 | 62-18 | *Excerpts from September 26, 2023 deposition of Joseph Kosinski* – Exhibit 16 to Declaration of Marc Toberoff in Support of Plaintiffs' Motion for Summary Judgment | 29 |
| 11/06/2023 | 62-35 | *Postproduction schedule for Top Gun: Maverick, dated May 7, 2020* – Exhibit 33 to Declaration of Marc Toberoff in Support of Plaintiffs' Motion for Summary Judgment | 81 |

Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Alex Kozinski (S.B. # 66473)
*alex@kozinski.com*
33 Marguerite Drive
Rancho Palos Verdes, CA 90275
Telephone: (310) 541-5885
Facsimile: (310) 265-4653

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SHOSH YONAY, an individual, and YUVAL YONAY, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> PARAMOUNT PICTURES CORPORATION, a Delaware corporation, and DOES 1-10, <br><br> Defendants. | Case No. 22-CV-03846-PA-GJS <br><br> **NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF JAMES MCDONALD** <br><br> [*Filed with: Declaration of Marc Toberoff; [Proposed] Order*] <br><br> **Hearing Date:** January 8, 2024 <br> **Hearing Time:** 1:30 P.M. <br> **Place:** Courtroom 9A <br> **Judge:** Hon. Percy Anderson |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on January 8, 2024 at 1:30PM, or as soon thereafter as counsel may be heard in Courtroom 9A of the Honorable Percy Anderson, United States District Court Judge, Central District of California, located at 350 West First Street, Los Angeles, California 90012, Plaintiffs Shosh Yonay and Yuval Yonay (hereafter, "Plaintiffs") will and hereby do move for an order, pursuant to Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 37, excluding all expert witness reports and testimony of Paramount Pictures Corporation's ("PPC") purported "rebuttal expert" James McDonald.

This Motion is based on the files, records, and proceedings in this action, this Notice, the Memorandum of Points and Authorities, the Declaration of Marc Toberoff and exhibits thereto, the reply memorandum that Plaintiffs intend to file, the arguments of counsel, and such other matters as may be presented at the hearing on this Motion or prior to the Court's decision.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on October 13, 2023. Declaration of Marc Toberoff ("Toberoff Decl."), ¶ 8.

DATED: November 6, 2023          Respectfully Submitted,

                                 TOBEROFF & ASSOCIATES, P.C.

                                 By:        /s/ *Marc Toberoff*
                                            Marc Toberoff

                                 Marc Toberoff
                                 *mtoberoff@toberoffandassociates.com*
                                 23823 Malibu Road, Suite 50-363
                                 Malibu, CA 90265
                                 Telephone: (310) 246-3333

                                 *Attorneys for Plaintiffs*

iii

# **TABLE OF CONTENTS**

*Pages*

I.    INTRODUCTION ...................................................................................... 1

II.   LEGAL STANDARD ............................................................................... 1

III.  ARGUMENT ............................................................................................. 3

   A.   McDonald's Expert Report and Opinions Are
        Rife With Improper Legal Conclusions .............................................. 3

   B.   McDonald's Report Must Be Excluded Due to
        PPC's Willful Failure to Disclose McDonald .................................... 7

   C.   McDonald's Rebuttal Should Also Be Excluded as an
        Improper Conduit for Inadmissible Hearsay ..................................... 12

   D.   McDonald's Factual Narratives of the Story and
        Sequel Do Not Provide Expert Assistance
        and Must Be Excluded ....................................................................... 14

   E.   McDonald's Report Should Be Excluded
        Because It is Unreliable ..................................................................... 15

V.    CONCLUSION ....................................................................................... 18

iv

**<u>TABLE OF AUTHORITIES</u>**

**<u>Cases</u>**

**Pages**

*Amarin Pharma, Inc. v. West-Ward Pharm. Int'l Ltd.*,
   407 F. Supp. 3d 1103 (D. Nev. 2019) ................................................. 8

*Aoki v. MobileHelp, LLC*,
   No. CV 20-00464, 2022 WL 972419 (D. Haw. Mar. 31, 2022) ..................... 13

*Benkirane v. Am. Family Connect Prop. & Cas. Ins. Co.*,
   No. CV 22-1451, 2022 WL 225266 (D. Nev. Jan. 25, 2022)) ..................... 7, 9

*Caldwell v. Cty. of San Francisco*,
   No. CV 12-1892, 2021 WL 1391464 (N.D. Cal. Apr. 13, 2021) .............. 13-14

*Canning v. Medtronic Inc.*,
   No. CV 19-4565, 2022 WL 1092801 (D. Ariz. Apr. 12, 2022) ................. 8, 10

*Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*,
   55 F. Supp. 2d 1024 (N.D. Cal. 1999) ...................................... 16-17

*Colby v. Newman*,
   No. CV 11-7413, 2012 WL 12885118 (C.D. Cal. Nov. 20, 2012) ................... 3

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ............................................... *Passim*

*Daubert v. Merrell Dow Pharms., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ....................................... *Passim*

*Dolby Lab'ys Licensing Corp. v. Adobe Inc.*,
   No. CV 18-1553, 2019 WL 6327210 (N.D. Cal. Nov. 26, 2019) ............. 14-15

*Elosu v. Middlefork Ranch Inc.*,
   26 F.4th 1017 (9th Cir. 2022) .......................................... 2

*Equal Emp't Opportunity Comm'n v. Freeman*,
   778 F.3d 463 (4th Cir. 2015) ......................................... 17

v

1

## TABLE OF AUTHORITIES

2

### Cases

3

Pages

4

*Frerck v. Pearson Educ.*,
   No. CV 11-5319, 2014 WL 477419 (N.D. Ill. Feb. 6, 2014).................... 10-11

5

6

*Fujifilm Corp. v. Motorola Mobility LLC*,
   No. CV 12-3587, 2015 WL 757575 (N.D. Cal. Feb. 20, 2015)................ 14-15

7

8

*Furnituredealer.net, Inc v. Amazon.com, Inc.*,
   No. CV 18-232, 2022 WL 891462 (D. Minn. Mar. 25, 2022)..........................5

9

10

*Gable v. Nat'l Broad. Co.*,
   727 F. Supp. 2d 815 (C.D. Cal. 2010)..............................................................4, 7

11

12

*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ..........................................................................................2

13

14

*Honeywell Int'l, Inc. v. W. Support Grp., Inc.*,
   947 F. Supp. 2d 1077 (D. Ariz. 2013)................................................................6

15

16

*In re Apex Oil Co.*,
   958 F.2d 243 (8th Cir. 1992)..............................................................................7

17

18

*In re Citric Acid Litigation*,
   191 F.3d 1090 (9th Cir. 1999).........................................................................12

19

20

*In re Imperial Credit Indus. Sec. Litig.*,
   252 F. Supp. 2d 1005 (C.D. Cal. 2003)...........................................................14

21

22

*J.R. Simplot Co. v. McCain Foods U.S., Inc.*,
   No. CV 16-449, 2021 WL 4899465 (D. Idaho Oct. 20, 2021) ........................9

23

24

*Lexmark Intern. v. Static Control Components*,
   387 F.3d 522 (6th Cir. 2004)..............................................................................6

25

26

*Med. Educ. Dev. Servs., Inc. v. Reed Elsevier Grp., PLC,*
   No. CV 05-8665, 2008 WL 4449412 (S.D.N.Y. Sept. 30, 2008).....................6

27

28

# TABLE OF AUTHORITIES

## Cases

**Pages**

*Messick v. Novartis Pharms. Corp.,*
    924 F. Supp. 2d 1099 (N.D. Cal. 2013) ..................................................... 15-16

*Moses v. Payne,*
    555 F.3d 742 (9th Cir. 2009) ............................................................................. 2

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.,*
    523 F.3d 1051 (9th Cir. 2008) ........................................................................ 4, 7

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,*
    166 F.3d 65 (2d Cir. 1999) ................................................................................. 6

*Novelty Textile Mills v. Joan Fabrics Corp.,*
    558 F.2d 1090 (2d Cir. 1977) ........................................................................... 17

*Paddack v. Dave Christensen, Inc.,*
    745 F.2d 1254 (9th Cir. 1984) ..................................................................... 12-13

*Pinal Creek Group v. Newmont Mining Corp.,*
    352 F. Supp. 2d 1037 (D. Ariz. 2005) ............................................................... 4

*Russell v. Walmart Inc.,*
    No. CV 19-5495, 2020 WL 9073046 (C.D. Cal. Oct. 16, 2020) ....................... 5

*SecureInfo Corp. v. Telos Corp.,*
    387 F. Supp. 2d 593 (E.D. Va. 2005) ................................................................ 6

*State v. Kinder Morgan Energy Partners, L.P.,*
    159 F. Supp. 3d 1182 (S.D. Cal. 2016) ......................................................... 8-9

*Wainwright Sec. Inc. v. Wall St. Transcript Corp.,*
    558 F.2d 91 (2d Cir. 1977) ................................................................................. 6

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.,*
    259 F.3d 1101 (9th Cir. 2001) ........................................................................... 8

*Zindel as Tr. For David Zindel Tr. v. Fox Searchlight Pictures, Inc.,*
    815 F. App'x 158 (9th Cir. 2020) ..................................................................... 18

FER-08

# TABLE OF AUTHORITIES

## Federal Statutes, Rules and Regulations

**Pages**

37 C.F.R. § 202.1 ........................................................................6

Fed. R. Civ. Proc.

    26 ............................................................................ *Passim*

    37 ............................................................................ *Passim*

Fed. R. Evid.

    403 ............................................................................7

    702 ............................................................................2

    703 ..........................................................................13

    802 ..........................................................................13

## OTHER AUTHORITIES

2 Melville Nimmer & David Nimmer,
   *Nimmer on Copyright* § 8.01 (2023 rev. ed.) ..................................................17

viii

## I.      INTRODUCTION

Defendant Paramount Pictures Corporation ("PPC") employed James McDonald ("McDonald") as a purported rebuttal expert witness "to analyze and respond to the Expert Report of Henry Bean, submitted by Plaintiffs." Toberoff Decl. Ex. 3 (Rebuttal Expert Report of James McDonald ("Rebuttal")) at 1. In furtherance of that goal, McDonald's report analyzes the 1983 story "Top Guns" by Ehud Yonay ("Yonay") and the 2022 film *Top Gun: Maverick* "under what [he] understand[s] to be the standards applicable to the 'extrinsic test' framework for assessing substantial similarity." *Id.* at 1-2. McDonald's report fails for numerous independent reasons.

*First*, McDonald's Rebuttal is a thinly veiled legal brief that argues for and proffers conclusions about ultimate issues of law in this case. *Second*, PPC should have *at the outset* disclosed and designated McDonald as an expert, as his report comments on Plaintiffs' copyright infringement claim and case-in-chief, far exceeding the scope of a mere rebuttal expert. *Third*, McDonald relies almost entirely—and completely improperly—on the hearsay-laden report of PPC's other expert, Andrew Craig, and thus likewise serves as a wrongful conduit for inadmissible hearsay. *Fourth*, McDonald's report purports to provide lengthy factual narratives of the entire *Top Gun: Maverick* film ("Sequel") and Yonay's 1983 story "Top Guns" ("Story") which do neither require nor impart any specialized knowledge and thereby invade the province of the fact finder. *Fifth*, McDonald is an obvious "company man" and prior studio employee, who exclusively advocates for movie companies using a copy-and-paste template to oppose all copyright claims, and thus, his Rebuttal has insufficient indicia of objectivity and reliability. For all these reasons, and as further discussed below, McDonald's testimony and report must be excluded.

## II.     LEGAL STANDARD

It is PPC's burden to establish that McDonald's opinions can be

1  introduced by demonstrating that he is qualified to render his proffered opinions
2  and that his testimony is admissible. Fed. R. Evid. 702; *Daubert v. Merrell Dow*
3  *Pharms., Inc.*, 509 U.S. 579, 592 n.10. The district court acts as a "gatekeeper"
4  to ensure that McDonald's testimony is admissible pursuant to the standards set
5  forth in Rule 702 and *Daubert*.

6      Under Rule 702 expert testimony is admissible only if: (a) the expert's
7  scientific, technical, or other specialized knowledge will help the trier of fact to
8  understand the evidence or to determine a fact in issue; (b) the testimony is
9  based on sufficient facts or data; (c) the testimony is the product of reliable
10  principles and methods; and (d) the expert has reliably applied the principles and
11  methods to the facts of the case. Fed. R. Evid. 702. According to Rule 702(a),
12  expert testimony is inadmissible unless it will assist the trier of fact. "Under
13  Rule 702, expert testimony is helpful to the jury if it concerns matters beyond
14  the common knowledge of the average layperson and is not misleading." *Moses*
15  *v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009). "[T]he basic function of expert
16  testimony [is] to help the trier of fact understand highly specialized issues that
17  are not within common experience." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th
18  1017, 1026 (9th Cir. 2022).

19      In determining the reliability of proffered expert testimony, the district
20  court's task "is to analyze not what the experts say, but what basis they have for
21  saying it." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir.
22  1995) ("*Daubert II*"). "[N]othing in either *Daubert* or the Federal Rules of
23  Evidence requires a district court to admit opinion evidence that is connected to
24  existing data only by the *ipse dixit* of the expert. A court may conclude that there
25  is simply too great an analytical gap between the data and the opinion
26  proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "To avoid this
27  disconnect, the proponent of expert testimony must 'explain the methodology
28  the experts followed to reach their conclusions [and] point to any external source

1  to validate that methodology.'" *Colby v. Newman*, 2012 WL 12885118, at *6

2  (C.D. Cal. Nov. 20, 2012) (quoting *Daubert II*, 43 F.3d at 1319). PPC and its

3  expert have not satisfied these standards, and as such, the expert report and

4  testimony should be excluded.

5  **III.   ARGUMENT**

6      **A.   McDonald's Expert Report and Opinions Are Rife With**

7               **Improper Legal Conclusions.**

8        McDonald's Rebuttal attempts to establish outright legal conclusions and

9  determine ultimate issues of law in the case, which not only reaches well beyond

10  his purported expertise, but inappropriately usurps the province of this Court. As

11  McDonald's opinions are repeatedly and inextricably tied to his improper legal

12  conclusions throughout, his Rebuttal and testimony must be entirely excluded.

13        McDonald's report is replete with baseless, layperson legal analysis.

14  Indeed, he admitted his goal was to "analyze[] the two works at issue under what

15  I understand to be the standards applicable to the 'extrinsic test' framework for

16  assessing substantial similarity." Rebuttal at 1-2. He sets forth a list of

17  "applicable [legal] standards" guiding his views, which consists of pages of

18  purported summaries of the law governing what is copyrightable, complete with

19  supposed examples from cases. *Id.* at 1-3 ("[C]ourts have held that a mood of

20  'secrecy and mystery' merges with the idea of a show about the mystery of

21  magic . . . . [C]ourts have concluded that, because the process of visualizing the

22  sport of karate in a videogame is constrained by the nature and rules of the sport

23  itself, the elements that flow from those constraints must be filtered out.").

24  Layperson though he is, McDonald briefs cases without citation then offers the

25  Court his amateur and incorrect legal conclusions like "Mr. Bean's opinions are

26  not based on a proper application of the 'extrinsic test[,]'" that aspects of Bean's

27  report "are relevant only to the intrinsic test, which is separate from the extrinsic

28  test" for copyright infringement, or that elements of the Story are purportedly

- 3 -

"unprotectable under the doctrines of merger and/or *scenes-a-faire.*" *Id.* at 3-4.
McDonald's amateur appraisals, which underlie all his viewpoints, are
unmoored to his purported expertise and instead, read "more like a legal brief
than an expert report." *Pinal Creek Group v. Newmont Mining Corp.*, 352 F.
Supp. 2d 1037, 1044 (D. Ariz. 2005) (excluding expert report that discussed
applicable law, including offering numerous case examples, and purported to
apply the law to the facts of the case).

   Worse, McDonald's report flagrantly offers legal opinions, including the
ultimate issue of whether the works in this case *satisfy the extrinsic test*.
McDonald's report contravenes settled law that an expert witness "cannot give
an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of
law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th
Cir. 2008) (emphasis in original). Indeed, the stated purpose of his report is the
"application of the 'extrinsic test,'" which culminates in the pre-ordained
conclusion[1] that Plaintiffs have not satisfied that test. Rebuttal at 3-4. Even if
McDonald were an attorney specializing in copyright law, which he is not, such
usurpation of the province of the Court would be entirely improper. *Gable v.
Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 835 (C.D. Cal. 2010) (holding that an
expert witness, even David Nimmer, the co-author of the leading copyright
treatise *Nimmer on Copyright*, "may not state his or her opinion as to legal

---

[1]Notably, at McDonald's deposition, PPC's counsel repeatedly objected to
Plaintiffs' counsel's deposition questions on the basis that they "call[] for a legal
conclusion." *See, e.g.*, Toberoff Decl. Ex. 4 (Deposition of James McDonald
("McDonald Dep.")) at 136:25-137:3 (objecting to question: "So when would
you say the copyright in the story protects [literary expression]?"), 138:6-10
(objecting to question: "Is novelty required for the selection and arrangement of
elements to be protected?"); 178:24-179:3 (objecting to question whether
"individualism against institutional authority" qualifies as a theme). If according
to PPC, McDonald cannot opine on legal matters in his deposition, surely, he
cannot opine on them in his Rebuttal either.

- 4 -

1    standards, nor may he or she state legal conclusions drawn by applying the law

2    to the facts" because "[s]uch opinions invade on the province of the judge.").

3          Yet, McDonald's Rebuttal interjects baseless legal conclusions, one after

4    the other, concerning which aspects of Yonay's Story are purportedly

5    uncopyrightable and "must be filtered out of any extrinsic analysis." Rebuttal at

6    9-12, 14, 15, 17-26, 28-32, 40-41, 43-44, 46-47, 49-50, 55, 59, 61. His amateur

7    legal opinions cover even very particular aspects of copyright law, including that

8    certain similarities between the works are "unprotectable under the doctrine[] of

9    merger" or "unprotectable ideas or *scenes-a-faire* that must be filtered out." *Id.*

10   at 4, 26, 27; *see also id.* at 4-5, 15-16, 18, 28, 30-31, 33, 39-41, 50-51, 65

11   (opining on whether aspects of the Story are "protectable" or "unprotectable");[2]

12   *Russell v. Walmart Inc.*, 2020 WL 9073046, at *4 (C.D. Cal. Oct. 16, 2020)

13   (excluding expert testimony opining on copyrightability because "the issue of

14   whether an item is copyrightable is a question of law," and "[m]atters of law are

15   for the court's determination, not that of an expert witness."). He goes so far as

16   to explain to the Court how "substantial similarity" analysis works. *Id*. at 35

17   (opining that Bean's analysis "is not how substantial similarity of dialogue is

18   assessed under the extrinsic test."); *see Furnituredealer.net, Inc v. Amazon.com,*

19   *Inc,* 2022 WL 891462, at *10 (D. Minn. Mar. 25, 2022) (excluding expert who

20   "simply opines on what he thinks the standard for copyrightability is, applies the

21   facts of this case to that standard, and concludes that [Plaintiff] has failed to

22   meet the standards of copyrightability").

23         The extrinsic test for copyright infringement is a subtle and complex area

24   of the law, even for attorneys and jurists, and certainly not a proper subject on

25   which a story consultant should opine. For instance, just because something can

26

27      [2] McDonald admitted in his deposition that there is valid copyright in Yonay's

28   Story, yet, his Rebuttal tries to take the seemingly irreconcilable position that
     *nothing* in the Story is copyrightable. McDonald Dep. at 135:7-12.

- 5 -

1  be characterized as non-fiction does not mean it is unprotectable under the

2  extrinsic test or otherwise. For example, facts, "[i]deas, plans, methods, systems,

3  or devices, [are] *distinguished from the particular manner in which they are*

4  *expressed or described in writing*." 37 C.F.R. § 202.1 (emphasis added). Thus,

5  an author's expression of facts, and his selection and arrangement of them, *is*

6  protectable. *See, e.g.*, *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,

7  166 F.3d 65, 70 (2d Cir. 1999) ("[T]hough there can be no copyright in the news

8  itself, copyright does protect 'the manner of expression, the author's analysis or

9  interpretation of events, the way he structures his material and marshals facts,

10  his choice of words, and the emphasis he gives to particular developments.'"

11  (quoting *Wainwright Sec. Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 95-96

12  (2d Cir. 1977))); *SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 611 (E.D.

13  Va. 2005) (finding copyrightable "manuals conveying a detailed [technical]

14  procedure"). Even technical exam prep materials, which are inundated with

15  facts, can be copyrightable. *Med. Educ. Dev. Servs., Inc. v. Reed Elsevier Grp.,*

16  *PLC*, 2008 WL 4449412, at *6 (S.D.N.Y. Sept. 30, 2008) (rejecting argument

17  that nursing exam prep book was "dictated largely by the [exam] and the science

18  of nursing" and thus not copyrightable); *see also Honeywell Int'l, Inc. v. W.*

19  *Support Grp., Inc.*, 947 F. Supp. 2d 1077, 1081-82 (D. Ariz. 2013) (finding

20  aircraft manuals that included factual information, such as "procedures for

21  checking and repairing aircraft parts," copyrightable).

22       Furthermore, McDonald repeatedly concludes, without analysis, that

23  aspects of the Story are unprotected as mere *scènes à faire* or as having allegedly

24  merged with an "idea," but he is, once again, incorrect in his layperson

25  methodology dismissing these aspects as uncopyrightable. "In trying to discern

26  whether [the doctrines of merger and *scènes à faire*] apply, courts tend to 'focus

27  on whether the idea is capable of various modes of expression.'" *Lexmark*

28  *Intern. v. Static Control Components*, 387 F.3d 522, 536 (6th Cir. 2004). Here

- 6 -

1  however, McDonald's report contains no discussion of whether the ideas he

2  claims the similarities "merge" with, are capable of various modes of expression.

3  Instead, his report leaps to "filter out" anything in the Story that he claims he

4  saw in a prior movie. McDonald's repeated legal conclusions are not only the

5  improper subject of expert opinion *per se*, his faulty legal analysis with respect

6  to the "idea/expression dichotomy," "fact/expression dichotomy," "merger

7  doctrine," and "*scènes à faire*" are demonstrably erroneous and thereby pose a

8  significant danger of confusing and misleading the fact finder. Fed. R. Evid. 403.

9       McDonald's report amounts to little more than wrongful and unqualified

10  legal opinions and conclusions on the ultimate issues of law in the case.

11  McDonald's Rebuttal and testimony therefore must be excluded in their entirety.

12  *See Nationwide Transp. Fin.*, 523 F.3d at 1058 (holding that an expert witness

13  may not opine on legal conclusions or ultimate issues of law); *Gable*, 727 F.

14  Supp. 2d at 835 (C.D. Cal. 2010) (excluding expert report of copyright scholar

15  David Nimmer because "portions of Nimmer's report read much like a third

16  legal brief" and "instruct[ing] the Court as to Ninth Circuit law . . . invade[s] on

17  the province of the judge").

18       **B.    McDonald's Report Must Be Excluded Due to PPC's Willful**

19            **Failure to Disclose McDonald.**

20       McDonald is not a "rebuttal expert." As McDonald's expert report and

21  opinions purport to address Plaintiffs' case-in-chief from the outset, he is

22  obviously an affirmative expert who absolutely should have been disclosed in

23  PPC's initial expert disclosures. He was not disclosed and as such, his report and

24  testimony must be excluded. *Benkirane v. Am. Family Connect Prop. & Cas. Ins.*

25  *Co.*, 2022 WL 225266, at *2 (D. Nev. Jan. 25, 2022) (quoting *In re Apex Oil*

26  *Co.*, 958 F.2d 243, 245 (8th Cir. 1992)) (excluding purported rebuttal expert

27  testimony because: "If the purpose of expert testimony is 'to contradict an

28  expected and anticipated portion of the other party's case-in-chief, then the

1    witness is not a rebuttal witness or anything analogous to one.'"); *State v. Kinder*

2    *Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182, 1193 (S.D. Cal. 2016)

3    (granting motion to exclude purported rebuttal expert report and testimony

4    because expert opinion "essential to proving the [party's] case-in-chief" is "not

5    proper rebuttal" and that he "should have been disclosed as an initial expert.").[3]

6         Parties *must* disclose the identity of any affirmative expert witness they

7    intend to use regarding the opposing party's case-in-chief and *must* make this

8    disclosure at the time and in the sequence that the court orders. Fed. R. Civ.

9    Proc. 26(a)(2)(D). If a party fails to make this disclosure, "the party is not

10   allowed to use that information or witness to supply evidence on a motion, at a

11   hearing, or at a trial, unless the failure was substantially justified or is harmless."

12   *Id.* R. 37(c)(1). Rule 37 "gives teeth" to Rule 26's disclosure requirements by

13   *automatically* excluding expert reports not properly disclosed. *Yeti by Molly Ltd.*

14   *v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (quoting Fed. R.

15   Civ. P. 37(c) Advisory Committee's note to 1993 amendment) (affirming the

16   exclusion of untimely-disclosed expert report, explaining that exclusion under

17   Rule 37(c)(1) is a "'self-executing,' 'automatic' sanction to 'provide a strong

18   inducement for disclosure of material[.]'"). PPC's gamesmanship and failure to

19   disclose McDonald as an affirmative expert necessitates Rule 37's automatic

20   sanction of exclusion.

21        As of January 6, 2023, when this Court issued its Scheduling Order, PPC

22   was well aware that the deadline to complete liability discovery including

23   disclosure of "expert testimony and reports for liability" was July 7, 2023. Dkt.

_____

24

25   [3] A rebuttal opinion is defined as one "intended *solely* to contradict or rebut
     evidence on the same subject matter identified by another party." Fed. R. Civ.

26   Proc. 26(a)(2)(D)(ii) (emphasis added). It "cannot be used to advance new
     arguments or new evidence" and "may not introduce new, alternative or

27   previously unconsidered theories." *Canning v. Medtronic Inc.*, 2022 WL

28   1092801, at *7 (D. Ariz. Apr. 11, 2022); *Amarin Pharma, Inc. v. West-Ward
     Pharm. Int'l Ltd.*, 407 F. Supp. 3d 1103, 1116 (D. Nev. 2019).

30 at 2, n.1; *see also* Dkt. 36 at 3. That Order further specified that this deadline
is subject to Paragraph 3(c) of this Court's Standing Order, which states,
"Failure to timely comply with this deadline may result in the expert being
excluded at trial as a witness." *Id.*; Dkt. 10 ¶ 3(c).

It was never in question that copyright infringement would be at issue in
this case, as it is essential to both sides' cases-in-chief. *Benkirane*, 2022 WL
225266, at *2; *Kinder Morgan*, 159 F. Supp. 3d at 1193. PPC even argued as
much in the parties' Joint Rule 26(f) Report: "Here, as the Court is aware from
Paramount Pictures' motion to dismiss, liability is very much a threshold
issue . . . ." Dkt. 27 at 3. However, the sole affirmative expert PPC initially
disclosed was, oddly, a Navy veteran who opined on the narrow issue of what
aspects of the Top Gun school described in the Story were "factually correct."
Toberoff Decl. Ex. 1 (Expert Report of Andrew Craig ("Craig Report")). This
was a strategic play to prejudice Plaintiffs and rob them of a fair opportunity to
rebut PPC's chief liability expert. And it worked. Plaintiffs only first became
aware of McDonald on July 28, 2023—the date on which rebuttal reports were
due—and therefore had no real opportunity to respond to the many new
arguments and alternative theories set forth in McDonald's expert report. *J.R.
Simplot Co. v. McCain Foods U.S., Inc.*, 2021 WL 4899465, at *2 (D. Idaho Oct.
20, 2021) (expert sur-replies "are highly disfavored"). *See* Dkt. 36 at 3; Rebuttal
at 65.

It was PPC that proposed "liability expert reports" be due on June 26,
2023. Dkt. 27 at 5. Thus, it seems particularly disingenuous for PPC to have
waited until July 28, 2023, the *rebuttal* liability expert report deadline, to first
disclose McDonald and his report which amounts to a comprehensive brief on
PPC's case-in-chief and raises numerous points and legal arguments not
mentioned in Plaintiffs' expert's report. McDonald Dep. at 76:6-10 ("In the past
I've always – I have done either the expert witness report first and then come

- 9 -

FER-18

1    back and done rebuttal reports, but in this particular case, I had to combine

2    them[.]"). McDonald's supposed rebuttal report goes into a full, independent

3    analysis of what he believes to be the applicable legal standards governing the

4    case-in-chief: substantial similarity between the two works. Rebuttal at 1 ("I will

5    analyze and offer my opinions on the similarities and differences . . . using the

6    'extrinsic test' framework that I understand applies in copyright infringement

7    cases."). His report includes a great deal of discussion of the two works which

8    do not respond to any actual statement made by Plaintiffs' expert, Henry Bean.

9    Rebuttal at 5-7 (two pages of comprehensive plot analysis with just a token

10   reference to Bean's report); 7-8 (a detailed discussion of "key conflicts" in the

11   2022 Sequel that does not respond to, nor mention, anything in Bean's report);

12   9-10 (a comparison of the "climaxes" of the Story and the Sequel, a subject that

13   Bean's report does not cover). McDonald even admits that he conducted

14   analyses completely independent of Bean's report: "Having reviewed Mr. Bean's

15   claims regarding substantial similarity, and having also *independently* analyzed

16   the protectable expression in the Article and compared that to the artistic

17   expression in *Maverick*, I conclude . . . ." *Id.* at 64 (emphasis added). *See also*

18   McDonald Dep. at 78:15-18 ("[T]he format [was] that I would *state what I felt*

19   and *then* get involved in what Mr. Bean claimed and then respond to those

20   claims.") (emphasis added). Independent analysis and opinions like McDonald's,

21   by definition, do not "explain, repel, counteract, or disprove evidence of the

22   adverse party," but instead were used by PPC "to advance new arguments" on

23   the rebuttal expert deadline, which Plaintiffs could not rebut. *Canning v.*

24   *Medtronic Inc.*, 2022 WL 1092801, at *7 (D. Ariz. Apr. 11, 2022).

25          Courts hold that such tactical and improper "rebuttal" reports must be

26   excluded. In *Frerck v. Pearson Educ., Inc.*, for example, the court excluded a

27   rebuttal expert report just like the one McDonald submitted. 2014 WL 477419

28   (N.D. Ill. Feb. 6, 2014). In *Frerck*, an expert report purported to rebut the

1    opposing party's experts by "outlin[ing] his own view of the law of damages in

2    copyright cases." *Id.* at *2. That individual, a career expert, like McDonald,

3    submitted a report setting forth his view of the applicable law and opined that

4    the opposing experts failed to adopt the appropriate legal standard, just like

5    McDonald did. *Id.* at *3-4. His report extensively quoted the opposing party's

6    experts, and then opined that their bases for determining damages were not

7    considerations when calculating damages in copyright cases and instead inserted

8    what he viewed as the legally correct method to calculate damages in a

9    copyright case. *Id*. The court observed that the expert's opinions "could have

10   been lifted from a legal treatise, although he provide[d] no citation." *Id.* at *4.

11   The court *excluded* the expert's rebuttal report and testimony because it

12   advanced a new theory of damages not discussed in the initial expert reports, and

13   because it wrongfully attempted to bolster the party's case-in-chief and

14   "backdoor in" the expert's affirmative opinion as supposed rebuttal evidence. *Id.*

15   at *4-5. So too, did McDonald.

16         McDonald's report suffers from these same defects including setting forth:

17   (a) "the [legal] standards applicable to the 'extrinsic test' framework for

18   assessing substantial similarity" and opining that Bean failed to adopt the

19   appropriate legal standard (Rebuttal at 2, 35 ("[T]hat is not how substantial

20   similarity of dialogue is assessed under the extrinsic test.")); (b) his view of the

21   law governing substantial similarity, including eight paragraphs describing what

22   he views as the correct method of applying the "extrinsic test" in copyright

23   infringement cases (*Id*. at 1-3); and (c) supposed case law without providing the

24   citations to those cases for fear his brief would look like one (*Id.* ("[C]ourts have

25   held that a mood of 'secrecy and mystery' merges with the idea of a show about

26   the mystery of magic . . . . [C]ourts have concluded that . . . the elements that

27   flow from those constraints must be filtered out.")). *See Frerck* at 7 (condemning

28   an expert report that "could have been lifted from a legal treatise, although he

- 11 -

1  provides no citation"). Further, just as in *Frerck*, McDonald improperly

2  advances new theories not discussed in Bean's report attempting to "backdoor

3  in" McDonald's affirmative opinions as rebuttal evidence.

4      McDonald's expert report boils down to what is obviously PPC's

5  affirmative legal brief cloaked as a "rebuttal" report.[4] PPC strategically declined

6  to identify McDonald as an affirmative expert and instead, surprised Plaintiffs

7  and deprived them of any opportunity to respond. Expert testimony that falls

8  outside the scope of a rebuttal must be timely disclosed in an initial expert

9  report, and failure to do so results in an automatic exclusion under Federal Rule

10  of Civil Procedure 37(c)(1). Accordingly, McDonald's report must be excluded.

11      In addition to the sanction of excluding McDonald's report and testimony,

12  Rule 37(c)(1)(A) permits an award of reasonable attorneys' fees and costs

13  caused by PPC's failure. Fed. R. Civ. Proc. 37(c)(1)(A). Accordingly, Plaintiffs

14  respectfully request that this Court order PPC to pay such reasonable attorneys'

15  fees in an amount to be determined, subject to proof.

16      **C.    McDonald's Rebuttal Should Also Be Excluded as an Improper**

17      **Conduit for Inadmissible Hearsay.**

18      PPC improperly seeks to use McDonald's expert report as a conduit to

19  introduce hearsay evidence from PPC's other expert witness, Andrew Craig

20  ("Craig"), into the record. "The law is clear, however, that an expert report

21  cannot be used to prove the existence of facts set forth therein." *In re Citric Acid*

22  *Litigation*, 191 F.3d 1090, 1102 (9th. Cir. 1999).

23      A party may not call an expert to introduce hearsay evidence under the

24  guise that the expert largely relied on hearsay as the basis for his opinions.

25  *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1262 (9th. Cir. 1984) ("An

26

27  ─────────────────

28  [4] In this respect, McDonald's "brief" also effectively constitutes an end-run around the applicable word (or page limitations) applicable to PPC's motion for summary judgment. Local Rule 11-6.1; Dkt. 51 at 2.

- 12 -

1    expert is permitted to disclose hearsay for the limited purpose of explaining the

2    basis for his expert opinion, Fed. R. Evid. 703, but not as general proof of the

3    truth of the underlying matter, Fed. R. Evid. 802.").

4           But McDonald's opinions do exactly that. He relies exclusively on the

5    report of Craig for the proposition—central to his report and opinion—that

6    various aspects of Yonay's Story are purported unprotectable facts. As explained

7    in Plaintiffs' Motion to Exclude the Expert Reports and Testimony of Andrew

8    Craig ("Mot. to Excl. Craig") filed concurrently herewith, Craig's report is

9    defective largely because it too is a conduit for inadmissible hearsay. Craig's

10   report relies entirely on hearsay evidence to state which aspects of the 1983

11   Story are "factually correct" or "reflect factual aspects" of the TOPGUN school

12   as it existed in 1983, as he has absolutely no first-hand knowledge of the school

13   from that time. Mot. to Excl. Craig § III.A. In turn, McDonald's Rebuttal

14   incorporates the same foundational defect by *repeatedly* citing Craig's report for

15   the truth of those statements, rendering it *double hearsay*. *See Aoki v.*

16   *MobileHelp, LLC*, 2022 WL 972419, at *4 (D. Haw. Mar. 31, 2022) ("Rule 703

17   does not permit expert witnesses to circumvent hearsay rules by solely testifying

18   about the opinions of other experts . . . . An expert may not simply 'parrot' the

19   opinion of another expert.").

20          In fact, the bulk of McDonald's expert report and opinions rely on the

21   hearsay of Craig. *See, e.g.*, Rebuttal at 12 ("The Article's discussion of Admiral

22   Fellowes wanting to restore discipline and Naval decorum is factual. Craig

23   Report at 30 fn. 16."); 13 ("The 'human side' of fighter pilots, including their

24   drinking and carousing and competition with each other . . . are real-world

25   aspects of the TOPGUN program. Craig Report at 21-22."); 14 ("As explained

26   in the Craig Report, that is factually accurate . . . ."). This kind of parroting is

27   improper, and necessitates the exclusion of McDonald's report. *Aoki*, 2022 WL

28   972419, at *4; *Caldwell v. Cty. of San Francisco*, 2021 WL 1391464, at *5 (N.D.

1    Cal. Apr. 13, 2021) ("[A] party cannot call an expert simply as a conduit for

2    introducing hearsay under the guise that the testifying expert used the hearsay as

3    the basis of his testimony.").

4            Furthermore, even if Craig's reports *were* admissible (they are not) it

5    would still be improper for McDonald to rely on Craig's opinions. The Federal

6    Rules of Evidence "do not permit an expert to rely upon excerpts from opinions

7    developed by another expert for the purposes of litigation"—period. *In re*

8    *Imperial Credit Indus. Sec. Litig.*, 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003).

9    This holds true regardless of whether the underlying report is admissible. *Id.* at

10   1012-13. Here, McDonald has done just that, and based his views on the

11   hearsay-laden opinions of Craig. For these reasons, McDonald's Rebuttal must

12   be excluded.

13           **D.    McDonald's Factual Narratives of the Story and Sequel Provide**

14                   **No Expert Assistance and Must Be Excluded.**

15           An expert report that offers "'nothing more than a factual narrative' of

16   otherwise admissible evidence," or that "present[s] a narrative of the case which

17   a lay juror is equally capable of constructing," is inadmissible as evidence.

18   *Fujifilm Corp. v. Motoral Mobility LLC*, 2015 WL 757575, at *27 (N.D. Cal.

19   Feb. 20, 2015) (citations omitted). Such evidence, rather, is "'properly presented

20   through percipient witnesses and documentary evidence,' not through expert

21   testimony." *Id.* The role of an expert witness is "to provide specific expertise so

22   that a fact finder can make its own decisions with respect to the factual dispute.

23   To the extent that an issue is within the sphere of a fact finder's understanding,

24   an 'expert' cannot usurp that role." *Dolby Labs. Licensing Corp. v. Adobe Inc.*,

25   2019 WL 6327210, at *2 (N.D. Cal. Nov. 26, 2019).

26           McDonald's Rebuttal presents unhelpful purportedly "factual" narratives

27   of the Sequel and the Story. He offers five full pages of detailed, scene-by-scene

28   descriptions of the Sequel from the opening scene to the final scene, including

- 14 -

1    descriptions of every character featured in the Sequel. Rebuttal at 5-10, 36-39.

2    He does the same with the Story. *Id*. at 57-59. McDonald offers no expert

3    analysis of these extensive factual narratives nor does he connect them to

4    anything in Bean's report. These narratives of the Story and Sequel do not

5    require any specialized knowledge to be understood by a lay juror, who is fully

6    capable of determining what scenes appear in the Sequel, what the characters are

7    like, and what the Story says. *Fujifilm Corp.*, 2015 WL 757575, at *46 (holding

8    that "present[ing] a narrative of the case which a lay juror is equally capable of

9    constructing" is inadmissible). Accordingly, those portions of McDonald's

10   Rebuttal which concern such matters readily "within the sphere of a fact finder's

11   understanding" should be excluded. *Dolby Labs.*, 2019 WL 6327210, at *3-4.

12          **E.      McDonald's Report Should Be Excluded Because It is**

13                  **Unreliable.**

14          McDonald's Rebuttal consists of unreliable assertions manufactured for

15   his studio patrons. In *Daubert*, the U.S. Supreme Court provided a non-

16   exhaustive list of factors courts may consider when determining whether an

17   expert opinion is based on reliable methodology. 509 U.S. at 593-94. On remand

18   from the U.S. Supreme Court in the same case, the Ninth Circuit confirmed that

19   expert reports based on independent research, rather than research conducted for

20   the purposes of litigation, carry these required indicia of reliability. *Daubert v.*

21   *Merrell Dow Pharms., Inc. (Daubert II)*, 43 F.3d 1311, 1317 (9th Cir. 1995). The

22   Ninth Circuit's focus on independent, pre-existing research provides "objective

23   proof that the research comports with the dictates of good science" and is less

24   likely "to have been biased by the promise of remuneration." *Id.* If the research

25   was not made outside of litigation, or if it has not been subjected to peer review,

26   "then the expert must explain precisely how he went about reaching his

27   conclusions and point to some objective source—a learned treatise, the policy

28   statement of a professional association, a published article in a reputable []

- 15 -

1    journal or the like . . . ." *Messick v. Novartis Pharms. Corp.*, 924 F. Supp. 2d

2    1099, 1103 (N.D. Cal. 2013). McDonald has failed to present any of these

3    indicia of reliability.

4          McDonald is a go-to expert witness for motion picture studios and for

5    good reason—he has never once found two works to be substantially similar in

6    any copyright infringement case. McDonald Dep. at 47:19-48:1. This is so,

7    including in several cases where the court denied summary judgment for

8    McDonald's studio patrons on the issue of substantial similarity. *Id.* at 33:10-

9    35:25. Despite all this, McDonald admitted that he has not updated his

10   methodology in light of the decisions rejecting his analysis nor does he even

11   review such court decisions. *Id.* at 38:18-39:2.

12         In fact, his "expertise" on substantial similarity and the extrinsic test

13   stems from what counsel *told* him the rules were when he first became an expert

14   witness *twenty-five years ago*. *Id*. at 108:9-19. His "understanding" of copyright

15   principles such as *scènes à faire* and merger doctrine do not come from his own

16   independent research, but rather from "an example that was given to [him] by an

17   attorney back when" and "an example that was given to me in conversations

18   with lawyers in the past." *Id.* at 109:17-111:19. McDonald's report does not

19   provide a single citation for the very particular legal principles he attempts to

20   articulate as the key bases for his opinions. *Daubert II*, 43 F.3d at 1317-18

21   (excluding expert testimony prepared for the purposes of litigation where the

22   proffering party failed to provide "other objective, verifiable evidence" that the

23   testimony is based on valid principles).

24         McDonald's report is also unreliable because he cherry-picked examples

25   from the entire history of cinema to support his conclusions while failing to

26   consider or address those that do not. *Carnegie Mellon University v. Hoffmann-*

27   *LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1040 (N.D. Cal. 1999) (explaining that the

28   Ninth Circuit routinely excludes expert testimony "where the expert selectively

- 16 -

**FER-25**

chose his support"); *Equal Emp't Opportunity Comm'n v. Freeman*, 778 F.3d

463, 469-70 (4th Cir. 2015) (citing numerous examples where "courts have

consistently excluded expert testimony that 'cherry-picks' relevant data"). When

questioned about his methodology for selecting which films to review when

preparing his expert report, McDonald admitted he found a list of eighty-seven

aerial combat films on Wikipedia,[5] and "*picked and chose the ones that worked*

*for and supported the points that I was trying to make.*" McDonald Dep. at

88:22-89:6 (emphasis added). This sort of obvious advocacy by a so-called

expert is precisely the opposite of what *Daubert* requires for expert testimony to

be considered reliable and thus, admissible. *Daubert II*, 43 F.3d at 1317.

      Take as a counterexample the report of Plaintiffs' expert, Henry Bean.

Toberoff Decl. Ex. 5 (Expert Report of Henry Bean). Bean is not a career expert

witness. In fact, Bean did not seek payment for his expert report and opinions in

this case and instead insisted on reviewing the Story and Sequel to first ascertain

whether he believed they were similar before agreeing to serve as an expert for

the Plaintiffs. Toberoff Decl. Ex. 6 (Deposition of Henry Bean) ("Bean Dep."),

at 16:5-13. Bean is a writer with a passion for film and literature who

endeavored to communicate the complex intellectual concepts that inform a

writer's creativity and expression without attempting to make legal arguments or

draw legal conclusions concerning the "extrinsic text" for copyright

infringement. Instead, he used his considerable expertise *as a writer and a*

---

[5] Many of the films McDonald cites in his Rebuttal—such as *The Paper Chase*, *The Graduate*, and *Hoosiers*—have nothing to do with aerial combat. And in any case, McDonald's references to any prior art are irrelevant without additional evidence showing that either Yonay or PPC copied from these prior works. *Novelty Textile Mills v. Joan Fabrics Corp.*, 558 F.2d 1090, 1093 n.3 (2d Cir. 1977); Nimmer on Copyright § 8.01[C] ("[T]he common practice of defendants at trial in pointing out a similar work created in antiquity, or at least prior to defendant's creation, is of no assistance unless the trier of fact believes that defendant copied from that prior work.").

1   *screenwriter* to assist the fact finder in determining whether the two works at

2   issue share similar qualitative, creative elements. *Zindel v. Fox Searchlight*

3   *Pictures, Inc.*, 815 F. App'x 158, 159 (9th Cir. 2020) (expert analysis is useful to

4   determine the "qualitative importance" of similarities identified by the plaintiff).

5   Both Bean's expert report and deposition testimony ring of actual, honest

6   opinions and embody the exact opposite of McDonald's hired-gun advocacy.

7   Bean Dep. at 232:14-15 ("I'm [an] advocate only for *my own* position, *my own*

8   beliefs.") (emphasis added). Because McDonald's report and testimony lack

9   indicia of reliability and are unreliable, they must be excluded.

10   **IV.   <u>CONCLUSION</u>**

11         For all of the foregoing reasons, Plaintiffs respectfully request that the

12   Court exclude the expert report and testimony of James McDonald in their

13   entirety, and order PPC to pay Plaintiffs' reasonable attorneys' fees and costs

14   incurred as a result of PPC's failure to timely disclose Mr. McDonald as an

15   expert witness, in an amount to be determined.

- 18 -

DATED: November 6, 2023

Respectfully Submitted,

TOBEROFF & ASSOCIATES, P.C.

By:    */s/ Marc Toberoff*
Marc Toberoff

Marc Toberoff
*mtoberoff@toberoffandassociates.com*
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiffs*

- 19 -

FER-28

Joseph Kosinski
September 26, 2023

```
1                UNITED STATES DISTRICT COURT
2                CENTRAL DISTRICT OF CALIFORNIA
3
    SHOSH YONAY, an individual, and      )
4   YUVAL YONAY, an individual,          )
                                         )
5              Plaintiffs,               )
                                         )Case No.
6        vs.                             )2:22-CV-03846-PA-GJS
                                         )
7   PARAMOUNT PICTURES CORPORATION, a    )
    Delaware corporation, and            )
8   DOES 1-10,                           )
                                         )
9              Defendants.               )
    _____)
10
11
12
13     VIDEOCONFERENCE DEPOSITION OF JOSEPH KOSINSKI
14                Los Angeles, California
15             Tuesday, September 26, 2023
16                     VOLUME I
17
18                    CONFIDENTIAL
19
20   Stenographically Reported by:
     RENEE D. ZEPEZAUER, RPR, CRR
21   CSR No. 6275
     JOB No. 6127560
22   PAGES 1 - 118
23
24
25
                                            Page 1
```

Joseph Kosinski
September 26, 2023

```
 1                 UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3
    SHOSH YONAY, an individual, and      )
 4  YUVAL YONAY, an individual,          )
                                         )
 5            Plaintiffs,                )
                                         )Case No.
 6        vs.                            )2:22-CV-03846-PA-GJS
                                         )
 7  PARAMOUNT PICTURES CORPORATION, a    )
    Delaware corporation, and            )
 8  DOES 1-10,                           )
                                         )
 9            Defendants.                )
    _____ )
10
11            Deposition of JOSEPH KOSINSKI,
12        VOLUME I, taken on behalf of Plaintiffs,
13        at 1999 Avenue of the Stars, Suite 800,
14        Los Angeles, California, beginning at
15        9:48 a.m. and ending at 12:54 p.m.,
16        Tuesday, September 26, 2023, before
17        RENEE D. ZEPEZAUER, Certified Shorthand
18        Reporter No. 6275.
19
20
21
22
23
24
25
                                        Page 2
```

Joseph Kosinski
September 26, 2023

```
 1   BY MR. TOBEROFF:
 2       Q    Did any of the writers of the scripts that had
 3   been written before you became involved in development
 4   receive credit on the film, to your knowledge?
 5       A    Yes.
 6       Q    Who?  Which writers?
 7       A    Well, let's see.  I think -- I think I'm
 8   getting their names right, Cash and Epps, I believe got
 9   credit for characters.  Peter Craig and Justin Marks I
10   believe got story by credit.  And then Eric Singer,
11   Aaron Krueger and Chris McQuarrie shared screenplay
12   credit.
13       Q    So Epps and the other gentleman you mentioned,
14   the name didn't stick with me, they had written the
15   screenplay for the 1986 "Top Gun"; correct?
16            MS. LENS:  Objection to the form or objection
17   to the extent -- or objection to the extent it lacks
18   foundation.  Calls for speculation.
19            You can answer.
20            THE WITNESS:  I assume -- I'm not totally aware
21   of who all received credit for the first film, but I
22   know they got credit on the film I did.
23   BY MR. TOBEROFF:
24       Q    But did they -- did they actually work on
25   writing the screenplay for the film you did?
```

Page 24

Joseph Kosinski
September 26, 2023

```
 1    understand that there are drafts of scripts which are
 2    then revised and polished.
 3         A    Yeah.
 4         Q    But in that process, even though all writers
 5    are entitled to credit, some may or may not be more of a
 6    driving force behind the movie.  And I'm trying to get a
 7    sense whether you believe between those three writers
 8    whether any was more of a driving force behind the film
 9    than another writer.
10              MS. LENS:  Same objections as before, and it's
11    been asked and answered.
12              THE WITNESS:  Yeah.  Again, it's not a
13    scientific thing.  You just -- there's different -- they
14    each brought something unique to the project so I do
15    feel like the shared credit among the three of them felt
16    like the right thing.
17    BY MR. TOBEROFF:
18         Q    Would you characterize "Top Gun: Maverick" as a
19    sequel to the 1986 film "Top Gun"?
20              MS. LENS:  Objection to the form.
21              You can answer.
22              THE WITNESS:  Yes.
23    BY MR. TOBEROFF:
24         Q    How would you define a sequel?
25              MS. LENS:  Objection to the extent that it
```

Page 38

Joseph Kosinski
September 26, 2023

```
 1    addition.
 2    BY MR. TOBEROFF:
 3         Q    Do you recall when principal photography for
 4    the sequel was completed?
 5         A    I can only estimate.  My estimation would be
 6    July, 2019.
 7         Q    And after principal photography -- after
 8    July '19 was there further shooting that was conducted?
 9         A    Yes.
10         Q    When was that?  In 2019?
11         A    I -- my best recollection is we did a few days
12    in London in November, 2019.  And then I believe one day
13    in Los Angeles in February, 2020.
14         Q    And were those -- would you call those
15    reshoots?
16              MS. LENS:  Objection to form.
17              THE WITNESS:  I would call it a mix of pickups
18    and reshoots.
19    BY MR. TOBEROFF:
20         Q    After the filming in 2020 that you mentioned,
21    was there any other filming that was conducted?
22         A    Not that I -- not that I recall.
23         Q    We're going to be looking at some documents
24    later on, and to the extent any of these documents
25    refresh your recollection and you want to modify or
```

Page 49

Joseph Kosinski
September 26, 2023

```
 1              What is he referring to by Final Draft files?
 2              MS. LENS:  Objection to the extent that it
 3    lacks foundation or calls for speculation.
 4              THE WITNESS:  Final Draft is the name of the
 5    screenwriting program we use.
 6              MR. TOBEROFF:  I see.
 7              THE WITNESS:  So that means it's in the final
 8    draft format and Emily, my assistant, was in charge of
 9    maintaining the official script so she would, then,
10    insert those pages into the official document.
11    BY MR. TOBEROFF:
12       Q    So he's sending script pages for the new scenes
13    to be read and eventually reshot?
14       A    Yes.
15              MS. LENS:  Objection to form.  You can answer.
16              THE WITNESS:  Yes.
17    BY MR. TOBEROFF:
18       Q    And Emily Cheung says she's attaching sides.
19    What is she referring to?
20              MS. LENS:  Again, objection to the extent it
21    lacks foundation or calls for speculation.
22              THE WITNESS:  So she's saying, "attached are
23    the sides I put together for tomorrow's read," which
24    means the sides are the -- on the day an actor is
25    shooting a scene, you don't give him a whole script.
```

Page 54

Joseph Kosinski
September 26, 2023

```
 1   You give them the pages that apply to the scenes they

 2   are shooting that day.  So sides can be a very small,

 3   like, two or three pages, and it says "for tomorrow's

 4   read."  So I did a table read or a -- sat down with Jenn

 5   and Tom the next day to read these new pages from Chris

 6   and get ready for the pickup shoot.

 7   BY MR. TOBEROFF:

 8      Q    And there's -- do you see the description

 9   further down in this e-mail, it's actually the -- an

10   e-mail dated January 31, 2:30 from Emily Cheung where

11   she describes, it says "Sc 55 Hard Deck"?

12      A    Yeah.

13      Q    Can you -- can you describe to me what scenes

14   are being referred to in those five lines?

15          MS. LENS:  Again, object to the extent that it

16   lacks foundation or calls for speculation.  It's

17   compound.

18          THE WITNESS:  Scene 55 is the scene I referred

19   to earlier where Mav meets Penny at the bar.  Scene AD

20   127 we did a shot where Penny, after getting off Mav's

21   bike, spending the day with him and getting off his

22   bike, she throws her head against the door like just

23   kind of exhales.  So it was really just that one shot.

24   Scene B152 beach Mav/Penny talked after the football

25   game.  That was a scene that ended up not being included
```

Page 55

Joseph Kosinski
September 26, 2023

```
 1    in the film where they talk after the beach football.
 2    Instead we just cut to them on the motorcycle.
 3          Scene 154 bedroom Mav and Penny kiss.  That was
 4    when they were talking in bed and Penny kicks Mav out of
 5    her bedroom, makes him climb down the -- jump off the
 6    roof so I think we reshot one line there at the window
 7    between them.
 8          And then BFM reduction.  BFM means basic flight
 9    maneuvers which is the first dogfight sequence in the
10    movie.  We did a couple lines in ADR with the other
11    actors.  It wasn't visual.  It was just the sound for
12    them to be seen inside their helmet.
13    BY MR. TOBEROFF:
14       Q    Thank you.  Do you recall how soon after the
15    read these scenes or pickups were shot?
16          MS. LENS:  Objection to form.
17          THE WITNESS:  Not exactly, but I'm assuming
18    within a day or two.
19    BY MR. TOBEROFF:
20       Q    I'm going to hand you what's been marked as
21    Exhibit 15.
22          (Exhibit 15 was marked for identification by
23    the court reporter and is attached hereto.)
24    BY MR. TOBEROFF:
25       Q    Exhibit 15 is an e-mail from a gentleman at
```

Page 56

Joseph Kosinski
September 26, 2023

```
 1   Paramount dated February 4th, 2020, to a variety of
 2   people at Paramount.
 3       A    Yeah.
 4       Q    And it says attached -- it's attachment L.A.
 5   shoot as of February 3rd, but there's no attachment to
 6   the exhibit.  Is there -- are these -- is this a
 7   different pickup or a different reshoot or the same one?
 8            MS. LENS:  Objection to form.
 9            THE WITNESS:  I think it's the same one.
10   BY MR. TOBEROFF:
11       Q    And that was filmed on the Paramount lot at
12   Stage 27?
13       A    I do remember shooting on the Paramount lot.  I
14   don't recall what the stage number was.
15       Q    Okay.  Can you recall any other additional film
16   shooting for the sequel in 2020?
17       A    I shot a music video for the movie in July,
18   2021.  But I don't believe any other footage was shot
19   that was put into the film itself.
20       Q    Was any new footage shot for the music video --
21   did any of the footage shot for the music video end up
22   in the final film "Top Gun: Maverick"?
23       A    I don't think so.
24       Q    Did anything from the music video end up in the
25   film?
```

Page 57

Joseph Kosinski
September 26, 2023

```
 1              MS. LENS:  Objection to form.  Asked and
 2    answered.
 3              THE WITNESS:  The song.  The song itself.
 4    BY MR. TOBEROFF:
 5       Q    Which song?
 6       A    The song "Hold My Hand" by Lady Gaga was the --
 7    is the final song you hear in the film as the story is
 8    happening before the end credits.
 9       Q    And when was it decided to put that song in the
10    film approximately?
11       A    I mean, I think we knew the song was going to
12    be in the film in 2020, you know, as we were in post
13    production, but the final version of the song was laid
14    in in 2022 after Lady Gaga had finished the production
15    of it.
16       Q    And after she finished the song, that's when
17    you shot the music video?
18       A    We shot the music video in the summer of '21,
19    and I believe we laid the audio into the picture in
20    April -- March or April of 2022.
21       Q    Is there any other film shooting you recall in
22    2020 or 2021 or '22 in connection with "Top Gun:
23    Maverick"?
24              MS. LENS:  Objection to form.
25              THE WITNESS:  Not that I recall.
```

                                          Page 58

Joseph Kosinski
September 26, 2023

```
 1              MR. TOBEROFF:  I just need to take a short
 2     bathroom break, but I'll be quick.
 3              THE WITNESS:  Okay.
 4              MS. LENS:  Going off the record.  If I'm
 5     allowed to say it.  By stipulation.
 6              (Recess.)
 7     BY MR. TOBEROFF:
 8       Q    Mr. Kosinski, I'm going to show you what's been
 9     marked as Exhibit 16.
10              (Exhibit 16 was marked for identification by
11     the court reporter and is attached hereto.)
12              MR. TOBEROFF:  And, Molly, this particular
13     copy, these were produced to you yesterday with Bates
14     numbers but these particular copies don't have the Bates
15     number on them.
16              MS. LENS:  Understood.  Thank you for the
17     clarification.
18     BY MR. TOBEROFF:
19       Q    So Exhibit 16 is an article written by Adam
20     Chitwood with the title "'Top Gun: Maverick' Director
21     Says Film Will Be Completed On Time Despite Delay" that
22     appeared in Collider on April 16, 2020.
23              Do you see in the first paragraph it refers to
24     as working on post production on the film at that time?
25     The second sentence in the first paragraph.
```

Page 59

Joseph Kosinski
September 26, 2023

```
 1        A     Yes.  I do see that.

 2        Q     And were you doing that from your home?

 3        A     Yes.

 4        Q     Where was editing being conducted for the film

 5   at that time?

 6        A     During 2020 I believe Eddie Hamilton, our lead

 7   editor, was working from his home as well in London

 8   because were all on lockdown.

 9        Q     He had editing bays at his home?

10        A     Yes.

11        Q     And did you have editing machinery at your

12   home?

13        A     No.  But I had software that allowed me to

14   connect to his machine so that I could, you know, work

15   with him remotely.

16        Q     In real time?

17        A     Yes.

18        Q     I'm going to show you another Collider article

19   that's been marked as Exhibit 17.

20              (Exhibit 17 was marked for identification by

21   the court reporter and is attached hereto.)

22              MR. TOBEROFF:  Same as for the first article,

23   Molly, these were also produced.

24              MS. LENS:  Looks like your printer needs a new

25   toner.
```

Page 60

Joseph Kosinski
September 26, 2023

```
 1              MR. TOBEROFF:  I think that's just the setting.
 2       Q    So this is an article in Collider by Tom
 3    Reimann, July 24th, 2020 with the title "'Top Gun:
 4    Maverick' Joseph Kosinski Explains the Crazy New Cameras
 5    Used for the Sequel."
 6              Do you see that?
 7       A    Yes.
 8       Q    If you look at the first paragraph it refers to
 9    a Comic-Con at home panel hosted by Collider that you
10    participated in.
11       A    Yes.
12       Q    Is that accurate?
13       A    Yes.
14       Q    The article also says, and I quote, "'Top Gun:
15    Maverick' director Joseph Kosinski is hard at work
16    finishing up post production on the big-budget sequel
17    which is currently on track for December release," end
18    quote.
19              Is that accurate, as of July 4, 2020?
20       A    Yes.
21       Q    To the best of your recollection were any
22    actors injured in the course of production of "Top Gun:
23    Maverick"?
24       A    Not seriously.  I mean, there was -- the
25    occasionally sprained ankle or pulled muscle, but
```

Page 61

Joseph Kosinski
September 26, 2023

```
 1              You can answer.

 2              THE WITNESS:  I do not.

 3    BY MR. TOBEROFF:

 4        Q    You recall that the COVID pandemic hit hard in

 5    2020.

 6        A    Yes.

 7        Q    And that that began in or about January, 2020?

 8              MS. LENS:  Objection to form.

 9              THE WITNESS:  Personally I remember it being

10    March.

11    BY MR. TOBEROFF:

12        Q    And how did the pandemic affect production of

13    the sequel?

14              MS. LENS:  Objection to form.

15              You can answer.

16              THE WITNESS:  Well, it made a lot of the

17    post-production process happen in a way it normally

18    wouldn't happen in that we couldn't be together on a

19    sound stage, you know, for mixing.  A lot of the

20    facilities we used were closed so everything had to be

21    done remote which slowed things down quite a bit in the

22    finishing of the film.

23    BY MR. TOBEROFF:

24        Q    So I'm just going to go through some of the

25    sort of stages of post production and to the best of
```

Page 63

Joseph Kosinski
September 26, 2023

```
 1    your knowledge and recollection if you could tell me how

 2    the pandemic affected -- how that stage of post

 3    production was being conducted similar to the way you

 4    described how you were -- the editor was in London, but

 5    you were at home, but you could see his edits in real

 6    time.

 7              So editing the film you previously provided

 8    some information about that.  Do you have any other

 9    description of how the editing procedures changed due to

10    COVID?

11              MS. LENS:  Objection to form.

12              THE WITNESS:  Well, as I stated, we had a

13    program called Evercast which allowed me to work with

14    the editor, kind of like a Zoom call, but it works with

15    editing software so you can see the editor and look at

16    the cut while you're working on it.  So we used that.

17    And then I would download -- because we were finishing

18    shots, I would download visual effects shots onto my

19    home computer, review them on a very high quality color

20    accurate monitor, give my notes in e-mails and then

21    repeat that process day after day until every shot was

22    finished.

23    BY MR. TOBEROFF:

24         Q    And how did it affect the process of filming

25    reshoots or pickups?
```

Page 64

Joseph Kosinski
September 26, 2023

```
1        A    I think it made it, oh, impossible to do any,
2   you know -- I don't think we did any photography after
3   the -- you know, the lockdown happened in March, as I
4   recall.
5        Q    What about the process of sound editing, how
6   did the pandemic affect that process?
7             MS. LENS:  Objection to form.
8             You can answer.
9             THE WITNESS:  The mixing facility at Skywalker
10  was completely shut down so there was no way to mix the
11  film either in Skywalker where we planned or locally we
12  found a mix stage in England that because of the
13  different rules over there was able to open up and -- so
14  we mixed the film at Twickenham Stage which is outside
15  of London, and I monitored it at the sound stage at Fox
16  which they were able to do a digital connection so I
17  could be in there with a mask and listen to the mix on
18  a -- you know, in a proper environment and kind of give
19  my notes from there.
20  BY MR. TOBEROFF:
21       Q    How about the music -- music production in
22  connection with the film, how did the pandemic affect
23  that?
24            MS. LENS:  Objection to form.
25            THE WITNESS:  Sorry.  It was difficult because
```

Page 65

Joseph Kaminski
September 26, 2023

```
 1    you couldn't have an orchestra in the traditional way so
 2    I believe a lot of the recording had to be done with
 3    either very small groups or with individual musicians
 4    recording on their own.
 5    BY MR. TOBEROFF:
 6        Q    Did it delay the production of music that
 7    you're aware of?
 8        A    I think the whole -- just generally the whole
 9    post process went a few months longer than it had
10    originally been scheduled.
11        Q    How about the sound mixing process; is that
12    what we talked about?
13        A    That's what I referred to earlier, Twickenham.
14        Q    How about the visual effects process?
15        MS. LENS:  Objection to form.
16    BY MR. TOBEROFF:
17        Q    How was that affected by the pandemic?
18        A    Same effect in that because people weren't able
19    to work in their offices, everyone had to do their work
20    individually so it slowed down the process and it just
21    went a few months longer than we had originally planned.
22        Q    Did it have any sort of technical -- more
23    technical effect on the process where people couldn't
24    access certain machinery, for instance, that's what I
25    mean by technical effect.
```

Joseph Kosinski
September 26, 2023

```
 1                  MS. LENS:  Objection to form.
 2                  THE WITNESS:  Not as much as you would think
 3        because of just the advances of programs like Zoom and
 4        Evercast which allowed you to not have to be there in
 5        person to do the work.  It's not ideal to not be there
 6        and see it, you know, with your own eyes but we were
 7        able to work through it and finish the film.
 8        BY MR. TOBEROFF:
 9             Q    Now, was the editing -- did the editing for the
10        sequel largely take place in 2020?
11                  MS. LENS:  Objection to form.
12                  THE WITNESS:  I wouldn't say largely.  I would
13        say most of the editing of the film occurred in 2019.
14        BY MR. TOBEROFF:
15             Q    And what proportion between 2019 and 2020,
16        would you say the -- applied to the editing of the film?
17                  MS. LENS:  Objection to form.
18                  THE WITNESS:  Well, the editor was on from
19        start of principal in October or September of 2019.  So
20        I would say that editorial process was pretty constant
21        from the fall of 2019 until May of 2020.  So you're
22        talking about an 18-month span.
23                  (Exhibit 19 was marked for identification by
24        the court reporter and is attached hereto.)
25        //
```

Page 67

Joseph Kosinski
September 26, 2023

```
 1   BY MR. TOBEROFF:
 2       Q    I just handed you what's been marked as Exhibit
 3   19.  And it's an e-mail from Elizabeth Raposo at
 4   Paramount responding, and included in the e-mail chain
 5   an e-mail that -- the first e-mail is dated
 6   April 29th, 2020, and it's responding to an e-mail
 7   from Tommy Harper dated April 27th, 2020.
 8            Do you see that?
 9       A    Yes.
10       Q    Who is Tommy Harper?
11       A    Tommy Harper is a -- on this film served as a
12   line producer or UPM where his job is to kind of keep
13   the film, you know, schedule and budget, keep an eye on
14   kind of the organization of the film and make sure that
15   things are progressing.
16       Q    So as a line producer, is he in charge of
17   overseeing scheduling and physical production of the
18   film?
19            MS. LENS:  Objection.  Overly broad.
20            THE WITNESS:  I would say that's part of his
21   job, yes.
22   BY MR. TOBEROFF:
23       Q    I'd like to look at the -- if you look at the
24   lines of Tommy Harper's e-mail, do you see the second
25   line -- let's look at the first line.  I'd like you to
```

Page 68

Joseph Kosinski
September 26, 2023

```
1    help me decipher this e-mail.
2        A    Sure.
3        Q    Who is JK in the first line?
4            MS. LENS:  Objection to the extent it lacks
5    foundation or calls for speculation.
6            THE WITNESS:  I believe he's talking about me.
7    BY MR. TOBEROFF:
8        Q    Okay.  And who is TC?
9            MS. LENS:  Same objection.  Objection to the
10   extent that it lacks foundation or calls for
11   speculation.
12           THE WITNESS:  My guess that's Tom Cruise.
13   BY MR. TOBEROFF:
14       Q    And what does he mean by "mini cuts"?
15           MS. LENS:  Same objection.  Objection to the
16   extent that it lacks foundation or calls for
17   speculation.
18           THE WITNESS:  A mini cut I would assume he
19   means a short sequence of the film probably less than 30
20   seconds or so.  So a little piece of the film.
21   BY MR. TOBEROFF:
22       Q    Now, you see in the second line where it says,
23   "Eddie continues to get the stage ready"?
24       A    Yes.
25       Q    What does that refer to?
```

Page 69

Joseph Kosinski
September 26, 2023

```
 1              MS. LENS:  Same objection.  Objection as it
 2     lacks foundation or calls for speculation.
 3              THE WITNESS:  The stage is the place where
 4     you -- the Twickenham mixing facility.  There's a lot of
 5     prep an editor has to do before you mix a film to make
 6     sure all the files are organized and in the right place.
 7     BY MR. TOBEROFF:
 8         Q    And in the third line, what does that refer to?
 9     What are ADR sections?
10              MS. LENS:  Objection.  Lacks foundation.  Calls
11     for speculation.
12              THE WITNESS:  The ADR is additional dialogue
13     recording.
14     BY MR. TOBEROFF:
15         Q    And when it refers to Miles, Lewis, Jay, does
16     that refer to the names of characters in the movie?
17              MS. LENS:  Same objections.
18              THE WITNESS:  Those are actors, the actors'
19     names.
20     BY MR. TOBEROFF:
21         Q    Which actors are those referenced?
22         A    Miles Teller, Lewis Pullman, and Jay -- Jay --
23     what is Jay's last name?  He plays Payback in the movie.
24     Ellis.  Jay Ellis.
25         Q    Do you see about in the middle there where it
```

Page 70

Joseph Kosinski
September 26, 2023

```
 1   says, "Gaga needs to complete her work"?
 2        A    Yes.
 3        Q    Is that Lady Gaga?
 4        A    Yes.  Sorry.
 5        Q    And is that work, the song you were referring
 6   to?
 7        A    Yes.
 8        Q    Did she have more music in the film than that
 9   song?
10        A    The song was included if I remember correctly,
11   we included it twice.  You hear it in the bar when
12   Maverick comes in to pay back Penny and that is the
13   original version of the song and then at the end of the
14   film you hear the complete -- the completed and slightly
15   different version of the song so it's in there twice.
16        Q    And the next line, "Post M producer working on
17   his song per TC and McQ notes."
18             What does that -- what do you believe that
19   refers to?
20             MS. LENS:  Same objections.
21             THE WITNESS:  Post M refers to post Malone, the
22   artist.  Producer is the person who is producing his
23   song.  He was working -- he had created a song for the
24   movie for one of the sequences and when he submitted it,
25   Tom and McQ had some thoughts on it that they gave to
```

Page 71

Joseph Kosinski
September 26, 2023

```
 1   him, and I'm assuming this is referring to the producer
 2   working on those notes.
 3   BY MR. TOBEROFF:
 4       Q    And in the next line, Ryan Tetter, he's also a
 5   music artist working on a song for the film?
 6       A    Yes, his song ended up being in the film as the
 7   beach football song sequence.
 8       Q    And what do you believe is meant by "longer per
 9   the new cut"?
10            MS. LENS:  Objection to the extent it lacks
11   foundation and calls for speculation.
12            THE WITNESS:  We probably added a couple -- we
13   added a few more shots to the -- in the editing process,
14   we changed the beach football sequence and probably
15   added even just a few seconds to it would change the
16   sync with the music so it would need a new version of
17   the song to go a little bit longer.
18   BY MR. TOBEROFF:
19       Q    Was Ryan Tetter asked to make the song longer
20   to match the scene?
21            MS. LENS:  Objection to the extent it lacks
22   foundation or calls for speculation.
23            THE WITNESS:  Yeah, I mean, based on this note,
24   based on what I'm reading here, it sounds like this is
25   what he was asked to do.
```

Page 72

Joseph Kosinski
September 26, 2023

```
 1            MS. LENS:  Marc, since you're showing the

 2    witness a document that he's not on and you haven't

 3    established that he's seen, it would be helpful if your

 4    questions are -- I assume you're not just asking him to

 5    interpret this document but whether he's got independent

 6    knowledge of that?

 7            MR. TOBEROFF:  It's both.

 8            MS. LENS:  Well ...

 9    BY MR. TOBEROFF:

10      Q    Anyway, the next line it says, "VFX continues

11    daily."  That refers to the production of the special

12    effects for the movie?

13            MS. LENS:  Objection to the extent that it

14    lacks foundation or calls for speculation.

15            THE WITNESS:  VFX means visual effects.  When

16    we say special effects in film, we're talking about

17    physical effects like something that you do on the set

18    on the day like explosions or cannons or wire work.

19    When we're talking about VFX, we're talking about the

20    digital effects.  So I was finaling shots every day and

21    making sure that Tom and McQ, two producers on the

22    project, were seeing the final shots as they went in the

23    film.

24    BY MR. TOBEROFF:

25      Q    And finally it says, "Sound design, we are
```

Page 73

Joseph Kosinski
September 26, 2023

```
 1    ready once the stage opens."

 2             Are they referring -- does that refer to the

 3    facility in London you mentioned and you're waiting for

 4    it to be operational?

 5             MS. LENS:  Objection.  Calls for speculation.

 6    Lacks foundation.

 7             THE WITNESS:  Yes.  That's what -- my

 8    assumption that's what that means.

 9             MR. TOBEROFF:  Okay.  Thank you.

10              (Exhibit 20 was marked for identification by

11    the court reporter and is attached hereto.)

12    BY MR. TOBEROFF:

13        Q    Actually if you can just hand that back to me.

14    I gave you my copy because I highlighted it.  Thanks.

15             This is a memo dated February 12, 2020, to "Top

16    Gun" team from Paramount Pictures.  The subject says,

17    "Island Plaza."  Again, that's a code name for the "Top

18    Gun: Maverick"; right?

19        A    Yes.

20        Q    What is this document?

21             MS. LENS:  Objection to the extent it lacks

22    foundation or calls for speculation.

23             THE WITNESS:  This is a studio notes document

24    that you get anytime you show a cut to the studio or

25    show a cut to -- in an audience preview.
```

Page 74

Joseph Kosinski
September 26, 2023

```
 1    BY MR. TOBEROFF:
 2         Q    And the studio is making suggestions --
 3    suggested changes to the film in this document?
 4         A    Yes.
 5         Q    Do the producer -- do you as a director -- are
 6    you as a director obligated to -- strike that.
 7              What effect, if any, do notes like this have on
 8    the production of the actual film?
 9              MS. LENS:  Objection to form.
10              THE WITNESS:  Well, I always -- you know, I
11    think every director handles these directly.  I always
12    read them all and look for any ideas that I think are
13    helpful or worth trying.  And try them out and see if
14    they work.  But you're not -- I don't consider them ever
15    to be like notes that you have to do.
16              (Exhibit 21 was marked for identification by
17    the court reporter and is attached hereto.)
18    BY MR. TOBEROFF:
19         Q    I've marked as Exhibit 21 what appears to be a
20    press release entitled "Twickenham Film Studios Creates
21    Final Sound Mix for 'Top Gun: Maverick.'"
22              If you can look down to the third paragraph,
23    first -- beginning of the third paragraph of this press
24    release.  It says, quote, "The final mix took place
25    between June and July, 2020."
```

Page 75

Joseph Kosinski
September 26, 2023

```
 1            Do you see that?
 2       A    Yes.
 3       Q    Does that seem correct to you based on your
 4    recollection?
 5       A    Yes.
 6       Q    And then if you go to the very last paragraph
 7    or the very last -- yeah, the very last paragraph, the
 8    last sentence, it says, "Additional updates to the mix
 9    were completed at TFS in April, 2022."
10            Do you see that?
11       A    Yes.
12       Q    Does that accord to your recollection?
13       A    Yes.
14       Q    And TFS is Twickenham Film Studios?
15       A    Yes.
16       Q    And what was done in April, 2022?
17       A    As I said earlier, it was the updated Lady Gaga
18    song was added to the last scene in the movie.
19       Q    Anything else?  That you recall.
20       A    As I recall, we -- we turned down the music on
21    the Paramount logo at the beginning slightly so that we
22    had a little more to go to when the jets kicked in, but
23    it was like a very, very small adjustment.  It was a
24    small tweak.
25       Q    Do you recall any other adjustments that were
```

Page 76

FER-56

Joseph Kosinski
September 26, 2023

```
 1    made at that time?
 2         A    No.
 3              (Exhibit 22 was marked for identification by
 4    the court reporter and is attached hereto.)
 5    BY MR. TOBEROFF:
 6         Q    So Exhibit 22 is -- the first page is two
 7    e-mails and the second e-mail says here is the final mix
 8    only post schedule as of 7-02-20, July 2nd, 2020.
 9              If you turn to the second page, do you see
10    where on July 24th it says "final mix approved"?
11         A    Yes.
12         Q    What -- so my question is does that mean the
13    final mix was actually approved on that date or that in
14    scheduling it's anticipated that the final mix will be
15    improved -- approved by that date?
16              MS. LENS:  Objection to the extent it lacks
17    foundation or calls for speculation.
18              THE WITNESS:  I think it's the second one you
19    characterized, is the schedule done.  So it's the intent
20    of how to finish the film but things don't always follow
21    the schedule exactly.
22    BY MR. TOBEROFF:
23         Q    And what is -- you see below that, in the
24    heading there's a bar going across with the heading it
25    says "final dub fixes."
```

Page 77

Joseph Kosinski
September 26, 2023

```
 1    BY MR. TOBEROFF:
 2        Q    And when was the sequel picture locked?
 3        A    I don't recall the exact date.
 4        Q    Do you have an estimation?
 5        A    My estimate would be before the final mix so
 6    May, 2020.
 7        Q    After the film was picture locked, were
 8    there -- I don't know how to describe this.  Were
 9    there -- you mentioned that a film is picture locked
10    before the audio is added to the film; correct?
11        A    Yes.
12        Q    So after the film was picture locked, even if
13    they were in the process of adding audio, was that
14    picture locked film altered in any way?
15            MS. LENS:  Objection to form.
16    BY MR. TOBEROFF:
17        Q    The picture part of the film, the visual part
18    of the film I should say.
19            MS. LENS:  Same objections.
20            You can answer.
21            THE WITNESS:  Well, yeah, once the picture is
22    locked, your edit structure and cuts are locked but
23    you're replacing shots with more finished versions as
24    the visual effects are done.  So you'll constantly be
25    replacing shots with better versions even when the cut
```

Page 84

Joseph Kosinski
September 26, 2023

```
 1    Strike that.

 2            What does the acronym ADR stand for?

 3            MS. LENS:  Objection.  Asked and answered.

 4            THE WITNESS:  Additional dialogue recording.

 5    BY MR. TOBEROFF:

 6       Q    Was ADR -- an ADR took place for the film "Top

 7    Gun: Maverick"?

 8       A    Yes.

 9       Q    And was ADR delayed by the pandemic?

10            MS. LENS:  Objection to form.

11            THE WITNESS:  Yes.

12    BY MR. TOBEROFF:

13       Q    When approximately was ADR completed for the

14    film to the best of your recollection?

15       A    I remember doing ADR in March or April, but I

16    seem to recollect that during the final mix -- now I'm

17    remembering.  We sent recorders to each of the actors so

18    that they could -- because of the pandemic we actually

19    had actors recording some of the lines for the films in

20    their house.  So I had Miles Teller in his closet

21    surrounded by blankets doing lines for the film.  So

22    that was such a crazy time.  So I would say, you know, I

23    remember doing that probably through the mix.

24            So, you know, probably likely through June or

25    July, 2020.
```

Page 87

Atkinson-Baker, A Veritext Company
(818) 551-7300            www.veritext.com

Joseph Kosinski
September 26, 2023

```
 1        Q    Is ADR where actors are rerecording dialogue
 2   because you believe the dialogue could be improved?
 3             MS. LENS:  Objection to form.
 4             THE WITNESS:  Yes, I mean typically it's done
 5   for clarity.  Because you can see people's mouths and
 6   you can see what they are saying.  So "Top Gun" is a
 7   very unique movie.  Everyone is wearing masks and
 8   helmets so a lot of the story, you know, we could change
 9   tweaks to the story or the action after the fact in a
10   way that you wouldn't normally do on a film.  So I would
11   say there's more ADR in "Top Gun" than you'd have in a
12   normal movie.  So we were able to make lines clearer or
13   change it slightly what they were saying.
14   BY MR. TOBEROFF:
15        Q    Because -- that's because you can't see their
16   lips moving?
17        A    Yes.
18        Q    Did -- you may have answered it.  If so, I
19   apologize.  ADR sessions took place in April, May, 2020?
20        A    Yes.  I believe we did some in a real ADR
21   facility in Santa Monica and some were done at the
22   actor's homes if we just needed a word or two.
23        Q    And we previously spoke a little bit about the
24   music for the film.  Can you take me through that
25   process in terms of the time when the music of the film
```

Page 88

Joseph Kosinski
September 26, 2023

```
 1    was worked on and when it was completed and what was
 2    involved?
 3            MS. LENS:  Objection to form.  It's been asked
 4    and answered.  It's overly broad.  It's compound.  It's
 5    vague.
 6            THE WITNESS:  It was a lot of music in the
 7    film.  There's the score.  There's the -- what we call
 8    needle drops which are the pop songs which are put in
 9    the film.  And then, you know, there's the Lady Gaga
10    song which is kind of both because the melody of that
11    song influenced the score, but it also served as the
12    final song of the film.  So the music process started
13    with working with Harold Faltermeyer and Hans Zimmer in
14    2019 when we were -- 2018 when we started shooting the
15    film and the last thing we did is we talked about
16    putting in the final version of Lady Gaga's song as the
17    final piece in April, 2020.
18    BY MR. TOBEROFF:
19        Q    Other than the Lady Gaga song, what other music
20    do you recall was worked on in 2020?
21        A    The score for the film which was done by
22    Hans -- Harold and Lorne Balfe.  They were working on
23    the score for the film.  During that period.  And then
24    the Ryan Tetter song which was used for beach football
25    as we saw in the notes was being produced at that time
```

Page 89

Joseph Kosinski
September 26, 2023

```
 1    as well before the final mix.
 2         Q    And by "score," you're referring to the music
 3    of the film other than songs?
 4         A    Yes.
 5         Q    After the music is fully completed, it's
 6    combined in the sequel's audio during the final audio
 7    mix?
 8         A    Yes.
 9         Q    What else is included -- well, let me rephrase.
10              Is it correct to say that the final audio mix
11    of a film mixes all the sounds in the film which include
12    dialogue, score, songs as you've referred to, ADR, and
13    Foley; is that correct?
14         A    Yes.  And sound effects.
15         Q    Right.  Does Foley refer to sound effects?
16         A    Foley are all the sounds that a character makes
17    or object makes, you know, like moving a water bottle
18    around or sitting down.  Those kind of little things
19    that are -- make a movie feel more tactile and real.
20         Q    Like a door shutting?
21         A    Exactly.
22         Q    And when in 2020 was Foley done?  To your
23    knowledge.
24              MS. LENS:  Objection.
25    //
```

Page 90

Joseph Kasiński
September 26, 2023

```
 1   BY MR. TOBEROFF:
 2        Q    For the film, excuse me.
 3             MS. LENS:  To the extent it lacks foundation or
 4   calls for speculation, you can answer.
 5             THE WITNESS:  Foley is typically done before --
 6   right before the final mix starts.  So my estimate would
 7   be April, May, 2020.  Or possibly earlier than that,
 8   given that -- the pandemic.
 9   BY MR. TOBEROFF:
10        Q   Wasn't the final sound mix for the film done
11   sometime in July, 2020?
12             MS. LENS:  Objection to the extent it assumes
13   facts not in evidence.  Calls for speculation.
14   BY MR. TOBEROFF:
15        Q   Let me rephrase that.  Wasn't the final sound
16   mix completed in July, 2020, as we saw in the
17   Twickenham's studio's document we looked at earlier?
18        A    Yes.  I believe that's correct.
19             (Exhibit 23 was marked for identification by
20   the court reporter and is attached hereto.)
21   BY MR. TOBEROFF:
22        Q   So Exhibit 23 which I just handed you states at
23   the top "'Island Plaza' final mix schedule revised
24   draft" in the upper left-hand corner.  In the upper
25   right hand corner it says July 3, 2020.  What is this
```

Page 91

Joseph Kosinski
September 26, 2023

```
 1    document?
 2            MS. LENS:  Objection to the extent it lacks
 3    foundation or calls for speculation.
 4            THE WITNESS:  It looks like a schedule for the
 5    mix.
 6    BY MR. TOBEROFF:
 7       Q    So this would be the revised schedule as of
 8    July 3rd, 2020?
 9            MS. LENS:  Same objections.
10            THE WITNESS:  That's what it looks like.
11    BY MR. TOBEROFF:
12       Q    And it's similar to the schedule we looked at
13    previously for the final mix only it has a few more
14    detailed items?
15            MS. LENS:  Objection to form.
16            THE WITNESS:  Yes, that's what it appears to
17    be.
18    BY MR. TOBEROFF:
19       Q    So under this schedule, do you see in the
20    left-hand corner it says "post week No. 43"?
21       A    Yes.
22       Q    Is that referring to the 43rd week in the
23    post-production process?
24            MS. LENS:  Objection to the extent that it
25    lacks foundation or calls for speculation.
```

Page 92

Joseph Kosinski
September 26, 2023

```
 1                You can answer.
 2                THE WITNESS:  Yes, that's what it appears to be
 3      to me.
 4      BY MR. TOBEROFF:
 5          Q    Do you have a recollection of the -- number of
 6      weeks in the post-production process being extended from
 7      a certain number of weeks to another number of weeks and
 8      then a third or fourth number of weeks?
 9                MS. LENS:  Objection to form.
10                THE WITNESS:  Yes.  I don't recollect what the
11      exact number was, but the COVID pandemic definitely
12      extended the post from what the original plan was.
13      BY MR. TOBEROFF:
14          Q    Do you have a recollection of the
15      post-production schedule being extended after this?
16      More than 43 weeks?
17          A    I don't recollect, no.
18                (Exhibit 24 was marked for identification by
19      the court reporter and is attached hereto.)
20      BY MR. TOBEROFF:
21          Q    Exhibit 24 is a rather lengthy e-mail chain
22      starting on top of the most recent e-mail being dated
23      October 20, 2021, from Sadie Johnson at Paramount to a
24      Rich Stirling at Paramount.  Do you see that?
25          A    Yes.
```

Page 93

Joseph Kosinski
September 26, 2023

```
 1        Q    Could you just scan these e-mails because I'm
 2    just going to ask you to describe to me in general what
 3    you believe this is referring to.
 4             MS. LENS:  You should start at the back.
 5             THE WITNESS:  Yeah.  Okay.
 6    BY MR. TOBEROFF:
 7        Q    What -- just speaking generally, what is this
 8    e-mail chain referring to?
 9             MS. LENS:  Objection to form.  Objection to the
10    extent it lacks foundation or calls for speculation.
11    BY MR. TOBEROFF:
12        Q    Strike that question.  You'll see in the middle
13    of the page on the first page it says, "Hi Rich.  Just
14    checking with you to see if the conversation about
15    reopening the mix has happened."
16             Do you see that on the first page?
17        A    Yes.
18        Q    Does that refresh your recollection as to what
19    this is referring to?
20             MS. LENS:  Objection.  Lacks foundation.  You
21    haven't established that there's any recollection to be
22    refreshed.  Same objections as before.  Objection to the
23    extent that it lacks foundation or calls for
24    speculation.
25             THE WITNESS:  This -- I mean, this sequence of
```

Page 94

Joseph Kosinski
September 26, 2023

```
 1    e-mails is about the near field mix which is a different
 2    fix that's done for home video.  So the mix that you do
 3    for a theater is different than the mix that you do for
 4    your home.  So this is all referring to the home video
 5    version of the movie which would come out, you know, six
 6    months after the movie came out.  So looking at it you
 7    can see they had made some mistakes in converting the
 8    film to home video that I had caught in one of the
 9    run-throughs.  So that's what it looks like most of
10    these are about trying to fix the IMAX sections of the
11    film so that they opened and closed at the appropriate
12    places.  And then it gets into -- there was a sound
13    effect missing at the end of one of the shots that I
14    considered fixing in the home video version when
15    Rooster's plane crashes into the ground.  You don't hear
16    it.  But ultimately I ended up leaving it to match the
17    theatrical version and ended up not fixing it so I think
18    when she says reopening the mix, I think they are
19    talking about adding that extra explosion which I didn't
20    do.  They might have been talking about the Lady Gaga
21    song -- oh, I see.  EC, it means end credit.  At the end
22    they are what about the Gaga song, which I said ended up
23    fixing it in April, 2022.
24    BY MR. TOBEROFF:
25         Q    It refers to that as well?
```

Page 95

Joseph Kosinski
September 26, 2023

```
1       A    Yeah, EC means end credit.
2       Q    So is the home video -- how does the home video
3   differ, if at all, from the theatrical version of "Top
4   Gun: Maverick"?
5            MS. LENS:  Objection to form.
6            THE WITNESS:  Well, there's a different mix for
7   it because it's made for a different scale room so I
8   can't put the theatric mix to home video, it won't sound
9   exactly the same so you do what's called an NF mix, a
10  near field mix, which means it's meant to be watched in
11  surround sound in a home theater in your living room.
12  That's a slightly different version of the mix.  Then
13  you do a different version of the picture.  For watching
14  on television or off a Blu-ray versus a film -- you
15  know, film projector in a movie theater, it's a
16  different color space.
17           Also, there's two different types of home video
18  now.  There's high definition or high dynamic range
19  which is much brighter colors so you have to do a high
20  dynamic range version and a standard dynamic version and
21  then you have to do a version for television that
22  doesn't have any cursing in it.  Sometimes you have to
23  do different aspect ratios for airlines.  So a lot of my
24  work after the theatrical version is just converting the
25  theater version to a home video version.  So that's what
```

Page 96

Joseph Kosinski
September 26, 2023

```
 1    this is referring to, at least the mix part of it.
 2        Q    You also mentioned the IMAX version.  How does
 3    the IMAX version differ from other theatrical versions?
 4        A    The IMAX version, the aspect ratio gets taller.
 5    There's more picture revealed in, like, seven parts of
 6    the film, the action sequences, so if you watch it in
 7    IMAX you're getting more picture for those action
 8    sequences than you get in a normal theater that stays in
 9    the standard aspect ratio.
10    BY MR. TOBEROFF:
11        Q    Anything else?
12        A    There is an IMAX sound mix as well because IMAX
13    speakers are different than normal theater speakers so
14    there's also an IMAX mix done once the standard mixing
15    for the film is done.
16        Q    So do they have to remix it for IMAX?
17        A    Yeah, they make -- it's not the same seven-week
18    process.  It's usually done in a day or two and it's
19    just managing the subwoofer base because there's no
20    subwoofer in IMAX.  All the speakers are full-range
21    speakers.  You're tuning it for a slightly different
22    system.  It's tweaks.  It's not like you're redoing the
23    whole mix again.
24        Q    And when were these changes or conversions done
25    for home video, IMAX, and the other version you
```

Page 97

Joseph Kosinski
September 26, 2023

```
 1    mentioned?

 2           MS. LENS:  Objection to form.

 3           THE WITNESS:  Usually the audio versions are

 4    done right in the last week or the week after the normal

 5    mix.  They usually do the IMAX and the near field mix

 6    very close because that sound team is all going to jump

 7    on to another movie so they clean that up.  So I'm

 8    assuming that was all cleaned up in -- at least the near

 9    field mix and IMAX mix were done in summer, 2020.  And

10    then probably tweaked and updated in April, 2022, when

11    the Gaga song was added.  The home video picture I

12    did -- I think it was maybe a year later because there's

13    no rush on that because that's coming six months after

14    the movie comes out.  So you have a little more time and

15    since I was shooting another movie in Australia, I think

16    I might have done that when I got back from Australia.

17    BY MR. TOBEROFF:

18        Q    When was that approximately?

19        A    I think I did that in probably spring 2021.

20        Q    And what version is used when -- for "Top Gun:

21    Maverick" for screening?

22           MS. LENS:  Objection to form.

23           THE WITNESS:  Usually the home video version.

24    BY MR. TOBEROFF:

25        Q    I'd like to talk a little bit about the visual
```

Page 98

Joseph Kosinski
September 26, 2023

```
 1              MS. LENS:  Objection.  Argumentative.  It's
 2     been asked and answered.
 3              You can answer again.
 4              THE WITNESS:  I don't think that's correct.  We
 5     started visual effects very early in the process.  As
 6     soon as you have a shot that you know that's going to
 7     end up in the movie, you can start working on that
 8     before the edit is locked as long as you have an
 9     approximation of that -- of what section you're going to
10     use.
11     BY MR. TOBEROFF:
12        Q    After the picture is locked, you can add those
13     frames to the film that they worked on previously?
14        A    Yes.  You can replace -- you can replace shots
15     in the film all the way up to the final output from
16     the -- you know, when the coloring of the film is done.
17     That's the final step.
18        Q    When do you -- what's your best recollection as
19     to when the visual effects for the film were completed?
20        A    I would -- my estimate would be August, at some
21     point shortly after the mix was complete we probably
22     replaced a couple of visual effects shots which you can
23     do after the final mix.
24        Q    So August, 2020?
25        A    That's an estimate.  Total estimate.  I have no
```

Page 101

Joseph Kosinski
September 26, 2023

```
 1    idea what the actual date was.
 2        Q    And what about special effects?
 3        A    Well, special effects are filmed in camera when
 4    you shoot the film.  So the special effects would be
 5    done when the principal photography is finished.
 6        Q    Which we discussed earlier?
 7        A    Yeah.
 8             (Exhibit 25 was marked for identification by
 9    the court reporter and is attached hereto.)
10    BY MR. TOBEROFF:
11        Q    So I've marked as Exhibit 25 a multi-page
12    document entitled "'Island Plaza' post schedule 5."
13             Do you see in the upper right-hand corner it's
14    dated May 7th, 2020?
15        A    Yes.
16        Q    Do you see in the upper right-hand corner it
17    says 40-post weeks?
18        A    Yes.
19        Q    And also I'd like to draw your attention to the
20    bottom right-hand corner where it says answer print
21    July 31, 2020.
22        A    Yes.
23        Q    Does that mean pursuant to this schedule as
24    part of this schedule the answer print is scheduled to
25    be completed by July 31st, 2020?
```

Page 102

Joseph Kosinski
September 26, 2023

```
 1              MS. LENS:  Objection to form.
 2              THE WITNESS:  Yes.  I assume that's what that
 3     means.
 4     BY MR. TOBEROFF:
 5          Q    And do you recall the prior exhibit we looked
 6     at where I drew your attention to the fact that it says
 7     43 weeks instead of 40 weeks for the schedule?
 8          A    Yes.  Yes.
 9          Q    Based on that, do you believe that the schedule
10     was extended by at least another three weeks after this
11     calendared schedule?
12          A    Yes.
13          Q     In the lower right-hand corner of these
14     documents they have a designation that begins with TGM.
15     We call those Bates numbers.  If you can turn -- it's
16     about half -- more than halfway through this multi-page
17     schedule.  If you can turn to the Bates number ending in
18     10088.
19          A    Okay.
20          Q    Do you see on February 7th it says "VFX
21     turnover 125 shots."
22          A    Yes.
23          Q    That means it was scheduled that there would be
24     125 visual effects shots on February 7, 2020?
25          A     It means that I would have to pick 125 shots
```

Page 103

Joseph Kosinski
September 26, 2023

```
1      from the rough cut of the film to hand over to VFX to
2      start finishing at that point.  Because you need to turn
3      them -- you're doing 2,500, you have to turn them over
4      in chunks starting way before picture lock in order to
5      finish in time.  So that was just a note for me and the
6      editor to know that we have to turn over 125 unfinished
7      issued, you know, shots at that point.
8          Q    Who were those shots turned over to?
9          A    To the visual effects companies.  I mean, the
10     VFX producer and supervisor.  You know, I would go
11     through them with them, describe what needed to be done
12     and then they would start working on them.
13         Q    And if you turn to the next page, you see on
14     March 15 it says "COVID week No. 1."
15         A    Yes.
16         Q    And then March 16, "editorial working from
17     home"?
18         A    Yes.
19         Q    Is that what you were referring to previously
20     at a certain point in March, everybody had to adjust the
21     way they were working.
22         A    Yes.
23         Q    Including you working from home?
24              MS. LENS:  Objection to form.
25              THE WITNESS:  Sorry.
```

Page 104

Joseph Kosinski
September 26, 2023

```
 1    BY MR. TOBEROFF:
 2         Q    And the editor was working in London from home
 3    as described previously?
 4         A    I don't recall if that was the date that Eddie
 5    started working from London because he was prepping
 6    "Mission Impossible 7" with Tom as well.  So as I recall
 7    he might have gone back to London a few weeks before
 8    that.  But I can't remember the exact date.
 9         Q    But this was approximately when you started
10    working from home?
11         A    Yeah.  Me and everyone else involved with the
12    film that was doing post, that was when we had to
13    start -- we weren't allowed to go to the office anymore.
14         Q    And what is meant by COVID week No. 1, COVID
15    week No. 4, COVID week No. 5?
16              MS. LENS:  Objection to the extent it lacks
17    foundation or calls for speculation.
18    BY MR. TOBEROFF:
19         Q    What do you understand that to mean?
20         A    I would assume that's how many -- that's when
21    we started working -- everyone started working remote.
22         Q    And starting with -- during these COVID weeks
23    were there special protocols issued by the studio as
24    to -- sort of health protocols that they wanted the crew
25    to follow with respect to the production of the film?
```

Page 105

Joseph Kosinski
September 26, 2023

```
 1              MS. LENS:  Objection to form.  Assumes facts
 2     not in evidence.
 3              You can answer.
 4              THE WITNESS:  I mean, all I recall we were told
 5     we couldn't work together in the office so that we would
 6     all be working remote like everyone was from that day
 7     forward.
 8     BY MR. TOBEROFF:
 9        Q    So that's what COVID week means?
10              MS. LENS:  Objection to form.  Object to the
11     extent it calls for speculation or lacks foundation.
12              THE WITNESS:  That appears what it means to me.
13     BY MR. TOBEROFF:
14        Q    So if you look at page Bates-numbered 10091
15     where it says COVID week No. 9.
16        A    Yes.
17        Q    It says "scoring/mix score (to TBD)."  What is
18     your understanding of what that means?
19              MS. LENS:  Same objections.
20              THE WITNESS:  I'm assuming it means that the
21     recording of the score would be happening.  The
22     premixing of the score would start and TBD means to be
23     determined, whoever was putting it in this schedule was
24     obviously aware it was kind of a time where, you know,
25     we didn't know how long things were going to take or how
```

                                              Page 106

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

**FER-76**

Joseph Kosinski
September 26, 2023

1    kind of like a final point where you couldn't make any

2    more changes.  I just feel like now, with digital,

3    things are a little more fluid so it's hard to look at

4    these as definitive points in time since we know we

5    reopen the movie and tweaked it in April, 2020, again.

6         Q    Right.  But wasn't -- based on what we looked

7    at previously, where it says answer print in

8    July 31st, 2020, and then that was a 40-week schedule

9    may have been extended, it seemed to have been extended

10   for three weeks, do you believe the answer print was

11   delivered sometime toward the end of August?  Do you

12   recall that it was delivered sometime at the end of

13   August, 2020?

14            MS. LENS:  Objection to form.  It's been asked

15   and answered.

16            THE WITNESS:  I don't recall the exact date.

17   BY MR. TOBEROFF:

18        Q    But you recall that it was in the summer of

19   2020?

20            MS. LENS:  Objection to the extent it calls for

21   speculation or lacks foundation.

22            You can answer.

23            THE WITNESS:  That's my best estimate -- I

24   guess that would be an estimate.

25              (Exhibit 26 was marked for identification by

                                        Page 111

Joseph Krasinski
September 26, 2023

```
 1    took longer than we anticipated because of the COVID

 2    slowdowns from just the way we were working, but I don't

 3    recall the number of weeks or when the date -- when we

 4    actually finished.

 5    BY MR. TOBEROFF:

 6        Q    Do you have any reason to believe this e-mail

 7    was incorrect, that there was a 43-week post production

 8    calendar which was then revised to a 47-post production

 9    schedule?

10            MS. LENS:  Objection.  Calls for speculation.

11    Lacks foundation.

12            THE WITNESS:  I don't understand the question.

13    BY MR. TOBEROFF:

14        Q    Do you have any reason to believe this is

15    inaccurate?

16            MS. LENS:  Same objection.  It calls for

17    speculation.

18            THE WITNESS:  I don't have a reason to believe

19    this is inaccurate.

20    BY MR. TOBEROFF:

21        Q    Thank you.

22             (Exhibit 27 was marked for identification by

23    the court reporter and is attached hereto.)

24            MS. LENS:  I'm going to -- again, for the

25    record, a lot of these exhibits don't look like they are
```

Page 113

Joseph Kosinski
September 26, 2023

```
 1    complete e-mails so I'll just object for the record to
 2    the extent you're using incomplete documents during this
 3    deposition.
 4            MR. TOBEROFF:  I believe this is how it was
 5    produced.  To the extent it was shortened, it was to be
 6    less cumbersome and confusing.
 7            MS. LENS:  Sounds like my objection may have
 8    merit.
 9    BY MR. TOBEROFF:
10       Q    This is an e-mail chain, most recent e-mail on
11    the top is from Paramount dated July 25th, 2020.  Do
12    you see down in the middle of the page there's an e-mail
13    from Paramount dated July 24th, 2020?
14       A    Yes.
15       Q    It says, "How much of an extension do we want
16    to formally request.  Our previous request asked for an
17    extra four months beyond June 7th."
18            Do you see that?
19       A    Yes.
20       Q    Does this refresh your recollection in any
21    respect as to the post-production schedule being
22    extended to -- strike that.  Strike that.  You can put
23    away this exhibit.
24            MS. LENS:  Just for the record, so that I don't
25    waive it.  I note this e-mail, as well as the last
```

Page 114

Joseph Krasik
September 26, 2023

```
 1              I, the undersigned, a Certified Shorthand
 2    Reporter of the State of California, do hereby certify:
 3              That the foregoing proceedings were taken
 4    before me at the time and place herein set forth; that any
 5    witnesses in the foregoing proceedings, prior to
 6    testifying, were administered an oath; that a record of
 7    the proceedings was made by me using machine shorthand
 8    which was thereafter transcribed under my direction; that
 9    the foregoing transcript is a true record of the testimony
10    given; that if the foregoing proceedings were reported
11    stenographically remote from the witness and parties, the
12    transcript of the proceedings reflects the record that I
13    could hear and understand to the best of my ability.
14              Further, that if the foregoing pertains to
15    the original transcript of a deposition in a Federal
16    Case, before completion of the proceedings, review of
17    the transcript [X] was [  ] was not requested.
18              I further certify I am neither financially
19    interested in the action nor a relative or employee of any
20    attorney or any party to this action.
21              IN WITNESS WHEREOF, I have this date
22    subscribed my name.
23    Dated: October 3, 2023
24
25                    RENEE DiMENNO ZEPEZAUER
                      CSR #6275, RPR, CRR
```

Page 118



5.7.20             ISLAND PLAZA POST SCHEDULE           40 POST WEEKS

## June 2019

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| *26* | *27* MEMORIAL DAY HOLIDAY | 28 | 29 | 30 | 31 | *1* PREP POST WEEK 1 |
| | | PREP POST | | | | |
| *2* | 3 | 4 | 5 | 6 | 7 | *8* PREP POST WEEK 2 |
| | | PREP POST | | | | |
| *9* SHOOT WEEK 31 | 10 | 11 | 12 | 13 | 14 | *15* |
| | | PRINCIPAL PHOTOGRAPHY | | | | |
| *16* SHOOT WEEK 33 | 17 | 18 | 19 WRAP PRINCIPAL PHOTOGRAPHY | 20 | 21 | *22* |
| | | PRINCIPAL PHOTOGRAPHY | | PREP POST | | |
| *23* | 24 BEGIN DIRECTOR'S CUT | 25 | 26 | 27 | 28 VFX TURNOVER - 100 SHOTS (150 CUME) | *29* POST WEEK 1 |
| *30* | 1 | 2 | 3 | *4* 4TH OF JULY HOLIDAY | 5 | *6* POST WEEK 2 |

ANSWER PRINT: 7.31.20

Confidential

TGM0010080

**FER-82**

5.7.20                              ISLAND PLAZA POST SCHEDULE                    40 POST WEEKS

## July 2019

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| *30* | 1 | 2 | 3 | *4* <br> 4TH OF JULY HOLIDAY | 5 | *6* <br> POST WEEK 2 |
| *7* | 8 | 9 | 10 | 11 | 12 | *13* <br> POST WEEK 3 |
| *14* | 15 | 16 | 17 | 18 | 19 | *20* <br> POST WEEK 4 |
| *21* | 22 | 23 | 24 | 25 | 26 | *27* <br> POST WEEK 5 |
| *28* | 29 | 30 | 31 | 1 | 2 | *3* <br> POST WEEK 6 |

3 PREVIEW                                    ANSWER PRINT: 7.31.20

5.7.20             ISLAND PLAZA POST SCHEDULE           40 POST WEEKS

## August 2019

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| 28 | 29 | 30 | 31 | 1 | 2 | 3 <br> POST WEEK 6 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 <br> POST WEEK 7 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 <br> POST WEEK 8 |
| 18 | 19 <br> VFX TURNOVER - 39 SHOTS (95 CUME) | 20 | 21 | 22 | 23 | 24 <br> POST WEEK 9 |
| 25 | 26 <br> VFX TURNOVER - 75 SHOTS (170 CUME) * ALL OF DARK STAR | 27 | 28 | 29 | 30 | 31 <br> POST WEEK 10 |

3 PREVIEW            ANSWER PRINT: 7.31.20

Confidential

TGM0010082

5.7.20        ISLAND PLAZA POST SCHEDULE        40 POST WEEKS

Case 2:22-cv-03846-PA-GJS   Document 62-35   Filed 11/06/23   Page 5 of 16   Page ID #:2818

## September 2019

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| 1 | 2 LABOR DAY HOLIDAY | 3 | 4 LAST DAY OF DIRECTOR'S CUT | 5 | 6 STUDIO SCREENING | 7 POST WEEK 11 |
| 8 | 9 | 10 | 11 | 12 | 13 VFX TURNOVER - 100 SHOTS (270 CUME) *MUST INCLUDE COCKPIT, URANIUM ENRICH ENVIRON AND FX | 14 POST WEEK 12 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 POST WEEK 13 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 POST WEEK 14 |
| 29 | 30 | 1 | 2 | 3 | 4 VFX TURNOVER - 200 SHOTS (450 CUME) | 5 POST WEEK 15 |

3 PREVIEW        ANSWER PRINT: 7.31.20

**Confidential**

TGM0010083

**FER-85**

5.7.20  ISLAND PLAZA POST SCHEDULE  40 POST WEEKS

## October 2019

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 29 | 30 | 1 | 2 | 3 | 4 — VFX TURNOVER - 200 SHOTS (450 CUME) | 5 — POST WEEK 15 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 — POST WEEK 16 |
| 13 — FRIENDS AND FAMILY SCREENING - LONDON | 14 | 15 | 16 | 17 | 18 | 19 — POST WEEK 17 |
| | | | MCQ AND TC SCOUTING (Wed–Fri) | | | |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 — POST WEEK 18 |
| | | TEMP MIX (Mon–Fri) | | | | |
| 27 | 28 — CREATE DCP FOR TEST SCREENING | 29 — PREVIEW #1 - PARAMUS, NJ | 30 — TC DEBRIEF 9AM PST / 12PM EST / 5PM GMT | 31 | 1 — POST WEEK 19 | 2 |

3 PREVIEW  ANSWER PRINT: 7.31.20

Confidential

TGM0010084

**FER-86**

Case 2:22-cv-03846-PA-GJS   Document 62-35   Filed 11/06/23   Page 7 of 16   Page ID #:2820

5.7.20  ISLAND PLAZA POST SCHEDULE  40 POST WEEKS

## November 2019

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 27 | 28 CREATE DCP FOR TEST SCREENING | 29 PREVIEW #1 - PARAMUS, NJ | 30 TC DEBRIEF 9AM PST / 12PM EST / 5PM GMT | 31 | 1 | 2 POST WEEK 19 |
| 3 | 4 | 5 | 6 | 7 | 8 VFX TURNOVER - METHOD - 125 SHOTS (575 CUME) | 9 POST WEEK 20 |
| 10 | 11 | 12 | 13 | 14 | 15 VFX TURNOVER - METHOD - 125 SHOTS (700 CUME) POSTVIS WRAPS | 16 POST WEEK 21 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 POST WEEK 22 |
| | | SHOOT ADDITIONAL PHOTOGRAPHY - INSERTS - UK SHOOT | | | | |
| 24 | 25 | 26 | 27 | 28 THANKSGIVING DAY HOLIDAY | 29 THANKSGIVING DAY HOLIDAY | 30 POST WEEK 23 |
| | TEMP MIX AT SKYWALKER | | | | | |
| SHOOT | ADD'L PHOTO - | | | | | TEMP MIX AT |

3 PREVIEW  ANSWER PRINT: 7.31.20

Confidential

TGM0010085

**FER-87**

5.7.20

## ISLAND PLAZA POST SCHEDULE

40 POST WEEKS

### December 2019

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| *1* | 2 | 3 | 4<br>FRIENDS AND FAMILY - UK | 5 | 6<br>VFX TURNOVER - METHOD - 100 SHOTS (800 CUME)<br>VFX TURNOVER - MPC - 100 SHOTS (900 CUME) | *7*<br>POST WEEK 24 |
| | | | TEMP MIX AT FOX | | TEMP MIX AT FOX | |
| *8* | 9 | 10<br>CREATE DCP FOR TEST SCREENING TRAVEL TO NJ FOR PREVIEW | 11<br>PREVIEW #2 - PARAMUS, NJ | 12 | 13<br>VFX TURNOVER - 200 SHOTS (1,100 CUME) | *14*<br>POST WEEK 25 |
| | | TEMP MIX AT FOX | | | | |
| *15* | 16 | 17 | 18 | 19 | 20 | *21*<br>POST WEEK 26 |
| *22* | 23 | 24 | 25 | 26 | 27 | *28*<br>HIATUS |
| | | | HIATUS | | | |
| *29* | 30 | 31 | 1 | 2 | 3<br>HIATUS | *4* |
| | | | HIATUS | | | |

3 PREVIEW

ANSWER PRINT: 7.31.20

Confidential

TGM0010086

**FER-88**

Case 2:22-cv-03846-PA-GJS   Document 62-35   Filed 11/06/23   Page 9 of 16   Page ID #:2822

5.7.20          ISLAND PLAZA POST SCHEDULE          40 POST WEEKS

## January 2020

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 29 | 30 | 31 | 1 | 2 | 3 | 4 HIATUS |
| | | | HIATUS | | | |
| 5 LOLA SPOTTING SESSION | 6 | 7 | 8 | 9 | 10 VFX TURNOVER - 250 SHOTS (1,350 CUME) | 11 POST WEEK 27 |
| 12 | 13 | 14 | 15 | 16 | 17 LOLA TURNOVER | 18 POST WEEK 28 |
| 19 | 20 MLK HOLIDAY | 21 | 22 | 23 | 24 | 25 POST WEEK 29 |
| | | | TEMP MIX | | | |
| 26 | 27 | 28 | 29 | 30 | 31 | 1 POST WEEK 30 |
| | | | TEMP MIX #3 | | | |

3 PREVIEW          ANSWER PRINT: 7.31.20

Confidential          TGM0010087

5.7.20                      **ISLAND PLAZA POST SCHEDULE**               40 POST WEEKS

Case 2:22-cv-03846-PA-GJS    Document 62-35    Filed 11/06/23    Page 10 of 16    Page ID #:2823

## February 2020

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 26 | 27 | 28 | 29 | 30 | 31 | 1 — POST WEEK 30 |
| | | | TEMP MIX #3 | | | |
| 2 | 3 | 4 — INSERT SHOOT | 5 | 6 | 7 — VFX TURNOVER - 125 SHOTS (1,650 CUME) | 8 — POST WEEK 31 |
| | | | TEMP MIX #3 (FIXES) | | | |
| 9 | 10 — CREATE DCP FOR PREVIEW | 11 — PREVIEW #3 - ORLANDO, FL | 12 | 13 | 14 | 15 — POST WEEK 32 |
| TEMP MIX #3 | | | | | | |
| 16 — CAST CLAIM WEEK #1 | 17 — PRESIDENT'S DAY HOLIDAY | 18 | 19 | 20 — PPC MARKETING SCREENING | 21 | 22 |
| | | | PRE DUBS - FX - (SKYWALKER) | | | |
| 23 — CAST CLAIM WEEK #2 | 24 | 25 | 26 | 27 | 28 | 29 |
| | | | | | PRE DUBS - DIA - (SKYWALER) | |
| | PRE DUBS - FX - (SKYWALKER) | | | | | |

3 PREVIEW                 ANSWER PRINT: 7.31.20

Confidential

TGM0010088

**FER-90**

5.7.20            ISLAND PLAZA POST SCHEDULE          40 POST WEEKS

## March 2020

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| **1** CAST CLAIM WEEK #3 | **2** | **3** | **4** | **5** | **6** | **7** |
| **8** | **9** | **10** | **11** | **12** | **13** | **14** POST WEEK 33 |
| **15** COVID WEEK #1 | **16** EDITORIAL WORKING FROM HOME | **17** | **18** | **19** | **20** | **21** |
| **22** COVID WEEK #2 | **23** | **24** | **25** | **26** | **27** LOCK PICTURE | **28** |
| **29** COVID WEEK #3 | **30** | **31** | **1** | **2** | **3** | **4** |

Week of 1–6: PRE DUBS - 2 STAGES (SKYWALKER)

Week of 8–13: PRE DUBS - 2 STAGES (SKYWALKER)

Week of 15–20: MUSIC SCORE DEMOS / PREP MIX TRACKS - SKYWALKER

Week of 22–27: MUSIC SCORE DEMOS / PREP MIX TRACKS - SKYWALKER

Week of 29–3: MUSIC SCORE DEMOS / PREP MIX TRACKS - (UK SOUND CREW)

3 PREVIEW          ANSWER PRINT: 7.31.20

Confidential

TGM0010089

**FER-91**

5.7.20        ISLAND PLAZA POST SCHEDULE        40 POST WEEKS

## April 2020

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| **29** COVID WEEK #3 | 30 | 31 | 1 | 2 | 3 | **4** |
| **5** COVID WEEK #4 | 6 | 7 | 8 | 9 | **10** GOOD FRIDAY HOLIDAY | **11** |
| **12** EASTER SUNDAY COVID WEEK #5 | **13** UK BANK HOLIDAY | 14 | 15 | 16 | 17 | **18** |
| **19** COVID WEEK #6 | 20 | 21 | 22 | 23 | 24 | **25** |
| **26** COVID WEEK #7 | 27 | 28 | 29 | 30 | 1 | **2** |

Week of 29–3:
- MUSIC SCORE DEMOS (Mon 30 – Fri 3)
- PREP MIX TRACKS - (UK SOUND CREW) (Mon 30 – Fri 3)

Week of 5–10:
- MUSIC SCORE PREP / RECORD (Mon 6 – Thu 9)
- PREP MIX TRACKS - (UK SOUND CREW) (Mon 6 – Fri 10)

Week of 12–17:
- SCORING / MIX SCORE (Mon 13 – Fri 17)
- PREP MIX TRACKS - (UK SOUND CREW) (Tue 14 – Fri 17)

Week of 19–24:
- SCORING / MIX SCORE (Mon 20 – Fri 24)
- PREP MIX TRACKS - (UK SOUND CREW) (Mon 20 – Wed 22)
- SOUND CONFORM (UK SOUND CREW) (Thu 23 – Fri 24)

Week of 26–1:
- VFX REVIEWS (Mon 27 – Fri 1)
- SCORING / MIX SCORE (Mon 27 – Fri 1)

3 PREVIEW        ANSWER PRINT: 7.31.20

5.7.20            ISLAND PLAZA POST SCHEDULE          40 POST WEEKS

Case 2:22-cv-03846-PA-GJS   Document 62-35   Filed 11/06/23   Page 13 of 16   Page ID #:2826

## May 2020

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| **26** COVID WEEK #7 | 27 | 28 | 29 | 30 | 1 | **2** |
| | | VFX REVIEWS | | | | |
| | | SCORING / MIX SCORE | | | | |
| **3** COVID WEEK #8 | 4 | 5 | 6 | 7 | **8** UK BANK HOLIDAY | **9** |
| | | VFX REVIEWS | | | | |
| | | SCORING / MIX SCORE | | | | |
| **10** COVID WEEK #9 | 11 | 12 | 13 | 14 | 15 | **16** |
| | | VFX REVIEWS | | | | |
| | | SCORING / MIX SCORE (TBD) | | | | |
| **17** COVID WEEK #10 | 18 | 19 | 20 | 21 | 22 | **23** |
| | | VFX REVIEWS | | | | |
| | | SCORING / MIX SCORE (TBD) | | | | |
| **24** HIATUS WEEK #1 | **25** MEMORIAL DAY HOLIDAY | 26 | 27 | 28 | 29 | **30** |
| | | | VFX REVIEWS CONTINUE (TBD) | | | |
| | | POST HIATUS - WEEK #1 | | | | |
| **31** HIATUS WEEK #2 | 1 | 2 | 3 | 4 | 5 | **6** |
| | | VFX REVIEWS CONTINUE (TBD) | | | | |
| | | POST HIATUS - WEEK #2 | | | | |

3 PREVIEW         ANSWER PRINT: 7.31.20

5.7.20　　　　　　　　　　ISLAND PLAZA POST SCHEDULE　　　　　40 POST WEEKS

Case 2:22-cv-03846-PA-GJS   Document 62-35   Filed 11/06/23   Page 14 of 16   Page ID #:2827

## June 2020

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 31 HIATUS WEEK #2 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 HIATUS WEEK #3 | 8 START DI CONFORM | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 START DI COLOR CORRECTION | 16 | 17 | 18 | 19 | 20 POST WEEK 34 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 POST WEEK 35 |
| 28 | 29 | 30 | 1 | 2 | 3 JULY 4TH HOLIDAY | 4 POST WEEK 36 |

Week of May 31 – June 5:
- VFX REVIEWS CONTINUE (TBD)
- POST HIATUS - WEEK #2

Week of June 7 – 12:
- VFX REVIEWS CONTINUE (TBD)
- SOUND CONFORM / PREP MIX TRACKS (TBD) - UK SOUND CREW
- POST HIATUS - WEEK #3

Week of June 14 – 19:
- DI COLOR CORRECTION
- FINAL MIX (UK)

Week of June 21 – 26:
- DI COLOR CORRECTION
- FINAL MIX (UK)

Week of June 28 – July 4:
- DI COLOR CORRECTION
- FINAL MIX (UK)

3 PREVIEW　　　　　　　　　　ANSWER PRINT: 7.31.20

Confidential

TGM0010092

FER-94

5.7.20        ISLAND PLAZA POST SCHEDULE        40 POST WEEKS

## July 2020

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 28 | 29 | 30 | 1 | 2 | 3 JULY 4TH HOLIDAY | 4 POST WEEK 36 |
| 5 | 6 | 7 | 8 | 9 | 10 MPA SCREENING DATE | 11 POST WEEK 37 |
| 12 | 13 | 14 | 15 | 16 | 17 RENDER DI FILES | 18 POST WEEK 38 **FINAL VFX DELIVERY** |
| 19 | 20 | 21 | 22 | 23 **FINAL MIX PLAYBACK** | 24 FINAL MIX APPROVED | 25 POST WEEK 39 |
| 26 | 27 | 28 | 29 | 30 | 31 **ANSWER PRINT** | 1 POST WEEK 40 |

Week of 28–4:
- DI COLOR CORRECTION (Mon–Fri)
- FINAL MIX (UK) (Mon–Fri)

Week of 5–11:
- DI COLOR CORRECTION (Mon–Fri)
- FINAL MIX (UK) (Mon–Fri)

Week of 12–18:
- DI COLOR CORRECTION (Mon–Fri)
- FINAL MIX (UK) (Mon–Fri)

Week of 19–25:
- PLAYBACK / FIXES (Mon–Fri)

Week of 26–1:
- M & E (Wed–Fri)
- PRINTMASTER (Mon–Wed)

3 PREVIEW        ANSWER PRINT: 7.31.20

Confidential

TGM0010093

**FER-95**

5.7.20          **ISLAND PLAZA POST SCHEDULE**          40 POST WEEKS

Case 2:22-cv-03846-PA-GJS   Document 62-35   Filed 11/06/23   Page 16 of 16   Page ID #:2829

## August 2020

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 26 | 27 | 28 | 29 | 30 | 31 — ANSWER PRINT | 1 — POST WEEK 40 |
| 2 | 3 | 4 | 5 | 6 | 7 — LAST DAY OF EDITORIAL | 8 — WRAP WEEK |
| 9 | 10 | 11 | 12 | 13 | 14 — APPROVE VIDEO MASTERS | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | 1 | 2 | 3 | 4 | 5 |

Bars:
- M & E (Wed 29 – Fri 31)
- PRINTMASTER (Mon 27 – Wed 5)
- IMAX MIX (Mon 3 – Wed 5)
- NEARFIELD MIX (Wed 5 – Fri 7)
- CREATE AND APPROVE VIDEO ELEMENTS (Mon 3 – Fri 7)
- CREATE AND APPROVE VIDEO ELEMENTS (Mon 10 – Fri 14)

3 PREVIEW          ANSWER PRINT: 7.31.20

Confidential

TGM0010094

**FER-96**